**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

TRIPLE S FARMS, LLC,

                    Plaintiff,

    v.

DELAVAL INC., WEST AGRO, INC.,
DELAVAL INTERNATIONAL AB,
DELAVAL HOLDING BV, DELAVAL
HOLDING AB, and TETRA LAVAL
INTERNATIONAL SA,

                    Defendants.

Case No. ___22-cv-309___

## CLASS ACTION COMPLAINT

Plaintiff Triple S Farms, LLC ("Plaintiff") brings this action individually and on behalf of all others similarly situated against DeLaval Inc., West Agro, Inc., DeLaval International AB, DeLaval Holding BV, DeLaval Holding AB, and Tetra Laval International SA ("Defendants" or "DeLaval") and states as follows:

## NATURE OF THE ACTION

1.    This lawsuit is the second chapter of litigation against DeLaval regarding its robotic or voluntary milking systems ("VMS"), as this lawsuit follows the first chapter on the DeLaval VMS$^{TM}$ Classic (the "Classic"), *Bishop, et al. v. DeLaval Inc., et al.*, Case No. 5:19-cv-06129-SRB. *Bishop* litigated the defectiveness of the first version of the robot—the Classic—which DeLaval released in the United States in 2007. This lawsuit relates to the DeLaval VMS$^{TM}$ V300 (the "V300"), which DeLaval released in the United States in 2018 claiming it was a substantial upgrade to the Classic. Much of the discovery conducted in *Bishop* is directly relevant to the claims asserted below and will be used to show that nearly all of the defects present in the Classic

remained in the V300 and that the international defendants named herein are subject to jurisdiction in this District and liable for the harm caused by the V300 to U.S. dairy farmers.

2.    DeLaval designed, manufactured, marketed, sold, distributed, and installed the V300. Like the Classic, the V300 is a robotic milking system purportedly designed to optimize quality milk yield by fully automating the milking process, so dairy producers can remove the manual or human tasks of milking typically required by a conventional milking system ("CMS").

3.    DeLaval uniformly and deceptively, falsely, and misleadingly marketed and represented that the V300 would, among other things, perform three essential functions: (1) wash with a sanitizing solution, fore-strip and dry each lactating teat before milking; (2) completely milk each lactating quarter in a manner that prevents contamination of milk and milking equipment; and (3) post-spray teat disinfectant on each teat after milking.  At the same time, DeLaval knowingly concealed from Plaintiff and the proposed Class that the V300 was defective and incapable of successfully performing these functions, including according to industry standards.

4.    In reliance on DeLaval's misrepresentations and concealment, Plaintiff and many other dairy farmers purchased V300 at costs exceeding hundreds of thousands of dollars and expended additional costs to design, modify, retrofit, or build new barns to install the V300, which caused economic harm to Plaintiff and physical harm to its property.

5.    After inducing Plaintiff and other dairy farmers to purchase the V300 based on these misrepresentations and concealments, DeLaval delivered a product that was defectively designed, had defects in material, manufacture, and workmanship, failed to conform to their express and implied warranties, and failed to perform as uniformly marketed and represented. Among other defects, the V300 suffers from the defects identified herein.

6.      Given the defects concealed from Plaintiff and the Class, the V300 cannot meet the industry standards for producing Grade A milk. Consequently, Plaintiff and others dairy farmers suffered harm in the form of impaired cow health, milk quality, and milk production and, more specifically, elevated bacteria levels and mastitis rates, causing elevated somatic cell counts, decreased milk production, and a host of other harms to both cows and milk quality.

7.      Dairy farms like Plaintiff that continue to milk with V300 despite its defectiveness are dependent on DeLaval. As DeLaval provides parts and service for the V300. This dependence is heightened by the fact that dairy cows must be timely milked each day or else they will develop mastitis and other serious health issues or death. Farmers are also dependent on DeLaval because their barns were designed or retrofitted specifically to accommodate the V300. Without additional costs or further economic harm, these barns cannot be used to milk cows by alternative methods. Thus, DeLaval knowingly created a situation where dairy farmers cannot transition to another milking system without additional costs or ongoing harm.

## JURISDICTION AND VENUE

8.      Jurisdiction and venue are proper in this Court.

9.      This Court has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332, because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of class members exceed $5,000,000.00, exclusive of interest, attorneys' fees, and costs; and (3) DeLaval and class members are domiciled in different states.

10.      As alleged herein, this Court has personal jurisdiction over each named defendant.

11.      Venue is proper pursuant in this District under 28 U.S.C. § 1391(b) because a substantial part of the conduct at issue in this case occurred in this District.

## PARTIES

*Plaintiff*

12.     Plaintiff Triple S Farms, LLC ("Plaintiff" or "Triple S") is a dairy farm located and operating at 24376 343rd Avenue, Belgrade, Minnesota 56312 ("Triple S Farm").

13.     At all times hereinafter mentioned, Robert Scherping ("Scherping") is the Chief Executive Officer of Triple S Farm, LLC.

14.     At all times hereinafter mentioned, Paul Stang, Roger Stang, and Charles Stang (the "Stangs") were agents, employees, and/or servants of Triple S.

15.     The terms "Plaintiff" and "Triple S" includes Triple S Farms, LLC, Scherping, and the Stangs.

*Defendants*

16.     DeLaval Inc. is a Delaware corporation with its principal place of business at 11100 N Congress Ave, Kansas City, Missouri 64153, and is, therefore, "at home" in this District with sufficient minimum contacts in Missouri to render the exercise of jurisdiction by this Court proper and necessary; develops, designs, manufactures, advertises, sells, promotes, services, maintains, repairs, distributes, and installs equipment and systems for milk production and animal husbandry markets, including, but not limited to, voluntary milking systems; and is a wholly owned subsidiary of DeLaval Holding BV.

17.     West Agro, Inc. is a Delaware corporation with its principal place of business at 11100 N Congress Ave, Kansas City, Missouri 64153, and is, therefore, "at home" in this District with sufficient minimum contacts in Missouri to render the exercise of jurisdiction by this Court proper and necessary; develops, designs, manufactures, advertises, sells, promotes, services, maintains, repairs, distributes, and installs equipment and systems for milk production and animal

husbandry markets, including, but not limited to, voluntary milking systems; does business under the fictitious name, "DeLaval Manufacturing," registered in Missouri and from the same address as West Agro, Inc.; and is a wholly owned subsidiary of DeLaval Inc.

18.    DeLaval International AB is a company founded under the laws of Sweden with its principal place of business located in Tumba, Sweden; develops, designs, manufactures, advertises, sells, promotes, services, maintains, repairs, distributes, and installs equipment and systems for milk production and animal husbandry markets, including, but not limited to, voluntary milking systems; is registered to do business in the State of Missouri; and is a wholly owned subsidiary of DeLaval Holding BV.

19.    On December 7, 2007, DeLaval International AB filed an Application for Certificate of Authority for a Foreign For-Profit Corporation with the Missouri Secretary of State, stating that the purpose of its business in Missouri is as the "[o]wner of inventory at the Missouri physical location of 11100 North Congress Avenue, Kansas City MO 64153." DeLaval International AB has continuously renewed that application since 2007 and remains registered to do business in Missouri.

20.    DeLaval Holding BV is the parent company for DeLaval Inc. and DeLaval International AB and is a company founded under the laws of Netherlands with its principal place of business located in Overijssel, Netherlands. On information and belief, DeLaval Holding BV is a wholly owned subsidiary of DeLaval Holding AB.

21.    DeLaval Holding AB is the parent company for DeLaval Holding BV and is a company founded under the laws of Sweden with its principal place of business located in Tumba, Sweden. On information and belief, DeLaval Holding AB is a wholly owned subsidiary of Tetra Laval International SA or Tetra Laval Group.

22.    Tetra Laval International SA is known as the Tetra Laval Group; is a company founded under the laws of Switzerland with its principal place of business located in Pully, Switzerland; and is the parent company for DeLaval Holding AB and, ultimately, DeLaval Inc., West Agro, Inc., DeLaval International AB, and DeLaval Holdings BV.

23.    The DeLaval entities, including West Agro, Inc., as part of the Tetra Laval Group, hold themselves out as a single enterprise and a single entity—the DeLaval Group—despite the technical existence of separate corporate structures. First, DeLaval Inc., West Agro, Inc., and DeLaval International AB are mere divisions of DeLaval Holding BV or DeLaval Holding AB— the DeLaval Group—which is a mere division of the Tetra Laval International AB (despite the existence of technically, separate corporate structures). Second, there is a close, synergistic relationship between the Defendants.

24.    The DeLaval Group maintains a single website in which it promotes "DeLaval" without regard to its corporate form. The U.S. Facebook page for DeLaval points to this website: www.delaval.com. The website describes "DeLaval" as "worldwide leaders in milking equipment and solution for dairy farms." Although it claims it is "headquartered in Tumba," it says it has "offices in more than 40 countries and employ over 4,500 staff globally." It does not distinguish employment based on corporate structure. Moreover, it solicits employees for "DeLaval" generally without regard to corporate form. This includes seeking employees for work in Kansas City, Missouri. For example, as of October 29, 2019, DeLaval was soliciting for an accounting manager on its website to work in Kansas City, Missouri whose responsibilities would span "(9) different countries across (11) regions in the Americas region." The website does not distinguish between any corporate entity, and characterizes the various subsidiaries all as "divisions of the Tetra Laval Group."

25.     In the 2018/2019 annual report ("18/19 Annual Report") for the Tetra Laval Group, the ultimate parent of all DeLaval entities, Tetra Laval Group describes DeLaval as one of its "three industry groups" where the "head of each industry group has operational management responsibility for the respective industry group and reports directly to the Tetra Laval Group Board," who is responsible for the overall strategy of the Group and for controlling and supervising all of its business operations." 18/19 Annual Report at 4. See https://tlcomprod2.azureedge.net/static/documents/tetra-laval-2018-2019.pdf (last visited May 9, 2022). That person appears to be Joakim Rosengren, who is listed on DeLaval's website as the President & CEO of "DeLaval" without regard to corporate form. Rosengren is also listed as the President of DeLaval International AB in its most recent registration filing with the Missouri Secretary of State.

26.     On information and belief, the Tetra Laval Group controls the DeLaval Group, in that it provides the cash necessary for the entities within the DeLaval Group, including DeLaval Inc., to operate; requires approval of changes to legal structure; maintains how the board of the DeLaval Group entities is composed; requires approval of any sale or acquisition related to business assets; and directs how excess cash is handled.

