# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Triple S Farms LLC, | No. 22-cv-1924 (KMM/DTS) |
| Plaintiff, | |
| v. | **ORDER** |
| DeLaval Inc.; West Agro, Inc.; DeLaval International AB; DeLaval Holding BV; DeLaval Holding AB; and Tetra Laval International SA; | |
| Defendants. | |

Triple S Farms, LLC, is a dairy farm located in Belgrade, Minnesota. In 2018, to upgrade its milking operation, Triple S purchased a robotic DeLaval voluntary milking system ("VMS") known as the DeLaval VMS™ V300 ("V300") and made substantial changes to its barn to incorporate the new robotic system. In this litigation, Triple S alleges that Defendants misrepresented the capabilities of the V300, that the robot is defective and fails to operate as promised, and that these and other issues have cause Triple S to incur substantial damages. Triple S seeks to represent a class of United States dairy farmers who purchased, financed, leased, or rented a V300. Defendant DeLaval Inc. ("DLI") has moved for partial dismissal of Triple S's claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). West Agro, Inc., argues that all the claims against it should be dismissed pursuant to Rule 12(b)(6). And both DLI and West Agro ask the Court to strike the class allegations from Triple S's Complaint. For the reasons that follow, DLI's motion

to dismiss is granted in part and denied in part, West Agro's motion to dismiss is denied without prejudice, and the motion to strike class allegations is denied.

## I.    BACKGROUND

### *The Parties*

Triple S asserts claims relating to the V300 against six Defendants: West Agro; DLI; DeLaval Holding BV; DeLaval International AB; DeLaval Holding BV; DeLaval Holding BV; and Tetra Laval International SA. West Agro does business as DeLaval Manufacturing and is a wholly owned subsidiary of DLI. DLI is a wholly owned subsidiary of DeLaval Holding BV, which is a corporation based in the Netherlands. DeLaval International AB, a Swedish corporation, is also a wholly owned subsidiary of DeLaval Holding BV. DeLaval Holding AB is a Swedish corporation that is the parent company for DeLaval Holding BV, and DeLaval Holding AB is a wholly owned subsidiary of Tetra Laval International SA ("Tetra Leval"). Tetra Leval is a Swiss corporation that is DeLaval Holding AB's parent company. [Compl. ¶¶ 12–22, Doc. 1].

According to the Complaint, the Defendants are all closely related to one another and hold themselves out as a single entity—the DeLaval Group. Together they maintain a single website which does not distinguish between the companies in the DeLaval Group's search for employees. On information and belief, Triple S alleges that TLISA controls the DeLaval Group, including DLI. TLISA provides operating funds, is required to approve structural changes to the other entities, maintains the composition of the other Defendants' boards of directors, must approve of any asset sales, and directs how excess cash is handled. Defendants allegedly have common management personnel, maintain an integrated sales

organization, use consistent marketing materials regardless of allegedly separate corporate form, and keep uniform promotional materials and sales and distribution systems. DLI allegedly performs business functions its corporate parents would ordinarily perform and is the exclusive marketing and sales agent for VMS robots in the United States. And Defendants allegedly hold themselves out as a single enterprise. [Compl. ¶¶ 23–37].

### *The Classic and the V300*

"DeLaval" introduced the first automatic milking system in Europe in 1997 and claims to be the worldwide leader in automated milking equipment. [Compl. ¶ 44]. "The Classic" VMS robot was completed later and was distributed to dairy farmers in the US. [Compl. ¶ 45]. Introduction of The Classic led to a class action suit asserting that "DeLaval" delivered a defectively designed product, with defects in materials and workmanship, that failed to satisfy express and implied warranties. *Bishop, DVM v. DeLalval Inc.*, No. 5:19-cv-6129 (W.D. Mo.). In *Bishop*, the farmer plaintiffs alleged that The Classic failed to perform the "essential functions" of a VMS robot: "(1) wash with a sanitizing solution, fore-strip and dry each lactating teat before milking; (2) completely milk each lactating quarter in a manner that prevents contamination of milk and milking equipment; and (3) post-spray teat disinfectant on each teat after milking." [Compl. ¶ 46].

After the *Bishop* case was filed, Defendants developed and began marketing the V300, a new milking robot which was introduced to the VMS market in 2018. The promotional materials for the V300 appear to address concerns with The Classic that had been raised in *Bishop*. [Compl. ¶¶ 48–49]. Defendants represented that the V300 robot would exceed performance of The Classic, including "washing with a germicidal solution,

fore-stripping and drying each lactating teat before milking, such that each lactating teat is cleaner at the time of milking, producing over 100 pounds of milk per cow per day, lower preliminary counts, and maintain somatic cell counts under 140,000 cells/mL." [Compl. ¶ 50]. In other words, safe, clean milk and healthy, happy cows.