27.     There is a commonality of management between and among Defendants. Fernando Cuccioli is a member of the DeLaval Group "Executive Team" on its website and is also the President and Chairman of the board of directors of DeLaval Inc., according to corporate documents. See http://www.delavalcorporate.com/DeLaval-company-about/how-we-are-organised (last visited May 2, 2022).

28.     Although nominally President of DeLaval Inc., a separate corporation, DeLaval publicly describes Cuccioli as "our Regional President for North America."

See https://www.facebook.com/DeLavalUS/photos/a.805354006217677/998893120197097/?type=1 (last visited May 9, 2022).

29.    In its Annual Report, DeLaval lists a single management team without regard for corporate structure. 18/19 Annual Report at 45.

30.    In that same report, DeLaval is described as "a full-service supplier to dairy farmers" and referred to as "the" company, which "develops, manufactures and markets equipment and complete systems for milk production and animal husbandry." 18/19 Annual Report at 5. This includes DeLaval's VMS robot products. Id. at 6; see also id. at 11 (again referring to DeLaval as a single "company").

31.    In that same report, DeLaval reports that twenty-one percent (21%) of its net sales were made in the Americas, without regard to corporate form. Id. at 13. It refers to its "sales organisation" [British English spelling] as an integrated unit with regard to corporate form, describing it as "[t]he team" and "[o]ur entire sales organization" having been restructured. Id. at 43.

32.    DeLaval engages in a unified marketing image and corporate branding, including for its V300 regardless of corporate form. Its corporate insignias, trademarks and logos appear uniform regardless of corporate form, as shown by its website and the Tetra Laval Group annual reports.

33.    DeLaval has an integrated sales and distribution system across the nominally distinct corporate entities. For instance, DeLaval International AB holds the patents on the robots. It purports to have designed and manufactured the classic VMS robots, while DeLaval Inc. marketed, advertised, and sold the robots in the United States from its Kansas City, Missouri principal place of business.

34.     DeLaval entities also used the same, or very similar marketing materials, across corporate entities. For instance, marketing brochures distributed to dairy farmers in the United States, including Plaintiff, contain British English spellings, suggesting strongly that DeLaval Inc.'s parents, as well as DeLaval International AB, prepared those materials for use by DeLaval Inc. in selling the robots.

35.     DeLaval Inc. performs business functions that its parents, as well as DeLaval International AB, would ordinarily need to perform itself to market and sell its products in the United States but for the existence of DeLaval Inc.

36.     On information and belief, DeLaval Inc. is the exclusive agent for marketing and sales of classic VMS robots in the United States, and while DeLaval Inc. may distribute the robots through third-party dealers, all dealers in the United States must go through DeLaval Inc. to get and sell the robots.

37.     One or more VMS purchasers have heard technicians, who have visited their farms to service their VMS robots, refer to the need to consult "Sweden" for technical assistance regarding the robots. This likely refers to persons purportedly or nominally employed by the DeLaval Group and, ultimately, the Tetra Laval Group.

38.     Moreover, employees of DeLaval Inc. and employees of authorized dealers of classic model VMS robots for DeLaval Inc. receive training on how to install, service and repair classic model VMS robots in Sweden from DeLaval International AB, confirming that, despite the technical existence of separate corporate structures, Defendants are and hold themselves out as, a single enterprise.

39. On information and belief, DeLaval International AB, as the owner of the patents on the classic VMS robots, enters into a licensing arrangement with anyone who purchased a classic VMS robot, including purchasers in the State of Missouri.

40. The apparent uniformity of the design, marketing and sale of the classic VMS robots strongly suggests that DeLaval Inc.'s parents, as well as DeLaval International AB, exert substantial control over the Missouri-based DeLaval Inc. in its design, marketing, sale and maintenance of the robots.

41. For these reasons, DeLaval Inc. is a mere division of the DeLaval Group and, ultimately, the Tetra Laval Group. It is a mere instrumentality or adjunct of the former and part of a single, unified enterprise. The leadership of the DeLaval Group and, ultimately, the Tetra Laval Group control and dominate the affairs of DeLaval Inc., including its affairs in Kansas City, Missouri, such that they are the legal "alter egos" of DeLaval Inc., including West Agro, Inc.

42. At all times mentioned, DeLaval offers, and holds itself out as specialists with respect to, milking, milk production, herd management, feeding, milk cooling and storage, cow comfort, barn and working environment design and solutions, milking equipment, and systems for milk production, including voluntary milking systems.

43. At all times, DeLaval held itself out to dairy farmers and the general public as specialists providing integrated solutions designed to improve the production, quality and value of milk produced by dairy farmers, the welfare of cows, and the overall quality of life of dairy farmers, while decreasing the labor costs to operate dairy farms.

## FACTUAL BACKGROUND

44. DeLaval introduced the first automatic milking system in Europe in 1997 and promotes itself as the worldwide leader in milking equipment and solutions for dairy farmers:

10

> DeLaval is the worldwide leader in milking equipment and solutions for dairy farmers, which make sustainable food production possible, ensuring milk quality and animal health. DeLaval solutions are used by millions of dairy farmers around the globe every day. DeLaval was founded more than 130 years ago in Sweden, when the visionary Gustaf de Laval patented the cream separator. Today, DeLaval has 4,500 employees and operates in more than 100 markets. DeLaval, alongside Tetra Pak and Sidel, is part of the Tetra Laval Group.

https://www.delaval.com/en-us/about-us/ (last visited May 2, 2022).

45.    Several years after DeLaval completed and installed the "first voluntary milking system VMS™" (the Classic) at its "own Hamra plant in Sweden," it expanded distribution of the Classic to dairy farmers in the United States, https://www.delaval.com/en-au/about-delaval/AU/campaigns/20-years-of-vms/ (last visited May 2, 2022), and was subsequently sued in a class action lawsuit for harms suffered by purchasers from day 1:

> After inducing dairy farmers to purchase [the Classic], DeLaval delivered a product that was defectively designed, was not free from defects in material and workmanship, failed to conform to the express and implied warranties of DeLaval, and failed to perform as uniformly advertised, marketed and represented . . . .

*Terry Bishop, DVM, et al. v. DeLaval Inc., et al.*, United States District Court for the Western District of Missouri, Case No. 5:19-cv-06129, Doc. 204, ¶ 11 ("*Bishop*" or "*Bishop* Complaint").

46.    The harms suffered by Classic purchasers stemmed from its failure to perform any of its three "Essential Functions" (*i.e.*, to: (1) wash with a sanitizing solution, fore-strip and dry each lactating teat before milking; (2) completely milk each lactating quarter in a manner that prevents contamination of milk and milking equipment; and (3) post-spray teat disinfectant on each teat after milking.

47.    On or about 2011, DeLaval began developing a new milking system ultimately known as the DeLaval VMS™ V300 ("V300") in an attempt to rectify the defects with the Classic. DeLaval touted that the V300 would, like the Classic, fully automate the milking process and perform the Essential Functions of producing Grade A milk.

48. DeLaval publicly introduced the V300 in or about June 2018, including on DeLaval's website, where it represented the V300 as an upgrade to the Classic (the "Press Release"). The Press Release stated that the "new DeLaval VMS™ milking system V300 is available now worldwide" and "ensures that dairy farming is a profitable option not only today but also for generations to come," as well as:

> With up to 99% teat spray hit rate, real quarter milking, up 10% higher capacity from previous model with also lower running cost, up to 99.8% attachment rate, up to 50% faster attachment time, and with a potential of over 3,500kg of milk per day, the DeLaval VMS V300 system proves that the future of milking is already here.

https://corporate.delaval.com/2018/06/delaval-introduces-its-new-robotic-milking-system-the-delaval-vms-milking-system-v300/ (last visited May 2, 2022).

49. With respect to the Essential Functions, DeLaval uniformly marketed and represented that V300 could: (1) individually clean, stimulate and fore-strip "each teat" before milking; (2) have a teat milking cup attachment rate of 99.8% with detachment occurring at the "right time," which is once more than 70% of the milk in a particular mammary gland has been removed according to industry standards; and (3) deliver pre- and post-spray teat disinfectant "to each teat."

50. DeLaval further uniformly represented that the V300 would exceed the performance of the Classic by, *inter alia*, washing with a germicidal solution, fore-stripping and drying each lactating teat before milking, such that each lactating teat is cleaner at the time of milking, producing over 100 pounds of milk per cow per day, lower preliminary incubation counts, and maintain somatic cell counts under 140,000 cells/mL.

51. These representations turned out to be false. Despite the purported advancements that DeLaval claimed the V300 made "from [the] previous model," the V300 was plagued by virtually identical defects, lacking the ability to perform its Essential Functions. Such defects were

not disclosed to the general public, including prospective purchasers and purchasers (including Plaintiff), despite DeLaval's unique, peculiar and superior knowledge of them before any V300 were sold, including, but not limited to, the V300 sold to Plaintiff.

## THE DECEPTIVE, FALSE AND MISLEADING DELAVAL MARKETING SCHEME

52.     DeLaval misrepresented the V300's abilities, benefits, capabilities and past performance and at the same time concealed its unique, peculiar and superior knowledge of the defects and problems with the V300 discussed herein.  The only plausible reason to conceal these defects was that DeLaval intended to defraud dairy farmers in the United States, including, but not limited to, Plaintiff, by inducing them to expend vast sums of money to purchase and install V300.

53.     DeLaval's misrepresentations, including that the V300 would perform the Essential Functions of cow milking, were publicly and broadly disseminated, including on its publicly accessible website, in its brochures; on its YouTube channel, and in the United States Federal Register, which were distributed or otherwise made available to prospective purchasers, including Plaintiff.

*VMS V300 USA BROCHURE*

54.     In a publication titled "VMS V300 USA Brochure" ("V300 Brochure"), DeLaval represented that the "V300 is all about making dairy farming more personal. More accurate. More profitable." A copy of the V300 Brochure is publicly accessible through the DeLaval website at https://store.delaval.com/globalassets/inriverresources/pdfs/v/vms-v300-usa-brochure.pdf     (last visited May 2, 2022).

55.     DeLaval falsely represented that the V300 was "a fully automated milking system that can generate better results for" the dairy farm; that the "V300 uses automation to make [farmers] less reliant on an uncertain future labor market, to keep [farmers] at the forefront of

animal welfare and food safety issues, and to help ensure that dairy farming is a profitable option now, and an appealing lifestyle and care choice for the next generation," which is an attempt to appeal to family-run farms, such the one operated by Plaintiff. DeLaval illustrates such purported benefits in the following chart:



56.    DeLaval also falsely represented that the V300 could perform the three Essential Functions.

57.    First, DeLaval represented that the DeLaval PureFlow[TM] individually cleans, stimulates and fore-strips "each teat" before milking. DeLaval specifically represented that the "exclusive, transparent" teat cleaning cup:

> allows you to see PureFlow in action, individually cleaning and stimulating each teat to improve letdown and productivity.