### *False Representations*

According to Triple S, these representations "turned out to be false," and the V300 was plagued by virtually identical defects to those facing The Classic. Like its predecessor, the V300 lacked the ability to perform the essential functions for an automated milker. [Compl. ¶ 51]. Defendants published a brochure (the "V300 Brochure") that allegedly contains several false representations about what the V300 could do for a dairy farm [Compl. ¶¶ 54–60], and made similar misrepresentations on the DeLaval YouTube channel [Compl. ¶¶ 61–66]. Defendants allegedly won FDA approval for the V300 to provide Grade "A" pasteurized milk by misrepresenting the V300's capabilities. [Compl. ¶¶ 67–72].

Triple S alleges that the V300 is defective in its design, materials, and workmanship, and as a result it is incapable of performing the essential functions of a VMS. [Compl. ¶ 73]. The V300 cannot wash, fore-strip, and dry each teat as represented by Defendants and therefore cannot produce Grade "A" pasteurized milk, and it does not milk each cow as completely as promised. Its flaws allegedly lead to contamination of the milk supply and negatively affect the cows' health. [Compl. ¶ 75]. Defendants could have corrected the deficiencies through additional use of sensors and software programming, but they did not. [Compl. ¶ 76]. Among the problems the V300 suffers from are: (a) a defective guidance

system; (b) a defective teat cleaning system; (c) a defective detachment process; (d) a defective process by which milking cups are attached or re-attached after falling onto the milking platform floor; (e) a deficient and improper sequence in which the cleaning cup and milking cups are applied; and (f) a defective pre- and post-spray teat disinfectant application procedure. [Compl. ¶ 83].

### Defendants' Knowledge of the Defects

According to the Complaint, Defendants knew about these issues, but rather than delaying the launch of the V300, the Defendants each participated in a deceptive marketing scheme intended to defraud U.S. dairy farmers. [Compl. ¶ 86]. Defendants either knew of the problems with the V300 from their own testing, or would have known of them had they done adequate and proper testing. [Compl. ¶ 89]. Defendants were required to provide data to the FDA and either knew and concealed that the data showed the V300 could not meet Grade "A" standards, or misrepresented favorable data to the FDA. [Compl. ¶ 90]. In part, Triple S contends that Defendants knew of the problems because they had the same problems with The Classic robot, and when Defendants started selling the V300 they received feedback notifying them that the V300 was similarly defective. [Compl. ¶¶ 91–93]. Because Defendants have the sole discretion with respect to repair or replacement under the V300 limited warranty issued by DLI, Defendants also knew of the claimed defects experienced by dairy farmers. [Compl. ¶ 96].

### Inducement to Purchase V300 Machines

Triple S alleges it was fraudulently induced into purchasing four V300 robots and other related equipment in July of 2018. [Compl. ¶ 102]. Triple S spent $3,000,000 on the

construction and retrofitting of a new barn for the four robots. These investments were made based on Defendants' advice, plans, specifications, and suggestions. [Compl. ¶ 103]. Prior to 2016, Nick Kunkle, a sales agent for Defendants, convinced Triple S to purchase four of The Classic robots, but Mr. Kunkle allegedly failed to disclose that the V300 was coming out soon. [Compl. ¶ 104]. When Triple S discovered that an updated system would be released, Mr. Kunkel convinced Triple S to buy the V300 instead of The Classic machines. This resulted in an increased cost of $106,000 over the original purchase price. [Compl. ¶ 105]. Kunkel marketed the V300 to Triple S, representing that its system had many benefits and generally parroting the overhyped representations in the V300 Brochure, the videos on the DeLaval YouTube channel, and the statements in the material submitted by the Defendants to the FDA for Grade "A" milk approval. [Compl. ¶ 106–08]. Triple S relied on Mr. Kunkel's representations about the V300s' capabilities. Neither Defendants nor their agents disclosed to Triple S that the V300 was not capable of performing the essential functions of milking a cow, did not operate according to industry standards, and did not comply with the representations in the protocol prepared for the FDA. [Compl. ¶¶ 109–10].

Because of the alleged defects with the V300, Triple S suffered impaired cow health and reduced milk quality and quantity. [Compl. ¶ 113].

### The Sales Agreement

Triple S bought its V300s pursuant to a standard form sales agreement that was not subject to negotiation. [Compl. ¶ 119]. The four V300s were delivered to Triple S on March 18, 2019. [Compl. ¶ 112]. However, the Sales Agreement reflects that Triple S bought the

V300 robots from an "independent dealer" named Professional Dairy Systems, not from one of the named Defendants. [ECF No. 14-1].

DLI provided an express warranty that the V300 and related equipment were "free from defects in material and workmanship" for a period of one year from the date of installation, and that the services from DLI during the warranty period would be provided in a "good and workmanlike manner." [Compl. ¶ 120]. As part of the warranty, DLI agreed to repair or replace any flawed equipment, parts, or service in a reasonable period of time if it received written notice within 30 days after a problem was discovered. [Compl. ¶ 121]. This limited remedy further provides

> If DeLaval determines that repair or replacement of the item of Equipment is not an effective remedy, DeLaval shall refund to the Equipment Purchaser the purchase price (excluding the cost of installation labor) of the defective item of Equipment and any other Equipment which cannot be used in the absence of the defective item of equipment.