> Add to this the separation of foremilk, which is removed to a waste container via a separate line . . .

58.     Second, DeLaval represented that the V300 has a teat milking cup attachment rate of 99.8% and, with a dedicated "ICAR approved milk meter for each teat," detaches each teat milking cup "at the right time, in the right way to protect the sensitive and valuable teats." In the dairy industry, it is known that the "right time" to detach a milking cup is after more than 70% of the milk in a particular mammary gland has been removed, which represents a complete milking.

59.     Third, DeLaval represented that the V300 has 2-nozzles that deliver pre- and post-sprayed teat disinfectant "to each teat" with a "99% hit rate," stating: "The VMS V300 has two nozzles you can program depending on your preferences or seasonal requirements. It delivers incredibly accurate pre and post spray to each teat, eliminating waste and coverage errors from targeting the whole udder, and ensuring a better result."

60.     Even though these representations are false, DeLaval continues to make them on the version of the V300 Brochure currently available on its website.

***DeLaval YouTube Channel***

61.     On its YouTube channel, DeLaval made similar misrepresentations regarding the V300s ability to perform the Essential Functions of milking a cow. One video is titled "DeLaval VMS™ milking system V300 – It all revolves around you", is publicly available at https://www.youtube.com/watch?v=X4Dg9Ub-VOE and was published at DeLaval on June 27, 2018 (the "June 27, 2018 Video").

62.     DeLaval also published another video on July 11, 2018, which is titled "DeLaval VMS™ V300 | Unlock the True Potential of Voluntary Milking | DeLaval" and publicly available at https://www.youtube.com/watch?v=BKA267Jd3MA (the "July 11, 2018 Video"). Both videos (collectively, the "YouTube Videos") misrepresent the ability and conceal the inability of V300 to perform its Essential Functions.

63.    First, in the July 11, 2018 Video, DeLaval represents that the PureFlow leaves teats cleaned, stimulated, pre-milked, dried and ready to be milked:



64.    Second, in the June 27, 2018 Video, DeLaval represents that the V300 has "smooth and fast 99.8% attachment rate." Similarly, in the July 11, 2018 Video, DeLaval states that the camera on the robotic arm is a "New unique Vision System" that providers for a "99,8% attachment rate[,] Peace of mind[,] and Relaxed cows":



65.    Third, in the June 27, 2018 Video, DeLaval states that the V300 has a "Targeted spray system" that delivers a 99% teat spray hit rate:



66.    The representations set forth in the June 27, 2018 Video and July 11, 2018 Video are unqualified guarantees that the V300 is capable of performing these functions on a farm that purchases the V300.

***DeLaval VMS V300 Teat Preparation Protocol U.S.A.***

67.    Item 13r. of the Grade "A" Pasteurized Milk Ordinance requires manufactures of automatic milking installations ("AMI") to "submit data to FDA to show that the teat prepping system employed in their milking system is equivalent to Item 13r., **ADMINISTRATIVE PROCEDURES #4** . . .: "Teats shall be treated with a sanitizing solution just prior to the time of milking and shall be dry before milking."

68.    DeLaval submitted a "Teat Preparation Protocol" to the FDA to show that the V300 teat prepping system is equivalent to the Grade "A" Pasteurized Milk Ordinance, Section 7, Item 13r., Administrative Procedure No. 4., which was issued by Chris Horton and approved by Epke Bosma on July 10, 2018. The protocol was accepted by the FDA on or about July 19, 2018 based on the Teat Preparation Protocol submitted by DeLaval.

69.     The Teat Preparation Summary of the Teat Preparation Protocol states: "The DeLaval V300 VMS^TM Milk Stations use a single separate "Teat Cleaner" cup to wash the teats individually prior to milking . . . Per PMO procedure, teats shall be treated with a germicidal teat dip product onto the teat in sequence, prior to the time of milking." The procedure by which teats are so treated is performed for "each teat" in lactation:

> A pressurized spray nozzle can **optionally** pre-spray a teat sanitizer product on the teats in sequence, prior to positioning the Teat Cleaner cup over the teat for washing sequentially <u>each teat</u> stored in memory as lactating.

The Teat Preparation Protocol is available at https://fda.report/media/116157/Milk-M-I-18-16.pdf ("M-I-18-16") (last visited May 2, 2022) (bold in original) (underline added).

70.     The Teat Preparation Procedure of the Teat Preparation Protocol states: "DeLaval V300 VMS^TM Milk Stations use a multi-purpose robotic arm with an integrated spraying nozzle to apply optional Pre-Spray, as well as a robotic gripper to apply a specifically designed Teat Cleaner cup connected to a separate control system, delivering the following teat preparation steps:

1.  **OPTIONAL** Pre-Spray: A teat sanitizer product can be sprayed on all the teats in sequence after cow identification and cow pre-positioning functions deliver motion guidance to the robotic arm.

2.  **STANDARD** Cleaning Procedure: Begins with the robotic arm gripping the Teat Cleaner cup from its storage location outside the cow positioning stall, where it hangs upside-down, moving the Teat Cleaner cup to placement over the first teat.

                              * * *

6.  When completed, the teat cleaning process removes pre-sprayed teat dip, if applied, together with soils, and leaves the teats washed with a germicidal solution, rinsed, fore-stripped, dried, and ready to be milked.

7.  The teat cleaner cup is applied to the other teats in sequence and the washing, rinsing, fore- stripping, and drying process is repeated for <u>each teat</u> stored in the system memory as lactating.

                              * * *

M-I-18-16 (bold in original) (underline added).

18

71.     The Teat Preparation Protocol acceptance states: "While this protocol is specified for use with the DeLaval VMS$^{TM}$ V300 U.S.A., its acceptance will remain in effect with future versions (models) of this equipment as long as this accepted Teat Preparation Protocol can be applied as written." The Teat Preparation Protocol is only applied as written and required by the Grade "A" Pasteurized Milk Ordinance if the teat cleaning cup is applied to each teat.

72.     The M-I-18-16 memorandum was widely distributed to representatives of the dairy industry and other interested parties, was available on the FDA website at http:www.fda.gov, was published in the United States Federal Register, and was provided to each V300-purchaser before their commissioning inspection conducted for the purpose of granting a Grade "A" milk shipping permit, which is required for a producer to be paid in the Grade "A" structure.

**THE V300 IS DEFECTIVE AND PLAGUED WITH REPEATED OPERATIONAL FAILURES AND PROBLEMS**

73.     The V300 has numerous defects in design, material and workmanship, which cause it to suffer from numerous, repeated operational problems that render it unable to and prevent it from adequately and consistently performing one or more of its three Essential Functions. DeLaval has failed to cure these defects and cannot or is unwilling to deliver a V300 that is actually capable of performing these Essential Functions or as represented by DeLaval in the advertising and marketing materials discussed herein.

74.     At all times, DeLaval had peculiar, unique and superior knowledge of each defect and operational problems with the V300 and, in furtherance of their deceptive, fraudulent, negligent, misleading and uniform marketing scheme, concealed and, up to the present day, continues to conceal each such defect and operational problem.

75.     First, the V300 is not capable of washing with a sanitizing solution, fore-striping and drying each teat trained in memory as lactating, as represented by DeLaval, required by

19

national industry standards and required by Item 13r. of the Grade "A" Pasteurized Milk Ordinance. As a result, excessive bacteria will enter and contaminate the milk supply and cow health will be negatively affected by bacterial contamination. This is exacerbated by engineering and programing deficiencies, which permit milk extracted from teats to which the teat cleaning cup was not applied to travel through the milk line and enter the bulk tank, where it contaminates the milk ultimately sold to dairy processors before being sold to the public-at-large for human consumption.

76.    It was feasible for DeLaval to correct the foregoing deficiencies by implementing a teat cleaning cup sensor feedback signal to identify the teats to which the teat cleaning cup was successful applied, together with software programming rules that would either divert milk from cows with one or more teats that had not been properly cleaned, fore-striped and dried, or divert the milk from only those teats that had not been so cleaned, fore-striped and dried.

77.    Second, the V300 does not completely milk each lactating quarter in a manner that prevents contamination of milk and milking equipment, as required by national industry standards and Item 14r. of the Grade "A" Pasteurized Milk Ordinance, which requires that: "Milking and milkhouse operations, equipment and facilities shall be located and conducted to prevent any contamination of milk, containers, utensils and equipment." Grade "A" Pasteurized Milk Ordinance, Section 7,` Item 14r.

78.    V300-milking causes contamination of both milk and milking equipment when it attaches teat milking cups to teats to which the teat cleaning cup had not been applied in violation of national industry standards and Item 13r. of the Grade "A" Pasteurized Milk Ordinance. The same is true when the milking cups are attached to teats that had been contaminated or re-contaminated during the milking process.

79.     For example, if a milking cup detaches before the milking of a quarter with an expected yield exceeding 1,000-grams is deemed complete (i.e., produces less than 50% of its expected quarter milk yield under DeLaval's definition), the milking cup will be brought up into a chamber known as a magazine, then the robotic arm of the V300 will attempt to reattach the milking cup to the teat from which it fell to complete the milking of the incomplete quarter.

80.     However, during this process, the V300 does not clean or sanitize the interior liner (i.e., product contact surface) of milking cups following a detachment resulting in contact with a contaminated milking platform floor in violation of industry standards and Item 14r. of the Grade "A" Pasteurized Milk Ordinance, nor does it divert any milk extracted upon reattachment of a contaminated milking cup to prevent the contamination of the bulk tank milk.

81.     To remedy this defect, it was feasible for DeLaval to design and program the V300 to perform the "Cleaning-in-Place" procedure, by which the teat cleaner apparatus and milking equipment are cleaned and sanitized between cows, for milking cups that have become detached and, thus, contaminated through contact with the floor of the milking platform, which accumulates manure, urine and polluted water, among other contaminants.

82.     Third, the V300 does not apply post-milking teat disinfectant to each teat – as is the industry standard recommended by the National Mastitis Council to disinfect teat skin from contagious pathogens, protect cows against contagious and environmental mastitis by providing a residual physical or germicidal barrier during the inter-milking period and, thus, reduce mastitis rates. More than 10% of milked teats receive no or inadequate coverage, resulting in increased rates of mastitis among cows milked with the V300.