[Compl. ¶ 122]. The Sales Agreement also contains a waiver provision indicating that the owner/purchaser of the equipment "waives any and all other claims and causes of action against DeLaval" and that the listed remedies are the exclusive remedies for breach of the limited warranty. [Compl. ¶ 123].

Triple S notified Defendants on several occasions, in writing and within 30 days of discovering a defect, that the V300 robots were having problems and repeatedly asked DeLaval to repair or replace the defective V300s. [Compl. ¶ 124]. However, Defendants failed to repair or replace the V300s and did not refund Triple S's purchase price. [Compl. ¶ 125]. Triple S asserts that the limited remedy of repair or replacement is of no value to

Triple S because the V300 robot is defective. and Defendants will not or cannot provide a non-defective product. [Compl. ¶ 129]. Triple S also alleges that the refund provision cannot make whole the farmers who purchased the V300 machines because they had to pay for non-compensable installation costs, and they had to retrofit or construct new barns for the machines; the defects could not have been discovered by the farms prior to purchasing the machines; refunds would not cover the cost of removing the machines; and Defendants were either unable or unwilling to provide Triple S with an appropriate refund. [Compl. ¶¶ 133–37].

### *Class Action Allegations*

Triple S brings this action on behalf of itself and other similarly situated individuals. It purports to represent a nationwide class, a direct purchaser subclass, and a Minnesota subclass, which are defined in the Complaint as follows:

> Nationwide Class: All Persons who purchased, financed, leased, and/or rented a V300 (the "Nationwide Class" or "Class").

> Direct Purchaser Subclass: All Persons who purchased, financed, leased, and/or rented a V300 pursuant to a DeLaval Sales Agreement ("Direct Purchaser Subclass").

> Minnesota Subclass: All Persons who are residents of Minnesota and who purchased, financed, leased, and/or rented a V300 (the "Minnesota Subclass").

[Compl. ¶ 146]. Triple S also alleges that all of the requirements for maintaining a class action are satisfied. [Compl. ¶¶ 147–54].

*Causes of Action*

Plaintiffs allege ten separate "causes of action" in their Complaint, with each count asserted against all Defendants. The First Cause of Action ("Count 1") is a claim for breach of contract. [Compl. ¶¶ 158–67]. The essence of this claim is that Defendants promised to provide equipment that was free from defects in materials and workmanship, but breached that promise in providing defective equipment and in failing install the V300s in a good and workmanlike manner. Triple S also asserts that Defendants breached the implied covenant of good faith and fair dealing in administering the contract.

The Second Cause of Action ("Count 2") is for breach of implied warranty of merchantability. [Compl. ¶¶ 168–73]. This claim asserts that Defendants qualify as a merchant that sells goods and collectively hold themselves out has having knowledge of automated, robotic milking systems, creating an implied warranty of merchantability.

The Third Cause of Action ("Count 3") is for breach of implied warranty of fitness for a particular purpose. [Compl. ¶¶ 174–79]. Count 3 asserts that Triple S specified to Defendants what it needed the V300 to be able to do and relied on Defendants' expertise in VMS machines when it purchased the V300s.

The Fourth Cause of Action ("Count 4") is for breach of express warranty. [Compl. ¶¶ 180–87]. This claim alleges that Defendants gave an express warranty that the V300 was free from defects in material and workmanship.

The Fifth Cause of Action ("Count 5") is one of strict products liability. [Compl. ¶¶ 188–98]. Triple S alleges that Defendants failed to properly design and manufacture the V300.

The Sixth Cause of Action ("Count 6") is for negligence. [Compl. ¶¶ 199–203]. According Count 6, the Defendants' agents were allegedly careless in their dealings with Triple S, and it was foreseeable that their representations would cause class members harm to their herds and to themselves.

The Seventh Cause of Action ("Count 7") is for fraudulent inducement. [Compl. ¶¶ 204–18]. The gist of Count 7 is that through their knowingly false statements about the capabilities of the V300, Defendants induced Triple S to purchase and install the V300 system.

The Eighth Cause of Action ("Count 8") is for negligent misrepresentation. [Compl. ¶¶ 219–24]. This cause of action alleges that Triple S justifiably relied negligently made false representations in agreeing to purchase and install the V300 machines, and was harmed as a result.

The Ninth Cause of Action ("Count 9") is for fraudulent concealment or omission. [Compl. ¶¶ 225–31]. Count 9 asserts that Defendants had superior knowledge regarding the defects in their products, had a duty to disclose those details as a result, but failed to do so, turning its concealment of that information into a fraud.

Finally, the Tenth Cause of Action ("Count 10") is for a violation of the Minnesota Deceptive Trade Practices Act ("DTPA"), Minn. Stat. § 325D.43. [Compl. ¶¶ 232–37]. The DTPA claim alleges that Defendants engaged in a deceptive trade practice by falsely representing that their goods or services are of a particular quality/standard/grade. The Defendants also allegedly made representations that create a likelihood of confusion or misunderstanding about the quality of the goods being purchased.