83.     The defects and operational issues with the V300 also include:

a.  a defective guidance system that fails to accurately and consistently find and attach the teat cleaning cup and milking cups to each lactating teat of the cow

21

due to, among other defects, camera and encoder defects, causing teats to be milked without first being washed with a sanitizing solution, fore-stripped and dried, teat attachment issues, including repeated failures to attach properly the teat cleaning cup and milking cups, missed quarters, improper delays in the milking process and failure to completely milk cows, which causes numerous health problems for, and damage to, cows, increases mastitis and culling rates, decreases milking productivity and efficiency, elevates bacteria and somatic cell counts, elevates iodine levels, lessens milk production, and causes the other problems and/or failures identified herein.

b.  a defective teat cleaning system that fails to clean and dry the full length of each lactating teat before milking and otherwise fails to leave teats clean and dry for milking, is unable to discriminate between a dirty and clean udder and fails to either divert milk from cows with one or more teats that had not been properly cleaned, fore-striped and dried, or divert the milk from only those teats that had not been so cleaned, fore-striped and dried, all of which results in numerous health problems for cows, decreased udder health, increases mastitis and culling rates, elevates bacteria and somatic cell counts, elevates iodine levels, decreased milking production and revenue, and causes the other problems and/or failures identified herein.

c.  a defective detachment process that is slow, delayed or otherwise improper in that it is incapable of preventing the teat milking cups from being consistently dragged across the milking platform floor upon detachment or kick-off, and either fails to shut off the vacuum before the teat milking cups fall onto the milking platform floor and sucks-up manure, polluted water and other bacteria-laden contaminants, which causes contamination of both the milk and milking equipment, thereby elevating bacteria and somatic cell counts, as well as culling and mastitis rates, or prematurely shuts-off the vacuum, causing a premature detachment of the milking cup, which increases incomplete milking rates and also causes contamination of both the milk and milking equipment.

d.  a defective process by which teat milking cups are attached or re-attached after falling onto the milking platform floor, which fails to clean and sanitize the interior milking cup liner (i.e., product contact surface) after a milking cup becomes contaminated by falling onto the milking platform floor and before the milking cup is attached or re-attached, which results in numerous health problems for cows, decreased udder health, increases mastitis and culling rates, elevates bacteria and somatic cell counts, decreased milking production and revenue, and causes the other problems and/or failures identified herein.

e.  a deficient and improper sequence in which the teat cleaning cup and milking cups are applied, with the teat cleaning cup applied to the rear teats before the front teats with the milking cups applied in the same order, as a result of which the robotic arm and camera thereon contact and re-contaminate teats to which the teat cleaning cup had previously been applied, which results in numerous

health problems for cows, decreased udder health, increases mastitis and culling rates, elevates bacteria and somatic cell counts, decreased milking production and revenue, and causes the other problems and/or failures identified herein.

f.  a defective pre- and post-spray teat disinfectant application procedure, which fails to provide appropriate coverage to each teat, such that each lactating teat has a drop of teat disinfectant on the teat end, resulting in numerous health problems for cows, decreased udder health, increases mastitis and culling rates, elevates bacteria and somatic cell counts, elevates iodine levels, decreased milking production and revenue, and causes the other problems and/or failures identified herein.

84.    As a result of the defects and operational problems, V300 purchasers, including Plaintiff, suffer elevated bacteria counts, iodine levels and mastitis rates, from which a host of problems stem, such as increased bulk tank SCC, increased bacteria counts in milk, decreased milk production, premature culling, death, increased treatment costs, discarded milk, decreased genetic potential, and loss of milk revenue due to loss of premiums and/or penalties, among others.

85.    At all times, DeLaval has failed to disclose the existence of these defects and operations problems to potential and actual purchasers and the general public despite the individual knowledge of each Defendant.  DeLaval's misrepresentations were likewise untrue or, at best, half truths intended to conceal these defects and operational problems.  Plaintiff and other V300 purchasers would not have purchased the V300 if DeLaval had not omitted or concealed these defects and operational problems at the time of sale.

## DELAVAL CONCEALED ITS PECULIAR, UNIQUE AND SUPERIOR KNOWLEDGE OF THE V300 DEFECTS AND OPERATIONAL PROBLEMS

86.    Despite their peculiar, unique and superior knowledge of the defects and operational problems with the V300, DeLaval continued (and continue) to represent that the V300 performs its Essential Functions and in accordance with the representations made above. Instead of delaying the launch or ceasing the sale of the V300 after its launch, these entities each continued

and participated in a deceptive, false, incomplete and misleading marketing scheme with the intention of defrauding U.S. dairy farmers, including Plaintiff.

87.    DeLaval had peculiar, unique and superior knowledge of each of the V300's defects and operational problems detailed herein before DeLaval sold any V300 in the United States and, in furtherance of their deceptive, fraudulent, negligent, misleading and uniform marketing scheme, concealed and, up to the present day, continues to conceal each such defect and operational problem.

88.    Their superior knowledge stems from several non-exclusive facts. First, DeLaval designed, patented and manufactured V300, was responsible for developing and programming the software that operated the V300 and controlled the functions thereof and, thus, created the defects and problems with the V300.

89.    Second, at all times relevant herein, including before even a single V300 was sold, DeLaval knew from testing the V300 and its predecessor the Classic, or would have known had adequate and proper testing of the V300 been performed for a sufficient period of time, that the V300 was defectively designed, not free from defects in material and workmanship, and did not function or operate as represented, including that it was not capable of preforming its Essential Functions or complying with industry standards and Item 13r of the PMO.

90.    For example, since DeLaval was required to submit data to the FDA to show the teat prepping system employed in V300 is equivalent to Item 13r., Administrative Procedure No. 4, of the Grade "A" Pasteurized Milk Ordinance, they either: (a) knew and concealed that the data established that its teat prepping system was not equivalent, or (b) failed to obtain and misrepresented to the FDA that the data proved equivalence.

91.    Third, the Classic was plagued by virtually identical defects and operational problems, which DeLaval then incorporated into the V300.

92.    For example, no later than approximately August of 2009, Terry R. Smith, Ph.D. prepared an analysis for DeLaval of the Classic that were then operational on Chambers Dairy, a dairy farm in Potsdam, New York, identifying the very <u>same</u> milking cup detachment defect from which V300 suffer, which causes harm to cow health and milk quality, and violates the industry standard set forth in Item 14r. of the Grade "A" PMO:

> . . . the detachment process appears to be delayed/slow and as a result the teat cups and hoses are fairly consistently being dragged across the deck mat, which is accumulating water and manure, likely impacting overall milk quality and udder health (bacteria count and SCC). The accumulation of milk solids on the belting, against which the teat cup rest following detachment may also be a contributing factor to milk quality issues.

93.    Once DeLaval began selling V300, they had numerous product feedback sources from which to learn and from which it did learn that the V300 was defective and did not operate as represented or in accordance with industry standards.

94.    First, DeLaval has access to, real-time data from V300 in operation on dairy farms in the United States and across the world, detailing the defects and problems with, as well as the performance and failures of, those V300, which consistently revealed that the V300 was defectively designed, not free from defects in material and workmanship, and did not function or operate as represented, including in performing its Essential Functions.

95.    Second, since DeLaval only sells the V300 through approved, authorized and/or wholly owned dealers, some of which are also DeLaval service technicians, they knew or, in the absence of willful blindness, would have known that the V300 was defective and did not operate

as represented from dealers and service technicians, as well as from service and/or repair order information.

96.     Third, since it is the sole discretion of DeLaval to determine whether a repair or replacement of defective V300 equipment is covered by warranty, it necessarily analyzes, assesses and evaluates every claimed defect with V300 equipment that is experienced by dairy farmers across the world and, thus, knew of the defects and operational problems with the V300 from this source of information.

97.     DeLaval concealed the foregoing data, information and material facts, establishing – in contradiction to their representations – that the V300 is not capable of performing its Essential Functions

98.     In light of its access to and possession of such non-public information, DeLaval held itself out as having peculiar, unique and specialized knowledge about the abilities, benefits, capabilities, defects, failures, performance, problems, operation and workings of the V300, which was not available to, and was concealed from, Plaintiff and other dairy farmers to whom the V300 was sold.

99.     DeLaval concealed their peculiar, unique and specialized knowledge about the V300 to prevent the unearthing of data and facts they knew would prove each of the representations they made, and instructed their employees to make, about the V300 to be deceptive, false, incomplete and misleading, so that it could continue to deceive, mislead, and fraudulently induce dairy farmers to purchase V300.

100.    DeLaval knew that Plaintiff and all other prospective purchasers would reasonably rely to their detriment on Defendants superior knowledge by purchasing V300 and either building a new or retrofitting an existing barn.

101. No dairy farmer, including any purchaser of the V300 (*e.g.*, Plaintiff), would have purchased the V300 had the foregoing information and material facts been disclosed to them and not concealed by DeLaval.

## THE FRAUDULENT SALE OF DEFECTIVE V300 TO PLAINTIFF TRIPLE S FARM, LLC

102. On or about July 3, 2018, Triple S was fraudulently induced, as described herein, into entering an agreement with DeLaval (the "DeLaval Sales Agreement"), to purchase four V300s and other related equipment for the sum of $866,113.00.

103. At the behest of DeLaval and necessary for operation of the V300s, Plaintiff incurred an additional $3,000,000.00 or more to design and construct a new barn for the four (4) V300 based on advice, plans, specifications, suggestions or other recommendations provided by DeLaval. Since the barn was designed for DeLaval voluntary milking systems, it is not optimized for milking with any alternative system.

104. Prior to being fraudulently induced to enter the DeLaval Sales Agreement, DeLaval, by and through its agents, employees, or servants, including Nick Kunkle, convinced Triple S to purchase four VMS Classics by engaging in the same uniform, deceptive and fraudulent marketing scheme that gave rise to and was the subject of *Bishop*, *see Bishop* Complaint, ¶¶ 89-105, without disclosing that an updated system known as the V300 was soon to be released.

105. Once Triple S discovered that an updated system was going to be released following the June 27, 2018 Press Release, DeLaval, by and through Kunkel, convinced Triple S to purchase four (4) V300 instead of VMS Classics for the sum of $866,113.00, which is $106,000.00 more than the purchase price Triple S originally agreed to pay for the four (4) VMS Classics, i.e., the sum of $760,113.00.

106.    To convince Triple S to consummate the DeLaval Sales Agreement, DeLaval, through Kunkel, aggressively marketed the systems purported benefits, capabilities, features and past performance by making the representations set forth by DeLaval on its public website, in the V300 Brochure, in advertisements and sales pitches published by DeLaval on YouTube, including in the June 27, 2018 Video and July 11, 2018 Video, and in the V300 Teat Preparation Protocol U.S.A.

107.    During these sales pitches, which took place at Triple S Farm, over the phone and at various other locations, Triple S asked questions and requested information about the ability, benefits and capability of the V300 to perform the Essential Functions of properly milking a cow, especially in comparison to other robotic milking systems such as those designed, manufactured and sold by DeLaval's competitors, including Lely and GEA.