### The Bishop Case

As noted above, the Complaint references a previous case in which farmers sued some of the Defendants involved in the marketing and sale of The Classic VMS. That litigation took place in federal court in the Western District of Missouri and was captioned *Bishop v. DeLaval Inc.*, No. 5:19-cv-06129 (SRB) (W.D. Mo.). Ultimately, the *Bishop* litigation resolved through a class action settlement. Judge Stephen R. Bough entered Judgment on July 20, 2022. The settlement included a gross sum payment by the defendants of $55,000,000 to obtain a full release of all claims in the *Bishop* lawsuit, and class members (a nationwide class of those who purchased or leased The Classic) could submit claims to a qualified settlement fund for administration by a claims administrator to recover their damages.

## II.   DISCUSSION

### A.  Motion to Strike Class Allegations

DLI and West Agro ask the Court to strike Triple S's class allegations from the Complaint. Motions to strike are governed by Fed. R. Civ. P. 12(f), which provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "Striking a party's pleading is an extreme and disfavored measure." *Donelson v. Ameriprise Fin. Servs., Inc.*, 999 F.3d 1080, 1092 (8th Cir. 2021) (cleaned up). But granting a motion to strike can sometimes be appropriate, "such as when a portion of the complaint lacks a legal basis." *Id.* This includes granting "a motion to strike class-action allegations prior to the filing of a motion for class-action

11

certification." *Id.* Striking class allegations at the outset of litigation is appropriate under the following circumstances:

> It is "sensible ... to permit class allegations to be stricken at the pleading stage" if it is "apparent from the pleadings that the class cannot be certified" because "unsupportable class allegations bring 'impertinent' material into the pleading" and "permitting such allegations to remain would prejudice the defendant by requiring the mounting of a defense against claims that ultimately cannot be sustained.

*Id.* (quoting 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1383 (3d ed.).

Relying on *Donelson*, DLI and West Agro point out that a number of U.S. purchasers of V300s have agreements that include arbitration clauses waiving their rights to participate in any class action, thereby making those purchasers ineligible class members. Further, they assert that class allegations should be stricken to the extent they include putative members with arbitration agreements because those clauses present individualized issues that preclude class certification. As explained below, the Court finds Defendants' reliance on *Donelson* misplaced.

There is no question that, as a matter of law, a district court is permitted to strike class allegations prior to a motion for class certification. *Doneslon*, 999 F.3d at 1092 ("We agree . . . that a district court may grant a motion to strike class-action allegations prior to the filing of a motion for class-action certification."). And although the *Donelson* court found the district court had abused its discretion in declining to strike the class allegations in that case, *Donelson* is distinguishable from this case in two important ways. First, the named *Donelson* plaintiff had an arbitration agreement in his contract with the defendant,

and forcing the defendant to litigate the case up to the point of a class-certification motion created a significant risk of unfair prejudice to the defendant. If the defendant in the *Donelson* scenario were to litigate the matter without seeking to enforce its arbitration rights, it risked waiving those rights entirely. *Id.* at 1087–88. In such a case, the *Donelson* court reasoned that if a defendant must wait until class certification to raise such a challenge, it will have to engage in litigation with "one hand tied behind its back," or else risk waiving its right to arbitrate. *Id.* at 1092.

This concern with unfair prejudice is simply not present here. It is undisputed that the named plaintiff in this case, Triple S, does not have an agreement with an arbitration clause. Consequently, Defendants are not faced with the same catch-22 that the *Donelson* scenario presents. Failing to strike class allegations at the outset will not create any untenable risk to the Defendants that then might be viewed as waiving their right to arbitrate. Nor is this a situation in which the only thing preventing the defendant from getting to arbitration is the existence of class action allegations. *Id.* at 1092 (finding the district court abused its discretion because, in part, "the class allegations were all that stood in the way of compelling arbitration"). There is nothing in the record to suggest that the Defendant are prevented by this lawsuit from compelling arbitration where appropriate.

Second, the *Donelson* court found that on the face of the plaintiff's complaint, the class allegations should have been stricken because individual issues would clearly predominate and make class treatment inappropriate. *Id.* at 1092–94. But while *Donelson* found that it was "apparent from the pleadings that [the plaintiff] could not certify a class," *Id.* at 1092, here, the Defendants base their argument that individual issues pertaining to

the arbitration agreements will preclude class certification on material that appears nowhere in the Complaint or is otherwise embraced by the pleadings. To support their request to strike the class allegations, DLI and West Agro submit extra-pleading material showing that at some point in 2020 (likely motivated by the resolution of the *Bishop* litigation), Defendants inserted arbitration provisions into form purchase agreements. [Doc. 16-1, 16-2, 16-3]. But this is not part of Triple S's claims, and it is undisputed that Triple S's agreement itself contains no arbitration clause. Therefore, Defendants have not shown that Triple S's claims are inappropriate for class determination in any way comparable to *Donelson*.

For these reasons, the motion to strike class allegations is denied. This denial does not mean that absent class members who have valid arbitration agreements will be among those included in any class that may ultimately be certified in this case. Nor does it mean that the Court has determined, at this stage, whether any aspect of Triple S's claims is appropriate for class treatment. Those issues are left for another day.