108.    DeLaval, by and through Kunkel, made these representations knowing the quantity, quality and value of the milk produced by Triple S, the number of cows needing to be milked each day, the number of times each day each cow needed to be milked, the amount of money spent on labor to operate the farm, and the mastitis and culling rates of the herd on Triple S Farm.

109.    Between June 27, 2018 and July 3, 2018, Triple S also viewed and relied to their detriment on the uniform representations published by DeLaval on its publicly accessible website, in the V300 Brochure, in advertisements and sales pitches published by DeLaval on YouTube, including, but not limited to, the June 27, 2018 Video.

110.    At no time did DeLaval, any agent of DeLaval, or anyone else disclose to Triple S that the V300 was not capable of performing the Essential Functions of milking a cow, did not operate according to industry standards, did not comply with the representations in the V300 Teat Preparation Protocol U.S.A., and did not comply with the requirements of the PMO.  Nor did

28

anyone, including DeLaval, disclose to Triple S that the V300 was defective or that it would increase costs of operation, injure Triple S's cows or milk, result in decrease milk production and quality, or cause economic harm to Triple S farms.

111.    Acting in reasonable reliance on DeLaval's false representations and its omissions, which were uniformly made by DeLaval to dairy farmers in the United States, Triple S entered into the DeLaval Sales Agreement and built a new barn to accommodate the V300.

112.    DeLaval subsequently delivered the four (4) V300, which went into operation on or about March 18, 2019. When the four (4) V300 were delivered, DeLaval knew it was delivering a defective product that was incapable of conforming to industry standards, and had made false, deceptive, and misleading representations to Triple S to induce them to sign the DeLaval Sales Agreement.

113.    The defects and problems with the V300 rendered them unable to meet the national industry standards, as a result of which Triple S suffered harm in the form of impaired cow health, milk quality, and milk production and, more specifically, elevated bacteria counts and increased inflammation/mastitis rates, which resulted in increased somatic cell counts, decreased milk production, and a host of other harms to both cows and milk quality.

114.    The foregoing harms were caused by defects in the design, manufacture, materials and workmanship of the V300, all of which DeLaval had peculiar, unique and superior knowledge at all times relevant herein, yet concealed from and failed to disclose to Triple S up to, including, and well-beyond the dates on which the DeLaval Sales Agreement was entered into, including, but not limited to, those detailed herein.

115.    The defects, problems and failures of the V300 were not caused or contributed to by variation in farm animals, management practices or other conditions beyond the control of

DeLaval or in the control of Triple S and, instead, were caused by the defects with the V300 created and concealed by DeLaval.

116.    DeLaval concealed its unique, peculiar and superior knowledge of the defects, problems and failures of the V300 from Triple S up to, through and even after their execution of the DeLaval Sales Agreement, for the purpose of fraudulently inducing Triple S into entering those agreements.

117.    DeLaval has failed to refund the purchase price of the defective V300s (within a reasonable time or otherwise), despite having knowledge of each defect and problem with the V300 purchased by Triple S, which were delivered, installed and repeatedly serviced by DeLaval.

118.    The V300 are less efficient, productive and profitable than the CMS previously used to milk cows on Triple S Farm; caused Triple S to suffer significant property damage in that the health of the cows was negatively impacted, while numerous cows were lost due to culling and mastitis, thereby reducing their herd size and milk production capacity; and, overall, worsened quality of life.

## THE LIMITED REMEDY IS UNCONSCIONABLE AND FAILED ITS ESSENTIAL PURPOSE

119.    The V300s were sold to V300 purchasers, including Plaintiff, pursuant to a standard form sales agreement drafted by DeLaval, which was not subject to negotiation and offered on a take-it-or-leave-it basis. The purchase agreements are referred to herein as the DeLaval Sales Agreements unless specified otherwise.

120.    In the DeLaval Sales Agreement, DeLaval expressly warrantied that the V300 and related equipment were "free from defects in material and workmanship" for a period of one year from the date of installation (the "Warranty Period"), and that the services performed by DeLaval,

through its agents, servants and/or employees, would be provided in a good and workmanlike manner (the "Limited Warranty").

121.    During the Warranty Period, DeLaval was contractually obligated to repair or replace any equipment, parts or service that failed to comply with the Limited Warranty, provided that written notice is received by DeLaval within thirty (30) days of discovery (the "Limited Remedy"). DeLaval was required to perform any such repairs and provide any such replacements within a reasonable time.

122.    The Limited Remedy further provides as follows: "If DeLaval determines that repair or replacement of the item of Equipment is not an effective remedy, DeLaval shall refund to the Equipment Purchaser the purchase price (excluding the cost of installation labor) of the defective item of Equipment and any other Equipment which cannot be used in the absence of the defective item of Equipment." DeLaval was required to provide any such refunds for the purchase price within a reasonable time.

123.    The DeLaval Sales Agreement purports to disclaim other remedies and warranties that would otherwise be available aggrieved purchasers, as well as to disclaim consequential, incidental and other damages that such purchasers would otherwise be entitled to recover from DeLaval, stating, in pertinent part, as follows:

> IN CONSIDERATION OF THIS LIMITED WARRANTY AND THE REMEDIES SET OUT ABOVE, THE OWNER WAIVES ANY AND ALL OTHER CLAIMS AND CAUSES OF ACTION AGAINST DELAVAL . . .
>
> ***
>
> THE REMEDIES SET OUT ABOVE ARE OWNER'S EXCLUSIVE REMEDIES FOR BREACH OF THIS LIMITED WARRANTY. IN NO EVENT SHALL BUYER BE ENTITLED TO OR DELAVAL BE LIABLE FOR DAMAGES OF ANY KIND, WHETHER DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL . . .

(the "Remedy Exclusion & Damages Limitation Provisions").

124.    Plaintiff repeatedly advised DeLaval, within the time and in the manner required by the Limited Remedy, and DeLaval otherwise had knowledge of each aforementioned defect and problem with the V300. Plaintiff also made repeated requests to DeLaval for repairs and replacements of the defective V300, as well as for service, maintenance and/or support to cure the defects plaguing the V300.

125.    DeLaval failed to repair, provide an adequate replacement for, or refund the purchase price of the defective V300 (within a reasonable time or otherwise), which were defective and failed to conform with the Limited Warranty, despite having knowledge, and receiving adequate notice, of each defect and problem with the V300 within the time and in the manner required by the Limited Remedy.

126.    DeLaval has not adequately covered by warranty the repair or replacement of any of the countless V300-defects, problems and failures experienced by Plaintiff or the Class, and failed to provide adequate and proper service, maintenance and support to address such defects, problems and failures, despite its representation and guarantee that competent, trustworthy support was available 24/7 to cure any problems with or failures of the V300.

127.    To the contrary, DeLaval concealed its knowledge of those defects, problems and failures from Plaintiff and the Class through execution of the DeLaval Sales Agreements in furtherance of its scheme to conceal such knowledge, blamed Plaintiff and the Class for the issues complained by falsely attributing those issues to their particular farming and herd management practices (e.g., frequency of system washes and filter changes).

128.    The failure of DeLaval to correct the defective condition of the V300 purchased by Plaintiff resulted in repeated operational problems and failures therewith, which continue to persist

until to this day, excessive operational costs due to, *inter alia*, excessive and inconsistent chemical usage, system downtime during which cows cannot be milked, increased labor costs, decreased milk production and quality, and lost milk revenue.

129.    The limited repair or replacement remedy is of no value to Plaintiff because the V300 is defective and DeLaval will not or cannot provide a non-defective product. Even after repairs are performed or replacements are provided at the sole discretion of DeLaval, purchasers are still left with a defectively designed and manufactured product that consistently, repeatedly and routinely experiences operational problems and failures that cannot be corrected or cured by a repair or replacement.

130.    DeLaval knew that the limited repair or replacement remedy does not adequately protect purchasers of V300 since at least the Fall of 2008, when an identical remedy failed of its essential purpose due to the inability of DeLaval to correct similar defects with the Classic that were then installed on Chambers Dairy, a dairy farm in Potsdam, New York, which suffered from design defects like the V300 sold to Plaintiff.[1]

131.    The Limited Remedy and Remedy Exclusion & Damages Limitation Provisions are unconscionable and fail of their essential purpose because – at all relevant times, including before, at and <u>after</u> the time the DeLaval Sales Agreements were signed – DeLaval knew the defects with the V300 of which it had peculiar, unique and superior knowledge were incapable of being corrected or cured by the limited repair or replacement remedy.

132.    Since DeLaval knew that the defects and problems with the V300 of which it had peculiar, unique and superior knowledge (yet concealed from Plaintiff) were incapable of being

---

[1] *Terry Bishop, DVM, et al. v. DeLaval Inc., et al.*, United States District Court for the Western District of Missouri, Case No. 5:19-cv-06129, Document No. 204, ¶¶ 364-367 (establishing that the terms of the Limited Remedy and Remedy Exclusion & Damages Limitation Provisions are virtually identical to those here), ¶¶ 377-378 (explaining how the defects could not be corrected or cured).

corrected or cured by the limited repair or replacement remedy, there was an inequality of bargaining positions so strong, gross and manifest that it is impossible to state it to one with common sense without producing an exclamation at the inequality of it.

133.     The Limited Remedy and Remedy Exclusion & Damages Limitation Provisions are unconscionable and fail of their essential purpose since the determination of whether to repair, replace or refund the purchase price of a defective V300 is within the sole discretion of DeLaval, which systematically fails to honor the Limited Remedy and fails to exercise good faith when determining whether to provide a repair, replacement or refund.

134.     Although the Limited Remedy provides DeLaval with the discretion to refund the purchase price, such refund fails to make Plaintiff and other purchasers of defective V300, whole for several reasons, each of which DeLaval had knowledge at all times relevant herein, including before the DeLaval Sales Agreement was entered into. Thus, even in light of the backup refund remedy, the Limited Remedy fails of its essential purpose and is unconscionable.

135.     First, the refund is limited to the purchase price of the V300 and excludes the cost of installation labor, as well as the millions of dollars that Plaintiff spent to design and construct entirely new barns in which to install their V300 at the behest of DeLaval – not to mention the significant financial losses and property damage Plaintiff suffered and continue to suffer as a result of using the V300.

136.     Second, the latent character of the defects with the V300, which were concealed by DeLaval, did not allow said defects and problems to be discovered by Plaintiff prior to execution of the DeLaval Sales Agreements, upon tender of delivery, or prior to the installation of the V300 or the design and construction of the barns in which the V300 were installed, which could not be used to milk cows by any alternative method.