### B. Motions to Dismiss

DLI and West Agro have also moved to dismiss failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion of "detailed factual allegations" in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements," are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 5573). In applying this standard, the Court must assume the facts in the complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986); *see Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019). But the Court need not accept as true any wholly conclusory allegations or legal conclusions that the plaintiff draws from the facts pled. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).

### 1. DLI's Motion

DLI seeks partial dismissal of the Complaint.[1] DLI argues (1) that Count 1 of the Complaint alleging a breach of contract should be dismissed; (2) that the economic-loss doctrine bars significant portions of the damages sought in Count 5 (strict products liability), Count 6 (negligence), and Count 8 (negligent misrepresentation); and (3) that Triple S cannot obtain damages for a violation of the DTPA in Count 10. As discussed below, DLI's motion is granted in part and denied in part.

### *Breach of Contract*

To state a claim for breach of contract under Minnesota law, a plaintiff must allege that (1) an agreement was formed, (2) the plaintiff performed any conditions precedent to plaintiff's demand of performance by the defendant, and (3) the defendant breached the

---

[1] DLI does not argue that the Court should dismiss Count 2 (breach of implied warranty of merchantability); Count 3 (breach of implied warranty of fitness for a particular purpose); Count 4 (breach of express warranty); Count 7 (fraudulent inducement); or Count 9 (fraudulent concealment). In addition, DLI argues only that portions of the tort claims in Counts 5, 6, and 8 should be dismissed.

contract. *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014).

DLI asserts several bases for dismissal of Triple S's breach-of-contract claim. First, DLI argues that the contract claim should be dismissed because DLI is not a party to the Sales Agreement. Second, DLI asserts that the contract claim should be dismissed as duplicative of the breach-of-express-warranty claim. Third, to the extent the contract claim does not overlap with the express-warranty claim, DLI contends that the obligations that were allegedly breached are not found among the terms of the Sales Agreement and that the responsibility for fulfilling those obligations lies only with the independent dealer, Professional Dairy Systems. And fourth, DLI argues that the portion of the contract claim asserting a breach of the covenant of good faith and fair dealing should be dismissed because the covenant does not apply to sales contracts like the Sales Agreement.

The Court agrees that the Complaint fails to adequately allege formation of a purchase agreement between Triple S and DLI. "Under Minnesota law, if a plaintiff cannot plead the existence of a contract between himself and the defendant, the breach of contract claim will fail." *Kruger v. Lely N. Am., Inc.*, 518 F. Supp. 3d 1281, 1287 (D. Minn. 2021). Triple S alleges it entered a sales agreement with "DeLaval" to purchase the V300s. And Count 1 of the Complaint is premised on an alleged breach of the "DeLaval Sales Agreement." But Defendants have supplied a copy of the Sales Agreement, the authenticity

of which Triple S does not dispute,[2] which reveals that DLI is not a party to that contract. [Doc. 13-1]. The Sales Agreement identifies Triple S Farms as the buyer, indicates that the four V300 machines and associated materials constitute the equipment being purchased, and names the independent dealer Professional Dairy Systems as the seller of that equipment. [*Id.*]. The Sales Agreement is executed by agents of Triple S and Professional Dairy Systems, and in a text box bearing the heading "Acceptance of Agreement," Triple S acknowledged its understanding that Professional Dairy Systems "is an independent company and is not an agent of DeLaval Inc." [*Id.*]. These facts demonstrate that the contract for the purchase of the V300s was formed between Triple S and Professional Dairy Systems, not between Triple S and DLI.

Triple S refers to the "possibility that a DeLaval employee signed the agreement" on behalf of the Professional Dairy Systems [Doc. 37 at 14], but Triple S has pled no facts in its Complaint to make that possibility anything more than speculation at this stage. "A dealer is not a manufacturer's agent simply by virtue of being a dealer of that manufacturer's goods." *Kruger*, 518 F. Supp. 3d at 1288 (citing *Jurek v. Thompson*, 308 Minn. 191, 241 N.W.2d 788, 792 & n.6 (1976)). Nothing in the Complaint suggests that Professional Dairy Systems is DLI's agent, and Count 1 fails to state a claim because the

---

[2] The Sales Agreement is properly before the Court for purposes of the motion to dismiss because it is embraced by the pleadings and its authenticity is not in dispute. *Ahsanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) (explaining that documents need not be physically attached to the pleading to be embraced by the complaint).

first element of a breach-of-contract claim—contract formation—has not been adequately alleged.

Triple S attempts to distinguish this case from *Kruger* because the warranty and the sales agreement at issue there were not part of the same document. [Doc. 37 at 14–15 n.3]. However, the rationale for dismissing the contract claim in *Kruger* did not depend on the fact that the warranty was found in a separate document. The *Kruger* court's reasoning hinged, instead, on the fact that the defendant was not a party to the contract and the plaintiff failed to allege that the dealer of the defendant's goods was acting as the defendant's agent. 518 F. Supp. 3d at 1287–88. Similarly, Triple S's reliance on the Sales Agreement's references to DLI and the indication at the bottom of each page that a "pink" copy of the agreement was for DLI is misplaced because these details do not indicate that DLI was a party to the purchase agreement.