137.    By limiting the refund to the purchase price, DeLaval improperly attempts to avoid refunding the hundreds of thousands of dollars it would cost to remove the V300, and either modify the barn that was specifically built to accommodate and facilitate their use or demolish the newly constructed barn, then design and reconstruct an entirely new barn that is suitable for an alternative milking system.

138.    Third, DeLaval was either unable or unwilling to provide Plaintiff with an appropriate refund that was sufficient to provide them with the substantial value of the bargain of the DeLaval Sales Agreement or, for that matter, any refund at all. It provided Plaintiff with no reasonably timely refund or replacement and, in fact, provided them with nothing at all. Even if a refund of the purchase price had been provided, it would still not make Plaintiff whole.

139.    The Limited Remedy and Remedy Exclusion & Damages Limitation Provisions are unconscionable and fail of their essential purpose since DeLaval knew at and before the date on which the DeLaval Sales Agreements were entered into that those provisions deprived Plaintiff and other purchasers of minimum adequate remedies for damages due to the constant, long-term malfunctioning of the defective V300, which DeLaval knew it was incapable of correcting.

140.    The Limited Remedy and Remedy Exclusion & Damages Limitation Provisions are unconscionable and fail of their essential purpose since they are inadequate to cover Plaintiff's actual damages – including the purchase, installation and service costs of the V300, increased labor costs, value of the cows lost to culling and mastitis, lost business and profits, and other property damaged suffered – and, thus, deprive Plaintiff of the benefit of the bargain.

141.    Those provisions are further unconscionable and fail of their essential purpose because – at all times relevant herein, including at and before the DeLaval Sales Agreements were entered into – DeLaval had peculiar, unique and superior knowledge of the defects and problems

with the V300 and knew that those provisions deprived purchasers of defective V300 of a minimum adequate remedy.

142.    DeLaval concealed such peculiar, unique and superior knowledge from Plaintiff through execution of the DeLaval Sales Agreements and, to further its concealment, blamed the farming and herd management practices of Plaintiff for the issues complained, despite their knowledge that those issues were caused by incurable defects with the system that rendered it unable to operate to industry standards.

143.    DeLaval also knew that the Limited Remedy and Remedy Exclusion & Damages Limitation Provisions routinely operated to deprive purchasers of V300 of the benefits of their bargain by subjecting them to financial hardship and/or ruin due to excessive operational, maintenance and repair costs, loss of milk revenue due to loss of milk production, milk quality premiums and/or imposition of milk quality penalties, and other damages specified herein.

144.    Plaintiff sustained consequential and incidental damages that would not have been sustained but for DeLaval designing, marketing and selling defective V300, were not within the contemplation of Plaintiff and DeLaval at the time they entered into the DeLaval Sales Agreements and, thus, should not be prohibited when the bargained for remedy (i.e., the Limited Remedy) fails of its essential purpose and is unconscionable.

145.    Furthermore, the Limited Remedy is not enforceable because Plaintiff was fraudulently induced into the DeLaval Sales Agreement based on DeLaval's fraudulent or negligent misrepresentations and omissions but for which Plaintiff—and any reasonable purchaser—would not have agreed to the Limited Remedy.

## CLASS ACTION ALLEGATIONS

146.    <u>Class Definition</u>: Plaintiff brings this action on behalf of itself and other similarly situated individuals. Pursuant to Federal Rules of Civil Procedure 23(b)(3), Plaintiff seeks certification of Nationwide Class (the "Nationwide Class") and the following Subclasses defined as follows:

> <u>Nationwide Class</u>: All Persons who purchased, financed, leased, and/or rented a V300 (the "Nationwide Class" or "Class").

> <u>Direct Purchaser Subclass</u>: All Persons who purchased, financed, leased, and/or rented a V300 pursuant to a DeLaval Sales Agreement ("Direct Purchaser Subclass").

> <u>Minnesota Subclass</u>: All Persons who are residents of Minnesota and who purchased, financed, leased, and/or rented a V300 (the "Minnesota Subclass").

147.    Excluded from the Class are the Court and its officers, employees, and relatives; Defendants and their subsidiaries, officers, directors, employees, and agents; and governmental entities.

148.    <u>Numerosity</u>: the Class consists of members so numerous and geographically dispersed that joinder of all members is impracticable, as Plaintiff believes there are over one hundred members in the Class spread across several states whom have purchased several hundred V300.

149.    <u>Common Questions of Law and Fact Predominate</u>: There are many questions of law and fact common to Plaintiff and the Class, and those questions substantially predominate over any questions that may affect individual members of the Class. Common questions include:

> a.  Are the V300 defectively designed?

> b.  Do the V300 have defects in material and workmanship?

> c.  Were Defendants on notice of the defective nature of the V300 and, if so, as of what date?

d.  Do the V300 meet the past performance data and statistics uniformly represented by Defendants?

e.  Did Defendants breach an express and/or implied warranty of merchantability?

f.  Were the V300 merchantable at the time of sale?

g.  Did Defendants breach an implied warranty of fitness for a particular purpose?

h.  Did Defendants owe a duty of care to Plaintiff and the Class?

i.  Were Defendants negligent?

j.  Did Defendants make material misrepresentations in advertising, marketing and selling the V300?

k.  Did Defendants conceal facts regarding the V300?

l.  Did Defendants breach their contracts with Plaintiff and the Class?

m. Were Plaintiff and the Class damaged by Defendants' actions?

150.    All members of the Class are ascertainable by reference to objective criteria. DeLaval has access to addresses and other contact information for Class members which can be used for notice purposes.

151.    <u>Typicality</u>: Plaintiff's claims are typical of other members of the Class because all of the claims arise from the same course of conduct by DeLaval, the same defects and operational problems with the V300 and are based on the same legal theories.

152.    <u>Adequacy of Representation</u>: Plaintiff is an adequate class representative because its interests do not conflict with the interests of the Class members whom they seek to represent. Plaintiff has retained counsel with substantial experience in prosecuting complex and class action litigation. Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of class members and have the financial resources to do so. The Class members' interests will be fairly and adequately protected by Plaintiff and its counsel.

153.    <u>Superiority of Class Action</u>: Class treatment is superior to individual treatment, as it will permit a large number of similarly situated persons to prosecute their respective class claims in a single forum, simultaneously, efficiently, and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.

154.    To the extent not all issues or claims, including the amount of damages, can be resolved on a class-wide basis, Plaintiff invokes Federal Rule of Civil Procedure 23(c)(4), reserving the right to seek certification of a class action with respect to particular issues, and Federal Rule of Civil Procedure 23(c)(5), reserving the right to divide the class into subclasses.

## TOLLING

155.    Any applicable statute of limitations that might otherwise bar any claim of any Plaintiff or any member of the Class is tolled by Defendants' improper means or knowing and active concealment of the facts alleged above. Plaintiff and the Class were ignorant, by no fault of their own or due to any failure by them to exercise due diligence, of vital information essential to the pursuit of their claims and of which Defendants had superior, unique and particular knowledge.

156.    Plaintiff and the Class could not reasonably have discovered and filed suit regarding their claims, because Defendants misled them into believing that the V300 was free of defects, performed as uniformly represented, that other dairy farmers were not having problems with the V300, and that any problems were of their own making, all the while Defendants had exclusive possession and superior, unique and particular knowledge of material facts to the contrary to which Plaintiff and the Class did not have access.

157.    Upon information and belief, such improper means were not unique to Plaintiff but were systematically employed by Defendants to deter purchasers of the V300 from discovering their causes of action and pursuing their legal remedies.

## FIRSTCAUSE OF ACTION: BREACH OF CONTRACT
*On Behalf of Plaintiff and the Nationwide Class or,*
*Alternatively, on Behalf of Plaintiff and the Subclasses*

158.    Plaintiff and the Class hereby repeat, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

159.    Pursuant to the DeLaval Sales Agreement, DeLaval agreed to provide Plaintiff with V300 that were "free from defects in material and workmanship" and, pursuant to the uniform advertisements, marketing and representations detailed herein, performed and, in fact, had performed in the past on other farms in a manner consistent with the substance of those uniform advertisements, marketing, representations and warranties. Plaintiff and the Class paid substantial consideration in exchange for the foregoing promises made by DeLaval.

160.    DeLaval breached its contractual obligations and promises by furnishing V300 that, without exception, had defects in design, material and workmanship, including, but not limited to, those detailed herein, were incapable of operating to industry standards, and were plagued with numerous, repeated operational problems, causing decreased milk production and quality, physical damage to cows, and other harms specified herein.

161.    The aforementioned defects and operational problems, which were incapable of being corrected, cured or otherwise remedied, prevented the V300 from functioning, operating and performing as advertised, marketed, represented and warrantied by DeLaval. At all times relevant herein, DeLaval knew that it was delivering V300 that had the defects in material and workmanship detailed herein, all of which were concealed from Plaintiff and the Class.

162.    The defects and operational problems with the V300 are latent defects of which Plaintiff and the Class were unaware before the DeLaval Sales Agreements were executed, which were not disclosed to Plaintiff or the Class by DeLaval, were not readily apparent, obvious or

visible to Plaintiff or the Class before the DeLaval Sales Agreements and amendments were executed, and could not have been discovered by Plaintiff or the Class upon reasonable diligence and inspection.

163. DeLaval breached the DeLaval Sales Agreements by failing to provide Plaintiff and the Class with V300 and equipment that were free from defects in material and workmanship and conformed to the specifications set forth in the DeLaval Sales Agreements, as well as by failing to install the V300 in a good and workmanlike manner, despite full contractual performance by Plaintiff and the Class.

164. The V300 furnished by DeLaval were defective and did not conform to the specifications set forth in the DeLaval Sales Agreements.

165. To fraudulently and improperly dissuade, deter and prevent Plaintiff and the Class from seeking legal recourse and/or revoking acceptance of the defective, non-confirming V300 furnished to them by DeLaval, DeLaval, through its agents, servants and/or employees, including, but not limited to, those specifically identified herein, repeatedly guaranteed Plaintiff and the Class that it would cure its breaches, as well as that the defects in, problems with, and failures of the V300 they were experiencing:

       a.  were only temporary;

       b.  would be cured or solved by DeLaval (e.g., by a system update or upgrade);

       c.  were due to the dairy farm transitioning to a voluntary milking system and would cure themselves over time;

       d.  were not the result of any defects with the system, but were caused by the farmer's own farming and herd management practices;

       e.  were unique or not experienced by other dairy farmers using the V300.