Further, given the allegations in the Complaint and the clear import of the Sales Agreement, the fact that DLI provided a limited warranty, and that warranty appears on the reverse side of the contract, does not adequately allege that DLI was a party to a sales contract with Triple S. To the extent Triple S suggests otherwise, its argument largely conflates the breach-of-contract claim in Count 1 with the breach-of-express-warranty claim in Count 4. Any obligations under a contract premised on the express warranties provided by DLI are set forth explicitly in the limited warranty, so the contract and warranty claims completely overlap. Such duplication supports dismissal of the contract claim. *Kruger*, 518 F. Supp. 3d at 1288 ("When a breach of contract claim mirrors a breach of warranty claim, the former should be dismissed." (citing *Spectro Alloys Corp. v. Fire*

*Brick Eng'rs Co.*, 52 F. Supp. 3d 918, 929–30 (D. Minn. 2014)); *see also Cleveland v. Whirlpool Corp.*, 550 F. Supp. 3d 660, 671 (D. Minn. 2021) (same).

Although Triple S argues that the Court should not dismiss the contract claim as duplicative of the breach-of-warranty claim because the two claims may entitle Triple S to recover different damages [Doc. 37 at 14–15 n.3], the Court finds this argument unavailing as well. This argument does not change the fact that the obligations that would allegedly breached under a "warranties-as-contracts theory," *Kruger*, 518 F. Supp. 3d at 1288, would be identical to those that that would form the basis of the breach-of-warranty claim. Nor does it alter the reality that Triple S has failed to plausibly allege that it formed a contract with DLI in the first place.

Because Triple S has failed to plausibly allege that a contract was formed with DLI, Count 1 of the Complaint is dismissed, and the Court does not address DLI's remaining arguments concerning this claim.

### *Economic Loss Doctrine*

DLI next argues that the Court should dismiss certain requests for damages sought in connection with Triple S's strict liability, negligence, and negligent misrepresentation claims as barred by the economic-loss doctrine. Specifically, DLI argues that the economic-loss doctrine prohibits Triple S from recovering in tort for the alleged diminution in value of the V300 machines or the expenses incurred in retrofitting Triple S's barn. Alternatively, DLI asks the Court to strike these claims pursuant to Rule 12(f). DLI's motion is denied.

Under Minnesota law, "the economic loss doctrine . . . bars recovery under the tort theories of negligence or strict liability for economic losses that arise out of commercial transactions, except those involving personal injury or damage to other property" *Transp. Corp. of Am. v. Int'l Bus. Machines Corp.*, 30 F.3d 953, 956 (8th Cir. 1994); *Johnson v. Bobcat Co.*, 175 F. Supp. 3d 1130, 1144 (D. Minn. 2016) ("The economic loss doctrine generally prohibits a plaintiff 'from recovering purely economic losses in tort.'" (quoting *Thunander v. Uponor, Inc.*, 887 F.Supp.2d 850, 871 (D. Minn. 2012))).

The economic loss rule has been codified by the Minnesota Legislature at Minn. Stat. § 604.101. This provision "bars a buyer from bringing a tort claim for a product defect when the harm the buyer suffers is solely to the product." *Kruger*, 518 F. Supp. 3d at 1292 (citing Minn. Stat. § 604.101, subd. 3). The statute allows a buyer to bring a tort claim for "loss of, damage to, or diminution in value of ... other tangible personal property or real property." *Id.* (quoting § 604.101, subd. 3(1)). And the statue allows claims for "reasonable costs of repair, replacement, rebuilding, and restoration." *Id.*

Section 604.101 "'exhaustively states the economic loss doctrine' and thus abrogates the common law version of the doctrine." *Johnson*, 175 F. Supp. 3d at 1144–45 (quoting *Ptacek v. Earthsoils, Inc.*, 844 N.W.2d 535, 538–39 (Minn. Ct. App. 2014)). Because the statute abrogates the common law version of the doctrine, its applicability is limited to two circumstances: "product defect tort claims and common law misrepresentation claims." *Id.* at 1145. If a claim falls outside the statute's applicability, it is error to apply the economic loss rule as a bar to a plaintiff's claim. *Ptacek*, 844 N.W.2d at 539.

Insofar as DLI seeks dismissal of a portion of the damages sought by Triple S for its tort claims pursuant to Rule 12(b)(6), its argument is undermined by the conclusion reached on the same issue in a relatively similar piece of litigation from this District—*Kruger*. There, the Court declined to dismiss the plaintiff's "tort claims to the degree they seek to recover for damage to the [robotic milking] system and [plaintiff's] barn," because the Court found it could not dismiss "part of a claim" pursuant to Rule 12(b)(6). 518 F. Supp. 3d at 1292. Here, the Complaint alleges that the V300s' defects caused damage to Triple S's cows, milk product, and its barn, and DLI does not distinguish *Kruger* or otherwise argue that its reasoning is inapplicable.