166.    In addition to the express terms, the DeLaval Sales Agreements contain an implied covenant of good faith and fair dealing, which, among other things, serves to prevent one party from unfairly taking advantage of the other party, evading the spirit of the transaction, and denying the other party the expected benefit of the contract. This implied covenant of good faith and fair dealing also emphasizes faithfulness to an agreed common purpose and consistency for the justified expectations of the other party. As a result of the aforementioned conduct, DeLaval not only breached the express terms of the DeLaval Sales Agreements, but also breached the implied covenant of good faith and fair dealing contained therein.

167.    By reason of the foregoing, Plaintiff and the Class have been damaged and seek all remedies in the aggregate or in the alternative, including revocation of the contract and return of the purchase price and consequential damages and losses, including, but not limited to, the costs incurred in installing the equipment and building or remodeling their bards, increased labor costs, lost business profits, and all other damages permitted by law.

**SECOND CAUSE OF ACTION:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
*On Behalf of Plaintiff and the Nationwide Class or,*
*Alternatively, on Behalf of Plaintiff and the Subclasses*

168.    Plaintiff and the Class hereby repeat, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

169.    A warranty that V300 shall be merchantable was implied in the DeLaval Sales Agreements because DeLaval is a merchant who deals in goods of that kind and hold itself out as having knowledge and skill peculiar to the automatic, robotic and/or voluntary milking industry by advertising, marketing and representing themselves to be the worldwide leader in milking equipment and solutions for dairy farmers.

170. The V300 delivered and installed by DeLaval do not pass without objection in the dairy farming trade under the description set forth in the DeLaval Sales Agreements and are not fit for the ordinary purpose for which such devices are used in that the V300, when used in the customary, usual and reasonably foreseeable manners, was defective, was incapable of operating to industry standards, failed to milk cows and suffered from other serious operational deficiencies and errors, which are alleged herein and incorporated by reference.

171. The V300 delivered and installed by DeLaval do not run of even kind, quality and quantity within each unit and among all units involved, and do not conform to the promises and/or affirmations of fact made on the container, label and/or accompanying catalogues, manuals and/or brochures, including, but not limited to, the promises and/or affirmations of fact made in the V300 Brochure, DeLaval VMS V300 Teat Preparation Protocol U.S.A., June 27, 2018 Video, July 11, 2018 Video and elsewhere.

172. All conditions precedent have occurred or been performed.

173. By reason of the foregoing, DeLaval breached the implied warranty of merchantability and Plaintiff and the Class are entitled to recover their damages from DeLaval.

## THIRD CAUSE OF ACTION:
## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE
### *On Behalf of Plaintiff and the Nationwide Class or,*
### *Alternatively, on Behalf of Plaintiff and the Subclasses*

174. Plaintiff and the Class hereby repeat, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

175. Plaintiff and the Class specified to DeLaval, through its agents, servants and/or employees, that they required V300 capable of, among other things, washing with a sanitizing solution, fore-stripping and drying each lactating teat before milking, completely milking each

lactating quarter to prevent contamination of milk and milking equipment, applying post-milking teat disinfectant to each teat after milking, and operating to industry standards.

176.    Plaintiff and the Class relied on the skill and judgment of DeLaval, who holds itself out to be the worldwide leader in milking equipment and solutions for dairy farmers, to select and furnish a suitable voluntary milking system capable of meeting or exceeding their aforementioned requirements, a fact that was conveyed by Plaintiff and the Class to DeLaval, through their agents, servants and/or employees.

177.    Plaintiff and the Class relied on the skill and judgment of DeLaval in purchasing V300, which were not fit for the particular purpose for which they were required.

178.    All conditions precedent have occurred or been performed.

179.    By reason of the foregoing, DeLaval breached the implied warranty of fitness for a particular purpose and Plaintiff and the Class are entitled to recover their damages from DeLaval.

### FOURTH CAUSE OF ACTION: BREACH OF EXPRESS WARRANTY
*On Behalf of Plaintiff and the Nationwide Class or,*
*Alternatively, on Behalf of Plaintiff and the Subclasses*

180.    Plaintiff and the Class hereby repeat, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

181.    In the DeLaval Sales Agreements, DeLaval expressly warrantied that the V300 provided to Plaintiff and the Class were "free from defects in material and workmanship."

182.    The V300 failed to conform to the express warranty of DeLaval as detailed herein.

183.    Further, in the DeLaval Sales Agreement, DeLaval warrantied that all installation services performed by DeLaval, though its agents, servants and/or employees, would be performed in a workmanlike manner.

184.    DeLaval failed to install the V300 in a workmanlike manner in that its agents, servants and employees routinely caused property damage to the barns in which the V300 were installed due to their failure to install the same in a workmanlike manner. It also routinely failed to properly calibrate the V300, exacerbating the defects and operational problems set forth herein, including repeated teat cup attachment failures.

185.    Once the V300 were installed, DeLaval, through its agents, servants and employees, failed to perform repairs in a workmanlike manner, which resulted in repeated operational failures of the V300, operational failures not being addressed, system downtime, increased labor costs, decreased milk production, lost business and lower profits than before the dairy farms began using the V300.

186.    All conditions precedent have occurred or been performed.

187.    By reason of the foregoing, DeLaval breached the express warranty created by the aforementioned affirmations of fact, promises, representations and descriptions, entitling Plaintiff and the Class to recover all of their damages from DeLaval.

### FIFTH CAUSE OF ACTION: STRICT PRODUCTS LIABILITY
*On Behalf of Plaintiff and the Nationwide Class or,*
*Alternatively, on Behalf of Plaintiff and the Subclasses*

188.    Plaintiff and the Class hereby repeat, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

189.    DeLaval failed to properly design and manufacture the V300, which it placed on the market despite knowing that, as designed, it posed a substantial likelihood of harm to dairy farmers in that it damages their milk and cows as alleged herein.

190.    At all times relevant herein, DeLaval knew that the V300 was defectively designed and manufactured, and that the dairy farms on which it had been and was operational experienced

numerous problems as a result of its defects, which were incapable of being corrected or cured, were conveyed to DeLaval before the aforementioned express warranties were made and Plaintiff and the Class purchased their V300.

191. The aforementioned defects with the V300, among other defects of which DeLaval had peculiar, unique and specialized knowledge at all times relevant herein, including at and before each of the aforementioned representations were made, caused the problems with and failures of the V300 experienced by Plaintiff and the Class, as well as the financial and property damages Plaintiff and the Class suffered and continue to suffer.

192. It was feasible for DeLaval to design the V300 purchased by Plaintiff and the Class in a better, safer and more effective manner, including without limitation as detailed herein.

193. The aforementioned defects caused significant damage to the property of Plaintiff and the Class, including their cows, milk product and barn. The defects with the V300 caused damage to the cows owned by Plaintiff and the Class in that it caused their mastitis rates to increase due to, *inter alia*, the failure to properly prepare and fully milk each quarter of every cow during every milking in a sanitary manner, which resulted in injury and death to the cows.

194. Moreover, due to the V300-defects that fail to prevent contamination of milk and equipment, as required by Item 14r. of the Grade "A" Pasteurized Milk Ordinance and industry standards, bacteria laden water not only enters the milk line where it damages milk quality, but also causes damage to the barn by spreading disease producing bacteria and other contaminants all over the barn and stall environment.

195. The aforementioned defects with the V300 also damaged the quality of the milk produced by the cows owned by Plaintiff and the Class by causing its somatic cell count, raw bacteria, standard plate count and laboratory pasteurization count to increase significantly, while

causing significant damage to the teats of their cows to the point where they could not be milked or produce milk at all.

196.    Further, the defects also caused damage to Plaintiff's and the Class' barns and farms including, but not limited to, causing Plaintiff and Class members to destroy or retrofit barns that were then only fit to use the V300 after which Plaintiff and the Class had to rebuild barns or repair the damage to their respective dairy farms and barns caused by the installation of the defective V300.

197.    The egregious conduct of DeLaval – which caused the damages sustained by Plaintiff and the Class and was part of a pattern of similar conduct aimed and directed not only at Plaintiff and the Class but also at the public generally – amounts to such gross, wanton and willful fraud, dishonesty and malicious wrongdoing as to involve a high degree of moral culpability and turpitude, which demonstrates such wanton fraud, dishonesty and malicious wrongdoing as to imply a criminal indifference to civil obligations.

198.    By reason of the foregoing, Plaintiff and the Class are entitled to recover their damages from DeLaval, including, but not limited to, punitive damages.

## SIXTH CAUSE OF ACTION: NEGLIGENCE
### *On Behalf of Plaintiff and the Nationwide Class or,*
### *Alternatively, on Behalf of Plaintiff and the Subclasses*

199.    Plaintiff and the Class hereby repeat, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

200.    It was foreseeable, if not foreseen, by DeLaval that if its product did not perform as represented, Plaintiff and the Class would suffer the personal injury and property damage detailed herein. These injuries and the way they occurred, were entirely foreseeable, and even

foreseen, by DeLaval before it delivered the V300 to Plaintiff and the Class. Consequently, DeLaval owed a duty of ordinary care to prevent said injuries.

201.    DeLaval, by its agents, servants and/or employees, was reckless, careless and negligent as detailed herein. The egregious conduct of DeLaval – which caused the damages sustained by Plaintiff and the Class was part of a pattern of similar conduct aimed and directed not only at Plaintiff and the Class, but at the public generally – amounts to such gross, wanton and willful fraud, dishonesty and malicious wrongdoing as to involve a high degree of moral culpability and turpitude, which demonstrates such wanton fraud, dishonesty and malicious wrongdoing as to imply a criminal indifference to civil obligations.

202.    As a result of DeLaval's breach of its duty to act with reasonable care, Plaintiff and the Class suffered economic injuries, as well as physical injuries to their herd in the form of increased mastitis and death and to their barn which was built solely for use of the defective V300. They also suffered property damages to their milk in the form of increased bacteria and somatic cell counts and lower milk quality.

203.    By reason of the foregoing, Plaintiff and the Class are entitled to recover their damages from DeLaval, including, but not limited to, punitive damages.

### SEVENTH CAUSE OF ACTION: FRAUDULENT INDUCEMENT
*On Behalf of Plaintiff and the Nationwide Class or,*
*Alternatively, on Behalf of Plaintiff and the Subclasses*

204.    Plaintiff and the Class hereby repeat, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

205.    DeLaval fraudulently induced Plaintiff and the Class to enter the DeLaval Sales Agreements based on the representations and omissions described herein.

206.    As noted herein, DeLaval had and held itself out as having unique, peculiar and superior knowledge of the defects and problems with the V300.  They further possessed material facts contradicting the representations they made to Plaintiff and the Class in their publicly accessible and available marketing materials, from, among other non-public sources, their own internal data and studies, and the experiences relayed to them by other dairy farmers, all of which they had a duty to disclose, yet concealed with the intent to defraud Plaintiff and the Class thereby.