DLI, perhaps recognizing the impact of this portion of *Kruger*, which it otherwise heavily relies upon to support other aspects of its motion, suggests that the Court should, pursuant to Fed. R. Civ. P. 12(f), simply strike certain paragraphs from the Complaint related to precluded damages. [Doc. 63 at 17–18]. However, striking matter from a pleading under Rule 12(f) is a discretionary decision. *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) ("Judges enjoy liberal discretion to strike pleadings under Rule 12(f)."). And courts generally do not grant motions to strike without some showing of prejudice. *Braun v. Walz*, No. 20-CV-331 (NEB/DTS), 2021 WL 871217, at *1 (D. Minn. Mar. 9, 2021) ("There is general agreement that motions to strike 'should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action.'" (quoting 5C Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1382 (3d ed.)). DLI does not identify any significant prejudice

that will result if the paragraphs referencing purportedly unavailable damages are not stricken from the Complaint. DLI may implicitly argue that it would be unfair for it to have to defend against damages claims concerning Triple S's barn when those damages are unrecoverable, but defendants often have to defend against claims for damages that ultimately are shown to be beyond a plaintiff's reach. That run-of-the-mill aspect of a defense does not constitute significant prejudice that justifies striking all barn-related damages allegations from the Complaint.

Finally, at least at this stage of the proceedings, the Court cannot conclude that all barn-related damages are foreclosed by the economic loss doctrine. DLI suggests that any alleged costs to rebuild and repair Triple S's barn would be barred under the integrated-system rule because the V300 is integrated into the completed system of Triple S's dairy barn, so that the entire system ceases to be other property for purposes of the economic loss doctrine. [Doc. 63 at 16 (citing *Milwaukee Mut. Ins. Co. v. Deere & Co. Inc.*, No. Civ. 04-4905 (MJD/JGL), 2005 WL 2105513, at *3–4 (D. Minn. Aug. 26, 2005))]. DLI argues that Triple S's allegation that its barn can only be used with the V300s makes it clear that the integrated-system rule applies, but the Court disagrees. At this stage of the litigation, whether the integrated-system rule bars recovery for damages to Triple S's barn is a fact issue that is not appropriate for resolution under Rule 12(b)(6). *Cf. Milwaukee Mut. Ins. Co.*, 2005 2105513, at *4–5 (finding the rule applicable in a case where the tree processor attached to the excavator "work[ed] as a single unit and were sold as a single unit, in one transaction, for one undivided price" such that they "were component parts of an integrated system").

22

For these reasons, DLI's motion to dismiss, or alternatively to strike, the portions of Counts 5, 6 and 8 seeking damages related to Triple S's barn, the value of the V300s, or the costs incurred in removing or replacing the V300s is denied. Whether such damages are ultimately recoverable for Plaintiff's tort claims or are barred by the economic loss doctrine is a question better left for another day.

### Deceptive Trade Practices Act

The parties' dispute regarding the propriety of Triple S's pleading of Count 10 is indicative of some of the unnecessarily over-litigated aspects of this proceeding to date. In the portion of its Complaint reciting its cause of action for violations of the DTPA, Triple S alleged that DLI's deceptive trade practices caused it to incur monetary and non-monetary damages, and that the Plaintiff and Minnesota Subclass seek all monetary and non-monetary relief allowed by law. [Compl. ¶¶ 236–37]. Because the only remedy for violations of the DTPA is injunctive relief, *Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*, 603 N.W.2d 336, 339 (Minn. Ct. App. 1999), DLI asks the Court to dismiss this portion of Plaintiff's DTPA claim or strike Paragraphs 236 and 237 from the Complaint. Triple S responds that in those paragraphs it is not seeking to recover monetary damages, but seeks only those damages "allowed by law." Triple S otherwise suggests that these paragraphs merely show that it has suffered past harm, will suffer ongoing harm in the future, and that it is entitled to other equitable relief including recission of a contract. [Doc. 37 at 25–28]. And in reply, DLI insists that the paragraphs at issue *do*, in fact, ask for monetary damages; repeats its request for dismissal or to have Paragraphs 236 and 237 stricken; and contends that Triple S should not be permitted to use its response to amend

its Complaint to seek rescission of a contract when that relief was not requested in the pleading. [Doc. 63 at 18–20].

What this frustrating exchange reveals is that the parties do not actually dispute whether money damages are available for a violation of the DTPA. Because Triple S has conceded that such relief is not available, it is unnecessary for the Court to redline Triple S's Complaint via Rule 12(b)(6) or Rule 12(f) to make that clear. In light of the parties' agreement, DLI's motion is denied as moot on this issue.

### 2.  West Agro's Motion

West Agro's motion to dismiss has three distinct parts: (1) a "lumping" challenge; (2) a joinder in DLI's arguments; and (3) an argument that Plaintiff's fraud-based claims are not alleged with the particularity required by Rule 9(b). The Court first resolves the lumping and particularity challenges together, and then turns to the joinder argument.