207.    The deceptive, false and misleading representations made by DeLaval to Plaintiff and the Class through the aforementioned marketing materials concerned and falsely detailed the performance of V300, the results of which they knew were unattainable as detailed herein.

208.    As a result of both or either its superior knowledge or the representations affirmatively made, DeLaval had a duty to disclose the aforementioned defects, problems and material facts concerning the V300 to Plaintiff and members of the Class. Such information was not available to Plaintiff and the Class and could not have been discovered by Plaintiff and the Class with the exercise of reasonable diligence, especially in light of the improper means used by DeLaval to conceal the same.

209.    DeLaval intended to defraud Plaintiff and the Class by concealing and failing to disclose the aforementioned defects, problems and material facts and to induce them to purchase and install the V300s and related equipment.

210.    Plaintiff and the Class would not have purchased any V300 or related equipment if the aforementioned defects and operational failures—including without limitation the inability of the V300 to perform the Essential Functions—had been disclosed or known to them.

211.    As a result of the foregoing, Plaintiff and the Class sustained not only economic damages but also damage to their property, including their cows, milk product and barns, as alleged in detail herein.

212.    DeLaval made the aforementioned representations knowing that Plaintiff, the Class and other members of the general public desired the information conveyed for the serious purpose of deciding whether to expend significant sums of money to purchase V300, design, construct and/or retrofit barns in which to install them, and place their financial welfare in the hands of the self-proclaimed worldwide leader in milking equipment.

213.    At all times relevant herein, DeLaval knew of material facts establishing, indicating and/or proving that the V300 did not function or operate as represented or to industry standards, and was plagued by numerous defects in design, material and workmanship as detailed herein.

214.    The aforementioned defects with the V300, among other defects of which DeLaval had peculiar, unique and specialized knowledge at all times relevant herein, including at and before each of the aforementioned representations were made, caused the problems with and failures of the V300 experienced by Plaintiff and the Class.

215.    The aforementioned defects, problems and failures of the V300 are latent defects of which Plaintiff and the Class were unaware before the DeLaval Sales Agreements were executed, which were not disclosed to Plaintiff and the Class by DeLaval, were not readily apparent, obvious or visible to Plaintiff and the Class, and could not have been discovered by Plaintiff and the Class upon reasonable diligence and inspection.

216.    The egregious conduct of DeLaval – which caused the damages sustained by Plaintiff and the Class was part of a pattern of similar conduct aimed and directed not only at Plaintiff and the Class, but at the public generally – amounts to such gross, wanton and willful

fraud, dishonesty and malicious wrongdoing as to involve a high degree of moral culpability and turpitude, which demonstrates such wanton fraud, dishonesty and malicious wrongdoing as to imply a criminal indifference to civil obligations.

217.    All of the aforementioned representations made by DeLaval are extraneous to the terms and conditions of the DeLaval Sales Agreements, were statements of present fact that DeLaval knew were false at the time they were made based on then existing data and facts of which DeLaval had peculiar, unique and specialized knowledge, their substance was not addressed by or in the DeLaval Sales Agreements, and do not relate to performance of the terms, conditions and/or obligations set forth in the DeLaval Sales Agreements.

218.    By reason of the foregoing, Plaintiff and the Class have sustained damages, including, but not limited to, having purchased and made expenditures to install V300 that failed to perform as uniformly represented, lost profits, and increase operational and labor costs, as well as substantial damage to their property, including, but not limited to, their cows, milk in the form of increased bacteria and somatic cell counts, and farms.

### EIGHTH CAUSE OF ACTION: NEGLIGENT MISREPRESENTATION
*On Behalf of Plaintiff and the Nationwide Class or,*
*Alternatively, on Behalf of Plaintiff and the Subclasses*

219.    Plaintiff and the Class hereby repeat, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

220.    DeLaval made the representations specified herein – including those in their publicly accessible and available marketing materials, as well as in the DeLaval VMS V300 Teat Preparation Protocol U.S.A. – to Plaintiff and the Class for the purpose of selling them V300, all the while expecting and/or knowing that they would rely thereon by purchasing V300.

221.    DeLaval was reckless or, at a minimum, careless in making the aforementioned representations, as it knew those representations were false based on, among other non-public data sources, its own internal data and studies, and the experiences relayed by other dairy farmers or, at a minimum, should have known that those representations were false in the absence of willful blindness had they exercised reasonable care and diligence.

222.    DeLaval intentionally made the aforementioned representations and supplied the aforementioned information to Plaintiff and the Class to falsely advise them of the purported benefits, cost-savings and increased profits that they would obtain (and that other dairy farmers had obtained) by purchasing the V300. Plaintiff and the Class justifiably relied on the foregoing to their detriment, as DeLaval had superior, specialized, unique and peculiar knowledge of the design, performance and existence of defects in the V300.

223.    Due to their justifiable reliance, Plaintiff and the Class purchased V300 from DeLaval, as a result of which they uniformly suffered injuries and damages caused by the aforementioned false representations made by DeLaval. Plaintiff and the Class sustained not only economic damages, but also substantial damage to their property as detailed herein.

224.    By reason of the foregoing, Plaintiff and the Class have sustained damages, including, but not limited to, having purchased and made expenditures to install V300 that failed to perform as uniformly represented, lost profits, and increase operational and labor costs, as well as substantial damage to their property, including, but not limited to, their cows, milk in the form of increased bacteria and somatic cell counts, and farms.

## NINTH CAUSE OF ACTION: FRAUDULENT CONCEALMENT OR OMISSION
### *On Behalf of Plaintiff and the Nationwide Class or,*
### *Alternatively, on Behalf of Plaintiff and the Subclasses*

225.    Plaintiff and the Class hereby repeat, reiterate and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

226.    DeLaval had unique, peculiar and superior knowledge of the defects and problems with the V300, as well as material facts contradicting the representations they each made to Plaintiff and the Class, from, among other non-public sources, their own internal data and studies, and the experiences relayed to them by other dairy farmers, all of which DeLaval had a duty to disclose, yet concealed with the intent to defraud Plaintiff and the Class thereby.

227.    DeLaval had a duty to disclose the aforementioned defects, problems and material facts concerning the V300, because, among other reasons specified herein and known to those entities, they had peculiar, unique and superior knowledge of such defects, problems and material facts, which was not available to Plaintiff and the Class and could not have been discovered by Plaintiff and the Class with the exercise of reasonable diligence.

228.    DeLaval had a duty to disclose the aforementioned defects, problems and material facts, because they made representations to Plaintiff and the Class – both voluntarily and in response to direct inquiries – that were deceptive, false, misleading and, at best, half-truths, which required additional disclosure, specifically of the aforementioned defects, problems and material facts, to avoid misleading Plaintiff and the Class.

229.    DeLaval intended to defraud Plaintiff and the Class by concealing and failing to disclose the aforementioned defects, problems and material facts, each of which it had unique, peculiar and superior knowledge. The concealed and undisclosed defects, problems and material

facts were material, unknown by Plaintiff and the Class, and could not have been discovered or known by Plaintiff and the Class with the exercise of reasonable diligence.

230.    Had the aforementioned defects, problems and material facts been disclosed to Plaintiff and the Class or not concealed by DeLaval with the intent to defraud them, Plaintiff and the Class would not have purchased any V300. As a result of the foregoing, Plaintiff and the Class sustained not only economic damages but also damage to their property as detailed herein.

231.    By reason of the foregoing, Plaintiff and the Class have sustained damages, including, but not limited to, having purchased and made expenditures to install V300 that failed to perform as uniformly represented, lost profits, and increase operational and labor costs, as well as substantial damage to their property, including, but not limited to, their cows, milk in the form of increased bacteria and somatic cell counts, and farms.

**TENTH CAUSE OF ACTION:**
**VIOLATION OF MINNESOTA DECEPTIVE TRADE PRACTICES ACT,**
**MINN. STAT. § 325D.43 ET SEQ.**
*On Behalf of Plaintiff Triple S Farm, LLC and the Minnesota Subclass*

232.    Triple S, individually and on behalf of the Minnesota Subclass, hereby repeats, reiterates and re-alleges each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

233.    DeLaval, including each entity individually, is a "person" as defined by Minn. Stat. § 325D.43 *et seq*.

234.    DeLaval engaged in deceptive trade practices in the course of its business, vocation and/or occupation in violation of Minn. Stat. § 325D.44.

235.    As detailed herein, DeLaval violated Minn. Stat. § 325D.44, by among other violations set forth in detail herein, falsely representing that goods or services are of a particular

standard, quality, or grade, when they are of another, as well as by engaging in conduct which similarly creates likelihood of confusion or misunderstanding.

236.   As a direct and proximate result of the deceptive trade practices in which DeLaval engaged, Plaintiff and the Minnesota Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

237.   Plaintiff and the Minnesota Subclass seek all monetary and non-monetary relief allowed by law, including damages, reasonable attorneys' fees, and costs under the Minnesota Deceptive Trade Practices Act, and punitive damages.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of members of the Class and Subclasses, respectfully requests that the Court enter judgment in their favor and against DeLaval Inc., West Agro, Inc., DeLaval International AB, DeLaval Holding BV, DeLaval Holding AB, and Tetra Laval International SA, as follows:

1.  That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative, and appoint Plaintiff's counsel as Class Counsel;

2.  That the Court award Plaintiff, the Class, and the Subclass compensatory, consequential, general, nominal, and punitive damages (along with any other damages available at law) in an amount to be determined at trial;

3.  That the Court award statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

4.  That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

5.  That the Court award pre- and post-judgment interest at the maximum legal rate; and

6.  That the Court grant all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all claims so triable.

Respectfully Submitted,

/s/ Patrick J. Stueve
Patrick J. Stueve (MO BAR 37682)
Bradley T. Wilders (MO BAR 60444)
K. Ross Merrill (MO BAR 68259)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Rd., Suite 200
Kansas City, Missouri 64113
(816) 714-7100
stueve@stuevesiegel.com
wilders@stuevesiegel.com
merrill@stuevesiegel.com

Daniel C. Perrone (*Pro Hac Vice* forthcoming)
**PERRONE LAW PLLC**
2136 Victory Boulevard
Staten Island, New York 10314
(646) 470-9244
dcp@theperronefirm.com

Arend R. Tensen (*Pro Hac Vice* forthcoming)
**CULLENBERG & TENSEN, PLLC**
199 Heater Road, Suite 2
Lebanon, New Hampshire 03766
(603) 448-7100
tensen@nhvt-injurylaw.com

*Attorneys for Plaintiff*