### *Lumping and Particularity*

First, West Agro argues that Triple S fails to state any claim against it because the Complaint does not identify any specific conduct attributable to West Agro. Instead, West Agro contends that Triple S lumped all the Defendants together into a single entity that it defined as "DeLaval" for purposes of all the facts alleged and the causes of action. [Doc. 14 at 3–5]. This characterization of the Complaint is accurate. Triple S is pursuing an "alter-ego" theory of liability by which all six Defendants operate as a single unit. Triple S suggests that the integration of the Defendants means that the presumption that they are separate corporate entities should be disregarded and they should all be parties to the

litigation regardless of which company was nominally taking a specific action. [*See* Compl. ¶¶ 23–41 (discussing relationship between the Defendants and alleged "alter-ego" theory)].

Relatedly, West Agro argues that the absence of specific allegations related to its conduct necessarily means that Triple S's fraudulent inducement and fraudulent concealment claims fail because they are not pled with the particularity required by Rule 9(b). [Doc. 14 at 5]. As such, West Agro persuasively argues that the Complaint, as pled, does not inform West Agro of its alleged participation in the fraud. *Olin v. Dakota Access, LLC*, 910 F.3d 1072, 1075 (8th Cir. 2018) (stating that "in cases with multiple defendants, the complaint should inform each defendant of the nature of his alleged participation in the fraud") (internal quotations omitted).

At the time the Complaint was filed, Triple S was somewhat hamstrung in asserting its "alter-ego" theory by the fact that it could not use information about the relationships between the Defendants learned during the course of discovery in the *Bishop* litigation. The barrier to doing so was the presence of a protective order that precluded use of confidential materials from *Bishop* in other litigation. Subsequently, Triple S obtained relief from that protective order and supplemented the record in this case with material that it believes supports its "alter-ego" theory. [Doc. 150–52].

On February 1, 2023, the Court heard oral argument on additional motions to dismiss filed by other Defendants, including DeLaval Holding BV ("DLH BV") and Tetra Laval. DLH BV and Tetra Laval raised similar lumping arguments in their motions to those advanced by West Agro in the instant motion, as did other motions filed by DeLaval Holding AB ("DLH AB") and DeLaval International AB ("DLI AB"). Meanwhile, when

Triple S supplemented the record, it suggested that if the Court did not believe that the Complaint as drafted adequately supported the "alter-ego" theories of liability and personal jurisdiction Triple S was advancing, then Triple S should be given leave to amend.

In a February 1, 2023 bench ruling, the Court determined that Triple S should file an Amended Complaint to take its best shot at alleging the basis for its "alter-ego" theories of personal jurisdiction and liability. In addition, the Court denied the motions filed by DLH BV, Tetra Laval, DLH AB, and DLI AB without prejudice to potentially being refiled after Triple S files the Amended Complaint. The Court notes that West Agro has identified that it is situated somewhat differently from those other defendants because it is a subsidiary of DLI, and not a parent company that could control DLI's operations. [Doc. 14 at 4]. Regardless of whether West Agro's status as a subsidiary creates a barrier to the "alter-ego" theory laid out in the Complaint, the Court concludes that denying West Agro's motion without prejudice is likewise appropriate at this stage. As noted, Triple S will be filing an Amended Complaint, which will become the operative pleading in this litigation. The Court asked Plaintiff's counsel to think carefully about which Defendants were truly the appropriate parties to have in this litigation given what it knows about the Defendants' operations and relationships, and if Triple S persists in asserting claims against West Agro, West Agro is free to renew a motion to dismiss aimed at the allegations in the amended pleading if it believes they are deficient. That is true of both West Agro's theory that the Plaintiff improperly lumped the Defendants together and its argument that the fraud-based claims directed at West Agro were not alleged with sufficient particularity.

### *Adoption of DLI's Arguments*

In briefing its motion to dismiss, West Agro asserted that DLI's arguments raised in its motion to dismiss applied equally to West Agro. Like DLI, West Agro is not a party to the contract at issue, and for the same reasons the Court found that the Complaint fails to state a claim against DLI for breach of contract, it finds that the breach-of-contract claim against West Agro fails as well. Accordingly, the Court will grant West Agro's motion to dismiss to the extent it is aimed at the breach-of-contract claim. West Agro presents no compelling reason why the Court should resolve the other arguments that DLI raised any differently with respect to West Agro. Therefore, West Agro's motion adopting DLI's other arguments is denied for the same reasons discussed above.

## III.   ORDER

Consistent with the discussion above, **IT IS HEREBY ORDERED THAT**:

1. The Motion to Strike Class Allegations [Doc. 12] is **DENIED**.

2. DeLaval Inc.'s Motion to Dismiss or Alternatively to Strike [Doc. 15] is **DENIED IN PART** and **GRANTED IN PART**.

3. West Agro's Motion to Dismiss for Failure to State a Claim [Doc. 13] is **DENIED IN PART WITHOUT PREJUDICE** and **GRANTED IN PART**.


Date: March 2, 2023

  *s/Katherine Menendez*
Katherine Menendez
United States District Judge

27