## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Triple S Farms, LLC; Green Acres Dairy, LLC; Charles Fry and Emily Snyder; and Rocky Point Farms, Inc.;

No. 22-cv-1924 (KMM/DTS)

Plaintiffs,

**ORDER**

v.

DeLaval Inc.; West Agro, Inc.; DeLaval International AB; DeLaval Holding BV; DeLaval Holding AB; and Tetra Laval International SA;

Defendants.

## INTRODUCTION

Plaintiffs Triple S Farms, LLC ("Triple S"), Green Acres Dairy ("Green Acres"), LLC, Charles Fry and Emily Snyder (collectively "Fry"), and Rocky Point Farms, Inc. ("Rocky Point") are dairy farmers who purchased a robotic system to automate the process of milking their cows. That system is the DeLaval VMS V300, which was released in the United States in 2018 and allegedly promoted by the Defendants as a major upgrade over an earlier model, the DeLaval VMS Classic. In a previous lawsuit, *Bishop, et al. v. DeLaval Inc., et al.*, Case No. 5:19-cv-06129-SRN (W.D. Mo.), a class of farmers claimed the Classic was defective. The *Bishop* case ultimately ended in a $50 million class-action settlement.

According to the Plaintiffs in this case, although the marketing of the V300 promised it could properly and efficiently perform the essential functions of milking

dairy farmers' livestock, the V300, like the Classic before it, is defectively designed, defectively manufactured, fails to conform to express and implied warranties, and fails to perform as promised. The Plaintiffs also allege that the Defendants deceived them into believing that the machine could do it job through affirmative misrepresentations and omissions.

Based on these allegations, Plaintiffs are pursuing causes of action for breach of contract; breach of implied warranty of merchantability; breach of implied warranty of fitness for a particular purpose; breach of express warranty; strict products liability; negligence; fraudulent inducement; negligent misrepresentation; fraudulent concealment or omission; violation of Washington's Consumer Protection Act, RCW § 19.86, *et seq.*; and violation of Maryland's Consumer Protection Act, M.D. Comm. L. Code § 13-101, *et seq.*[1] [Am. Compl., Dkt. 199.]

After Triple S filed its initial Complaint, the Defendants filed several motions to dismiss raising a variety of challenges including failure to state a claim and lack of personal jurisdiction. The Court addressed the substance of motions to dismiss for failure to state a claim filed by Defendants DeLaval Inc. and West Agro, Inc., granting their motions in part and denying them in part. The Court noted that Triple S attempted to plead alter-ego claims and to allege an alter-ego theory of personal jurisdiction with respect to several of the Defendants, but it had done so without the ability to include information in the original Complaint that the *Bishop* plaintiffs had uncovered during that

---

[1] Green Acres is in Washington; Fry and Rocky Point are in Maryland.

litigation. Triple S, represented here by the same counsel that represented the *Bishop* class, pled the original alter-ego claims with one hand tied behind its back due to the provisions of a protective order from the *Bishop* case that precluded use of the information in other litigation. So, the Court gave the Plaintiffs an opportunity to replead once they obtained relief from the protective order from the *Bishop* court.

Plaintiffs filed their First Amended Class Action Complaint ("Amended Complaint") on March 23, 2023, which includes significantly greater detail concerning their alter-ego theory than could be found in the original Complaint. In other words, Plaintiffs have now taken their best shot at stating the factual basis for their alter-ego theories. As expected, Defendants renewed their motions to dismiss for failure to state a claim and for lack of personal jurisdiction. Specifically, this matter is before the Court on the Motion to Dismiss filed by Defendants DeLaval International AB ("DLI"), DeLaval Holding BV ("DHBV"), DeLaval Holding AB ("DHAB") (collectively the "Foreign DeLaval Entities"), and West Agro, Inc. ("West Agro"), [Doc. 210], and Defendant Tetra Laval International SA's Motion to Dismiss [Doc. 218]. For the reasons that follow, Tetra Laval International SA's motion is granted, and the Foreign DeLaval Entities' motion is granted in part and denied in part.

## BACKGROUND

Plaintiffs' factual allegations concerning the flaws in the V300 and the Defendants' actions in marketing the newer robotic milking system, taken as true for purposes of the pending motions, are discussed in the Court's March 2, 2023 Order on the motions to dismiss and to strike class allegations brought by DeLaval Inc. and West

Agro. [Doc. 189 at 3–8.] For purposes of this Order, those facts have not substantially changed with the filing of the Amended Complaint, so the Court will not repeat them in detail here. Generally, Plaintiffs allege that the V300 cannot safely and effectively milk their cows, the V300 does not conform to the manufacturer's express warranties, and one or more of the Defendants made material misrepresentations intended to induce Plaintiffs to purchase the V300s. As a result, Plaintiffs allege that they have suffered substantial losses through their inability to produce quality milk, being forced to build entirely new barns or retrofitting existing structures to house the largely ineffective V300 systems, and harm to their livestock.

The Foreign DeLaval Entities' motions focus predominantly on the sufficiency of Plaintiffs' "alter-ego" allegations in the Amended Complaint, both for purposes of determining whether the amended pleading states a claim for relief and for establishing personal jurisdiction. Therefore, the Court describes those allegations below, which are set forth in granular detail in Paragraphs 24 through 98 of the Amended Complaint.

### *Alleged Disregard of Corporate Form and Control*

DeLaval Inc. is a Delaware corporation with a principal place of business in Missouri, that designs, manufactures, advertises, markets, and installs robotic milking systems in the animal husbandry industry. West Agro is a Delaware corporation, also with a principal place of business in Missouri, that runs a similar business, and is a wholly owned subsidiary of DeLaval Inc.

Tetra Laval International SA ("TLI" or "Tetra Laval") is a Swiss company collectively owned by three members of the "Rausing Family." It is the controlling owner

4

of the DeLaval Group, and is the corporate parent, grandparent, or great-grandparent of the Foreign DeLaval Entities, DeLaval Inc., and West Agro.

DeLaval International AB ("DLI") is a Swedish company that is a wholly owned subsidiary of DeLaval Holding BV ("DHBV"). DLI allegedly "controls and directs the content of all marketing and sales information provided to dairy farmers by coordinating with employees of DeLaval Inc., including in Missouri." [Doc. 199 ¶ 20.]

DHBV is the parent company of DeLaval Inc. and DLI and owns all shares of both companies. It is founded under the laws of the Netherlands. DeLaval Holding AB ("DHAB") is a Swedish company that is DHBV's corporate parent. DHAB is a wholly owned subsidiary of TLI.

Plaintiffs allege that all the Defendants are controlled by one board, act as a single economic unit, do not observe corporate separateness, and have collectively implemented a fraudulent scheme to market and sell the V300s to Plaintiffs and the putative classes, while siphoning funds away from DeLaval Inc. that would otherwise be available to compensate the class members for their losses. Defendants allegedly operate as a non-legal entity referred to as "DeLaval Group," "DeLaval," or "One DeLaval." Each company is treated as a mere division of this group. TLI allegedly asserts operational control over all Defendants throughout the group, including as it relates to the design, manufacture, sale, and distribution of the V300.

All Defendants operate under the "Tetra Laval Group Board" and the "DeLaval Group Management Team." The Group Board and Group Management allegedly have decision-making authority that supersedes that of the management or directors of each of

the individual Defendant entities. The Group Board is responsible for the overall strategy of TLI, and allegedly "directs, mandates and controls the business operations of each Defendant." Nine individuals sit on the Group Board, three of whom are members of the family that collectively owns TLI. Several of the members of the Group Board also sit on the boards of directors of other Defendants.

The members of the Group Management are appointed by the Group Board. Group Management members purportedly exert day-to-day control over Defendants' operations, including the design, manufacture, sale, marketing and distribution of the V300. The CEO of the DeLaval Group is on the Board of Directors of both DHAB and DLI, is allegedly employed by DLI, but serves as the CEO without distinguishing between or among any of the Defendants. Plaintiffs claim that the CEO was involved in the design of the V300 through participation in projects and studies in the United States and was involved in the marketing of the V300 in the United States. The CFO of DeLaval Group is allegedly employed by DHBV or a subsidiary and serves in those roles without distinguishing between them. Other members of the Group Management are claimed to be employed by DLI, except for the Executive Vice President of Cluster Americas, who is employed by DeLaval Inc., and they too serve in their roles without distinguishing between technical legal entities.

Plaintiffs assert that the Group Board and Group Management control or dominate each individual Defendant's operation and management. All Defendants allegedly have the same directors or officers because the Group Management team and the Group Board and its committees oversee all the DeLaval entities. Pursuant to a "Corporate Policy,"

Plaintiffs claim that the CEO and CFO of the Group Management make the decisions that would normally be made by each entity's own officers. And there is significant overlap between the membership of the directors and officers of each of the Defendants and the Group Board and Group Management.

Moreover, TLI, DHAB, and DHBV allegedly do not allow the individual entities' boards of directors or management to make decisions that are in the best interests of those entities. Instead, they require the various boards to put the best interests of the overall DeLaval Group first. TLI does not operate as a typical holding company, but rather takes responsibility for the group's public affairs, communications, and human resources. Like TLI, DHAB allegedly has only a nominal board of directors and the Group Board controls its operations. DHBV serves as the "financial and controls department" of the DeLaval Group under the direction of the CFO. DLI acts as the "entrepreneur" of the DeLaval Group and was purportedly engaged in the design, development, manufacture, marketing, and sale of the V300 and associated products and services, and was responsible for centralized marketing of the V300.

The Amended Complaint also asserts that DeLaval Inc. failed to maintain formal legal requirements. It did not conduct continuous structured board meetings. And DeLaval Inc. allegedly maintained no meeting minutes from 2010 through the present. DHAB, DLI, DHBV, and West Agro also disclosed no meeting minutes during discovery in the *Bishop* litigation, leading Plaintiffs to assert that their nominal boards of directors do not meet regularly or maintain regular meeting minutes.

The Group Board and the Foreign DeLaval Entities oversee each Defendant's finances and financial controls functions. The DeLaval Group's members financials are consolidated, and intra-company transactions are eliminated. DeLaval Inc., West Agro, and DLI transfer all of their profit to the DeLaval Group and TLI. Because revenues that the subsidiaries make funnel up the corporate chain, subsidiary entities like DeLaval Inc. allegedly rely on cash made available by TLI for operating costs and to pay debts. The Corporate Policy also dictates that each DeLaval company keep excess cash to a minimum. At least in some instances, DeLaval Inc. allegedly lacks authority to set the terms for sale of V300s to dairy farmers, and the CEO has only limited power under the Corporate Policy to engage in financial transactions on behalf of any of the entities.

TLI, the Group Board, and Group Management determine executive compensation within each DeLaval entity. TLI coordinates and arranges all insurance and risk management for members of the DeLaval Group, including DeLaval Inc., pursuant to the Corporate Policy.

The Group Board, Group Management, and the Foreign DeLaval Entities reportedly treat property, especially the property of DeLaval Inc. and West Agro located in the United States, as their own. DLI uses storage facilities in the United States owned by DeLaval Inc. to house inventory. The entire DeLaval Group uses the same DeLaval Website and email domain, and the DeLaval Website does not distinguish between corporate entities. Vacancies for employment positions are advertised as positions with "DeLaval."

*Alleged Injustice from Abuse of Corporate Form*

According to the Amended Complaint, the disregard of corporate formalities and centralized control described above has been or will be used to commit fraud or injustice against the Plaintiffs. DeLaval Inc. was allegedly directed by Group Management, the Group Board, and the Foreign DeLaval Entities to make the fraudulent representations described in the Amended Complaint, and without the aforementioned control, Plaintiffs assert that they would not have been injured. That control also resulted in the asserted siphoning of funds from DeLaval Inc. to limit DeLaval Inc.'s potential liability for punitive damages. According to the Plaintiffs, after the *Bishop* case was filed and between the end of 2018 and the beginning of 2019, over $350 million in assets were taken from DeLaval Inc.'s accounts, reducing its total assets from over $790 million to under $434 million. Additional assets were siphoned from DeLaval Inc. to the point that it eventually showed a balance of negative $1. Further, Plaintiffs allege that the DeLaval Inc. President and CEO falsely stated that DeLaval Inc.'s assets totaled over $800 million, including $3 million in cash, but the total assets were, in fact, closer to $90 million.

Plaintiffs claim that this siphoning of funds was directed or completed by Group Management, the Group Board, and the Foreign DeLaval Entities. The individual DeLaval entities are also required to have inadequate cash by the Corporate Policy. Plaintiffs assert that "on information and belief, DeLaval Inc.'s cash was eliminated following the filing of *Bishop* in anticipation of *Bishop* and future class actions like this one to hinder Plaintiffs' ability to collect, including with respect to punitive damages."

[Doc. 199 ¶ 94.] In addition, TLI allegedly placed a $100 million loan on DeLaval Inc.'s books, though DeLaval Inc.'s President and CEO did not know what the loan was used to acquire. This loan almost doubled DeLaval Inc.'s liabilities. According to the Amended Complaint, this action was also taken for the purpose of hindering the ability of the Plaintiffs to collect on any judgment.

### DLI's Alleged Jurisdictional Contacts

The Amended Complaint asserts that DLI has targeted each state in the United States in which V300s were sold using marketing designed for the United States. DLI controlled the design and distribution of the marketing materials. Its CEO traveled to the United States and gave a presentation in person at a V300 launch event in Madison, Wisconsin. DLI also developed the V300 based on studies conducted in Missouri and on farms across the United States. DLI contacted V300 purchasers across the United States by servicing V300 machines. Those service contacts included remote access or monitoring and direct consultation with service providers in the United States. DLI also allegedly works directly with employees and agents of DeLaval Inc. in the United States, including in Missouri, regarding servicing of V300s. DLI registered to do business in Missouri, stores equipment in Missouri, and entered into agreements with DeLaval Inc. while it was headquartered in Missouri. [Am. Compl. ¶¶ 99–103.]

### DeLaval Inc. as Alleged Agent

Finally, the Amended Complaint alleges that DeLaval Inc. acted as the agent of the Foreign DeLaval Entities in the United States and Missouri because the latter directed and controlled DeLaval Inc.'s marketing, sale, and distribution of the V300. Because

DeLaval Inc.'s tortious acts and breaches were undertaken at the direction of DLI, as well as DHAB, DHBV, and TLI through Group Management and the Group Board, Plaintiff assert that there is personal jurisdiction over each Defendant. [Am. Compl. ¶¶ 104–07.]

### *Jurisdictional Evidence*

Because the pending motions raise challenges to the Court's personal jurisdiction, the parties have relied on evidence outside the pleadings. Plaintiffs offered extensive exhibits to support their showing that exercise of personal jurisdiction over the Foreign DeLaval Entities and TLI would be appropriate under an alter-ego or agency theory.[2] Plaintiffs offered copies of the LinkedIn profiles for DeLaval personnel Bret Faber, Christian Poggenesse, and Harnold Jans to illustrate that those affiliated with different organizations in the Defendants' corporate families refer to their respective employers simply as "DeLaval." [Dkt. 130-1, 130-2, 130-3.]

Plaintiffs similarly point to a DeLaval slideshow presentation that depicts a "DeLaval Board" and "Tetra Laval Board" and "Group Management" sitting at the two highest tiers of a pyramid depicting decision-making within the organization. [Dkt. 156 at 151.] The same slideshow demonstrates that the Tetra Laval Group Board establishes "Charters of Responsibilities & Code of Business Conduct" as well as the Tetra Laval "Group Policies and Procedures" that apply to TLI, "DeLaval," and others within the organization. [*Id.* at 162.] The slideshow also refers to "corporate governance" as "the

---

[2] Much of this evidence was obtained through the use of jurisdictional discovery that was permitted in *Bishop* so the plaintiffs in that class action could pursue the same alter-ego theories of personal jurisdiction against the same Defendants as in this case. However, that litigation settled before the jurisdictional issues were ultimately resolved by the *Bishop* court.

system by which the DeLaval group of companies are directed/mandated and controlled."
[*Id.* at 167.]

Plaintiffs provided a 2004 copy of the "DeLaval Corporate Policies." [Dkt. 156-3.]
The document sets forth mandatory rules for the organizations within the DeLaval Group
to follow, and DeLaval Group Management approves the policies. [*Id.* at 4.] One of the
policies requires the number of members of a DeLaval company's board of directors to
be kept to the legally required minimum, consisting of a Managing Director, a member of
local senior management, and a representative of the region or a member of DeLaval's
Group Management. [*Id.* at 9.] In addition, the policies provide that "[e]xcess cash must
be kept to a strict minimum locally," and that any excess cash be applied to cover certain
obligations first. [*Id.* at 15.] "Long-term, structural excess cash should be distributed as
dividend or otherwise extracted from the respective [DeLaval] company," and DeLaval
companies are required to seek financing internally from the Tetra Laval Group prior to
looking to external (bank) financing. [*Id.*] The policies prohibit DeLaval companies from
mortgaging assets without obtaining approval from DeLaval Group Finance and Control.
[*Id.* at 16.]

DeLaval Inc. and West Agro are identified as part of the "Americas Cluster" of the
DeLaval Group. [Dkt. 156-1.] The human resources, legal, and finance aspects of the
Americas Cluster businesses report directly to Sweden for support and so that business is
conducted consistently across regions. [Cuccioli Dep. at 162, Dkt. 156-2.] For certain
large transactions exceeding one million euros, the head of Americas Cluster, Fernando

Cuccioli, testified in the *Bishop* case that he would need to obtain approval. [*Id.* at 162–66.]

Plaintiffs also offer evidence indicating that at unspecified times, some individuals have held management roles or served as board members for more than one entity or group, including: the DeLaval Group Management Team; DHAB's Board of Directors; DHBV's Board of Directors; DLI's Board of Directors; DeLaval Inc.'s Board of Directors; and West Agro's Board of Directors. Plaintiffs illustrate the alleged overlapping management and board membership with the following chart:

| | DeLaval Group Mgmt. Team | DeLaval Holding AB Board | DeLaval Holding BV Board | DeLaval International AB Board | DeLaval Inc. Board or Officer | West Agro Inc. Board or Officer |
|---|---|---|---|---|---|---|
| Paul Lofgren | x | x | | x | | |
| Christian Poggensee | x | x | x | x | x | |
| Johan Swahn | x | o | | o | x | |
| Varlie Binner | x | | | x | | |
| Fernando Cuccioli | x | | | | x | x |
| Johan Ledel | x | o | | x | | |
| Bert Faber | | o | x | o | | |
| Katherine Sams | | | | | x | x |
| Jeff Fine | | | | | x | x |
| Matt Ericson | | | | | x | x |

[Dkt. 154 at 7 & nn. 6–7 (citing various exhibits at Dkt. 155 and Dkt. 156).][3]

---

[3] Within the table, the "x" appears to designate simply that the individual served, at one time or another, on the board or as an officer. The "o" designates that the individual was a "'[s]pecifically authorized signatory' for the entity." [Dkt. 154 at 7 n.5.]

Plaintiffs provide documentation indicating that the DeLaval Group companies use consolidated financial accounts and cash pooling maintained by the Tetra Laval Group. [Dkt. 156-3 at 13; Poggensee Dep. at 115–18, Dkt. 156-25.] They note that Mr. Poggensee explained how DeLaval Inc. obtains operational funding from that cash pool. [Poggensee Dep. at 122.]

Further, Plaintiffs present evidence that they argue shows DeLaval Inc. is inadequately capitalized. They assert that between the end of 2018 and the beginning of 2019, over $350 million in assets was removed from DeLaval Inc.'s books. [Dkt. 156-31 at 3 (showing Dec. 2018 closing assets); Dkt. 156-32 at 3 (showing 2019 opening assets).] DeLaval Inc.'s assets continued to decline, and by the end of 2019 its available cash eventually fell to –$1. [Dkt. 156-32 at 3 (pooled cash at closing); *id.* (closing 2019 assets).] Plaintiffs note that the corporate policies discuss above require cash pooling and for an entity like DeLaval Inc. to maintain "inadequate cash." [*See* Dkt. 154 at 12–13.]

Defendants also submitted evidence relevant to the jurisdictional questions. The DeLaval Group's Chief Financial Officer, Christian Poggensee, filed a declaration stating that DHAB is part of the DeLaval Group, which is a multinational group of companies, but DHAB does not refer to itself as DeLaval Group. [Dkt. 160 ¶ 3.] DHAB owns all but one share of DHBV, and Tetra Laval owns the sole remaining share. [*Id.* ¶ 4.] Although DHAB owns DHBV, which in turn owns DeLaval Inc. and other companies, DHAB does not engage in "industrial business operations" such as developing, manufacturing, marketing, selling, installing or servicing any products, including the V300s. [*Id.*] DHAB has no offices in the United States, owns no real property in the United States, and has no

14

employees in the United States. [*Id.* ¶ 5.] DHAB's board of directors meets four times a year in Sweden or online, and none of its directors are also officers or directors of DeLaval Inc. [*Id.* ¶ 6.] In fact, DHAB has no employees. [*Id.* ¶ 7.]

Mr. Poggensee filed a second declaration stating that DLI is a Swedish company that is part of the DeLaval Group, but does not refer to itself by that name. [Dkt. 164 ¶ 3.] DLI itself does not own any portion of DeLaval Inc., but it sells equipment to DeLaval Inc. under a distribution agreement so that DeLaval Inc. can make further sales in the United States. [*Id.* ¶ 4.] DLI has no offices in the United States and owns no real property in the United States, but it does store inventory at facilities owned by DeLaval Inc. ad West Agro in Kansas. [*Id.* ¶ 5.] DLI does not market, sell, or maintain products in the United States, except to assist DeLaval Inc. with complicated technical requests regarding products that DLI manufactures. [*Id.*] None of DLI's directors or employees are officers or directors of DeLaval Inc. [*Id.* ¶ 6.]

Other evidence indicates that DLI sets a price for the purchase of VMS machines and DeLaval Inc. buys the machines at that price. [Rodriguez Dep. at 58, Dkt. 215-2.] After a VMS is in DeLaval Inc.'s inventory, the price that DeLaval Inc. charges a dealer or a farmer for that VMS depends on many factors, including dealership performance and the competition in the particular market. [*Id.* at 58–59.]

Bret Faber, a member of the DHBV Board of Directors, provided a declaration indicating that DHBV is similarly part of the DeLaval Group, but it does not refer to itself by that name. [Dkt. 123-1 ¶ 3.] DHBV is based in the Netherlands, and as of November 2022, it owned 53 subsidiary entities located in various countries around the

world. [*Id.* ¶¶ 3–4.] One of the subsidiaries it owns is DeLaval Inc., but DHBV does not develop, manufacture, market, sell, install, or service any products, including the V300s. [*Id.* ¶ 4.] DHBV has no presence in the United States, owns no property in the United States, and conducts no business in the United States. [*Id.* ¶ 5.] Its board of directors meets in the Netherlands and none of its officers or directors are also officers or directors of DeLaval Inc. [*Id.* ¶ 6.] Unlike DHAB, DHBV does have some employees—eight to ten at any given time. [*Id.* ¶ 7.] They do not manage the day-to-day operations of any of the subsidiary entities that it owns, including any of the other Defendants in this case. [*Id.*]

Robert Swan, a member of the Tetra Laval board of directors, filed declarations stating that TLI is a Swiss company that is part of Tetra Laval Group, but it does not refer to itself by that name. [Dkt. 77 ¶ 3.] TLI does not develop, manufacture, market, sell, install, or service any products, including the V300s. [*Id.* ¶ 4.] It has no offices in the United States, owns no real property in the United States, has no employees in the United States, and does not conduct any business or activities in the United States. [*Id.* ¶ 5.] None of TLI's officers or directors is also an officer or director of DeLaval Inc. [*Id.* ¶ 7.] Mr. Swan further explains that the board meetings referred to in the Amended Complaint that took place in Pennsylvania in September 2008 and in Indiana in September 2019 were not TLI board meetings. [Dkt. 223 ¶ 4.]

Other evidence in the record indicates that DeLaval Inc. holds regular board meetings, including the testimony of one of DeLaval Inc.'s board members in the *Bishop* litigation. [Cuccioli Dep. at 61–63, Dkt. 168.] The record also includes DeLaval Inc. board meeting minutes and resolutions from 2006 through 2019. [Dkt. 169.] DeLaval

Inc's sole shareholder, DHBV, holds annual board meetings and votes to elect members of the board, and the board chooses the officers of DeLaval Inc. [Dkt. 156-11, 156-12.] In addition, while corporate policy documents show that TLI establishes a corporate code of business conduct, the DeLaval President & Chief Executive Officer, Joakim Rosengren, distributed a letter attaching an adapted Tetra Laval Code of Business Conduct providing that "Local Management of DeLaval reports to Group Management members and has operational responsibility for their respective DeLaval Company operating unit." The local managers are instructed to prioritize the overall interests of the DeLaval Group over their local entity, but "[t]he local manager is delegated such powers as are consistent with discharging this role. . . ." [Dkt. 171 at 1, 8.]

In yet another declaration, Mr. Poggensee explained that multi-national corporations like the DeLaval entities often use cash pooling arrangements. [Dkt. 174 ¶ 2.] "Their purpose is to use the internal funds of subsidiaries and parents before resorting to bank borrowing." [*Id.*] Debts incurred and payments received under these arrangements are documented on each company's financial statements, then those statements are combined in compliance with International Financial Reporting standards, which includes eliminating intracompany and intercompany transactions. [*Id.* ¶ 3.] Mr. Poggenesse explains that just as a line of credit does not give a bank operational control over the company to which it lends, funding of a subsidiary through a cash pooling arrangement does not give the company providing the funding control of the commercial operations of the other company. [*Id.* ¶ 4.] Further, Mr. Poggenesse explains that DeLaval Inc. pools cash among its own business units and its subsidiary West Agro,

but it does not share a cash pooling arrangement with DHBV, DHAB, DLI, or Tetra Laval. [*Id.* ¶ 5.] Instead, DeLaval Inc. has a "contractual cash pool/borrowing arrangement with Tetra Pak, Inc.,[4] which is a company within the Tetra Laval Group, in addition to external bank relationships." [*Id.*; *see also* Dkt. 173.] Defendants also provided evidence that DeLaval Inc. has cash on hand to pay its bills along with a "comfortable cushion." [Dkt. 170 ¶ 4.] Historically, DeLaval Inc. has paid an annual dividend to its shareholders, and it maintains insurance to cover liability claims. [*Id.*]

## DISCUSSION

### I.    Legal Standards

The Defendants' motions raise issues of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and failure to state a claim and Rule 12(b)(6).

### A. Personal Jurisdiction

In a diversity case like this, the court follows state law to determine the issue of personal jurisdiction, looking to the forum state's long-arm statute. *Walden v. Fiore*, 571 U.S. 277, 283 (2014). Because Minnesota's long-arm statute extends jurisdiction to the fullest extent allowed, courts in the District of Minnesota determine only whether their exercise of personal jurisdiction over a defendant is consistent with due process. *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1431 (8th Cir. 1995). To be consistent with due process, a defendant must have minimum contacts with the forum so that exercising jurisdiction will not "offend traditional notions of fair play and

---

[4] Tetra Pak Inc. is a Texas corporation.

substantial justice." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92 (1980). A defendant's contacts with a forum are sufficient when the defendant "should reasonably anticipate being haled into court there." *Id.* at 297; *Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 951 (8th Cir. 2022). In conducting that analysis, the Court must determine whether Defendants have sufficient minimum contacts and whether the Plaintiffs' claims "arise out of or relate to" Defendants' contacts. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (quoting *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*, 131 S. Ct. 1773, 1780 (2017)).

The Court considers five factors in the minimum-contacts analysis. *Bros. & Sisters in Christ*, 42 F.4th at 952; *Johnson v. Arden,* 614 F.3d 785, 794 (8th Cir. 2010). The three "primary factors" include: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts; [and] (3) the relationship of the cause of action to the contacts."[5] *Arden*, 614 F.3d at 794. These factors are "closely interrelated" and often considered together. *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519 (8th Cir. 1996). The "secondary factors" are "(4) the interest of [the state] in providing a forum for its residents; and (5) the convenience or inconvenience to the parties." *Arden*, 614 F.3d at 794.

In addition, "[p]ersonal jurisdiction can be properly asserted over a corporation if another is acting as its alter ego, even if that alter ego is another corporation." *Epps v.*

---

[5] The Eighth Circuit has noted that the third factor "distinguishes whether the jurisdiction is specific or general." *Arden*, 614 F.3d at 794. No party here contends that Minnesota has general jurisdiction over any of the Foreign DeLaval Entities or Tetra Laval, so the Court considers specific jurisdiction alone.

*Stewart Info. Servs. Corp.*, 327 F.3d 642, 649 (8th Cir. 2003); *Kruger v. Lely N. Am., Inc.*, No. 20-cv-629 (NEB/DTS), 2020 WL 12991167, at *3 (D. Minn. Dec. 14, 2020). "The circumstances of each case must be examined to determine whether a corporation through the activities of another corporation has subjected itself to jurisdiction in a state under its long arm statute." *Epps*, 327 F.3d at 649 (quoting *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc.*, 519 F.2d 634, 637 (8th Cir. 1975)); *Hawkeye Gold, LLC v. China Nat'l Materials Indus. Imp. & Exp. Corp.*, 89 F.4th 1023, 1035 (8th Cir. 2023) (finding, under Iowa law, that plaintiff failed to demonstrate "exceptional circumstances" justifying piercing the corporate veil to exercise jurisdiction over Chinese parent company based on U.S.-base subsidiary's contacts with Iowa). "[A] court's assertion of jurisdiction is contingent on the ability of the plaintiffs to pierce the corporate veil." *Epps*, 327 F.3d at 649. Courts consider state law when considering whether to pierce the corporate veil. *Id.*

On a motion to dismiss for lack of personal jurisdiction, the "plaintiffs bear the burden of establishing a prima facie showing of jurisdiction, and we view the [facts] in the light most favorable to the plaintiffs." *Kaliannan v. Liang*, 2 F.4th 727, 733 (8th Cir. 2021) (cleaned up). This prima facie showing "is accomplished by pleading sufficient facts 'to support a reasonable inference that the defendants can be subjected to jurisdiction within the state.'" *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011) (quoting *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004)). The evidentiary showing required at this stage is minimal. *Arden*, 614 F.3d at 794. This showing is "tested, not by the pleadings alone, but [also] by the

20

affidavits and exhibits" supporting and opposing the motion to dismiss. *Dever*, 380 F.3d at 1072. The district court views the evidence in the light most favorable to the plaintiffs and resolves conflicting facts in their favor. *K-V Pharm.*, 648 F.3d at 592.

### B. Failure to State a Claim

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion of "detailed factual allegations" in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In applying this standard, the Court must assume the facts in the complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986); *see Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019). But the Court need not accept as true any wholly conclusory allegations or legal conclusions that the plaintiff draws from the facts pled. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).

## II.    Choice of Law

The parties have extensively briefed and argued the appropriate choice of law to be applied to the analysis of the alter-ego personal-jurisdiction issues. Defendants argue that the Court must apply Missouri's choice-of-law rules because the case was transferred here from the Western District of Missouri. They argue that under Missouri's choice-of-

law rules, the Court must apply Delaware law to assess the sufficiency of Plaintiff's alter-ego allegations. However, they eventually suggest that there is no meaningful conflict between Missouri and Delaware law. [Dkt. 123 at 6–9; Dkt. 159 at 6; Dkt. 163 at 6; Dkt. 61 at 4 n.2; Dkt. 103 at 22–25; Dkt. 213 at 6 n.4; Dkt. 220 at 7–8.] Plaintiffs argue that Missouri law applies to both the choice-of-law question and to the sufficiency of their alter ego allegations, but also appear at one point to concede that there is no material conflict between these bodies of law. [Dkt. 129 at 13–16; Dkt. 231 at 25 n.25.] Nevertheless, Plaintiffs suggest that the Court is obligated to apply Missouri law. [Dkt. 129 at 13.]

This case was transferred to the District of Minnesota from the Western District of Missouri pursuant to 28 U.S.C. § 1404(a). [Dkt. 23.] "When a case is transferred under § 1404(a), the transferee district court [here, the District of Minnesota] applies the choice-of-law rules of the transferor court's State [here, Missouri]." *Steen v. Murray*, 770 F.3d 698, 701 (8th Cir. 2014). "Missouri courts apply the internal affairs doctrine when requested to pierce the corporate veil" and look to the law of a company's state of incorporation when resolving alter-ego disputes. *Douglas v. Imerys Talc Am., Inc.*, No. 4:18CV1141 RLW, 2019 WL 626427, at *6 (E.D. Mo. Feb. 14, 2019) (quotations and

citations omitted); *see also Nat'l Green Gas, LLC v. Estrategy, Inc.*, Case No. 4:18-CV-00285-BCW, 2019 WL 13207475, at *3 (W.D. Mo. Jan. 17, 2019).[6]

Because Plaintiffs contend that the Foreign DeLaval Entities and West Agro are alter-egos of DeLaval Inc., and DeLaval Inc. is incorporated in Delaware, the Court looks primarily to Delaware law to analyze the alter-ego issues in this case. However, the parties have relied upon cases from both Missouri and Delaware in their briefing, noted that courts generally consider Delaware law to be persuasive authority in cases involving various aspects of corporate law,[7] and broadly agreed that there is no outcome-determinative difference between the various bodies of law governing the alter-ego issues presented in this case. Having reviewed the cited caselaw and the voluminous briefing on the subject, the Court has failed to identify a meaningful difference between these bodies of law, as applied to these motions, will not belabor the issue further at this time, and will rely primarily on Delaware alter-ego law.

## III.   Personal Jurisdiction

The Foreign DeLaval Entities (DLI, DHAB, and DHBV) and Tetra Laval argue that the Plaintiffs have failed to meet their burden to make a prima facie showing that the

---

[6] Minnesota courts also appear to apply the internal-affairs doctrine and look to the law of a company's state of incorporation when evaluating whether an entity is an alter ego. *Russ v. XPO Logistics, LLC*, No. 19-cv-2719 (DSD/JFD), 2022 WL 3371132, at *7 (D. Minn. Aug. 16, 2022).

[7] *See Swope v. Siegel-Robert, Inc.*, 243 F.3d 486, 496 (8th Cir. 2001) (predicting that Missouri would follow Delaware law based in part on Delaware's "expertise in analyzing issues of corporate law").

Court has personal jurisdiction over them.[8] They contend that Plaintiffs' allegations do not establish personal jurisdiction under a theory that these entities are "alter egos" of DeLaval Inc. or through a traditional minimum-contacts analysis, and that Plaintiffs' "agency" theory of jurisdiction also fails as a matter of law.

## A. Alter-Ego Theory[9]

As noted above, a corporate subsidiary's contacts with the forum may be attributed to a corporate parent if the subsidiary is the mere alter ego of the parent. *Epps*, 327 F.3d at 649. Establishing jurisdiction under an alter-ego theory requires a showing akin to that needed to pierce the corporate veil under the applicable state law. *Id.* And under the circumstances of this case, the relevant state law is primarily that of Delaware.

---

[8] West Agro does not join this aspect of the Foreign DeLaval Entities' motion to dismiss and does not contest personal jurisdiction.

[9] In assessing the sufficiency of Plaintiffs' allegations for purposes of the personal jurisdiction analysis, the Foreign DeLaval Entities and TLI urge the Court to disregard thirty-seven allegations made by the Plaintiffs "on information and belief." [Dkt. 213 at 3–6; Dkt. 220 at 10.] They contend that allegations made on information and belief are insufficient to establish personal jurisdiction, citing *Zeavision, LLC v. Bausch & Lomb Inc.*, No. 4:21CV1487 HEA, 2022 WL 17092453, at *2, *5 (E.D. Mo. Nov. 21, 2022). In *Zeavision*, the relevant allegation made on information and belief was the conclusory assertion that the defendant "operates in Missouri," which was unaccompanied by any other factual assertion. *Id.* at *5. The Court is unaware of any Eighth Circuit authority standing for the proposition that a proper, non-conclusory factual assertion made "on information and belief" cannot be considered for purposes of a personal jurisdiction analysis at the motion to dismiss stage. In reaching the conclusions discussed in this Order, the Court has examined Plaintiffs' allegations that are not controverted by any evidence from the Defendants, including those made "on information and belief," while also observing that several of them are heavily worded conclusory statements unadorned by any specific factual allegations. However, the Court will not wholesale disregard all allegations made "on information and belief."

*Delaware Alter-Ego Law*

Delaware courts observe corporate separateness except when "a subsidiary is a mere instrumentality or alter ego of its owner." *Microsoft Corp. v. Amphus, Inc.*, C.A. No. 8092-VCP, 2013 WL 5899003, at *6 (Del. Ch. Oct. 31, 2013) (quotations omitted); *see also Blanks v. Fluor Corp.*, 450 S.W.3d 308, 375–76 (Mo. Ct. App. 2014). The separateness of parents and subsidiaries should be disregarded only in exceptional circumstances. *Case Financial, Inc. v. Alden*, No. 1184-VCP, 2009 WL 2581873, at *4 (Del. Ch. Aug. 21, 2009) (explaining that Delaware courts disregard the corporate form "only in the exceptional case"); *see also Goellner-Grant v. Platinum Equity LLC*, 341 F. Supp. 3d 1022, 1029 (E.D. Mo. Sept. 18, 2018) (observing that the "parent-subsidiary separation should be ignored with caution and only when the circumstances clearly justify it") (quoting *Blanks*, 450 S.W.3d at 376).

Disregard of corporate separateness requires a showing "that one entity exercises control over the other." *You Map, Inc. v. Snap, Inc.*, No. CV 20-162-CFC, 2022 WL 4377031, at *1 (D. Del. Sept. 22, 2022); *Blanks*, 450 S.W.3d at 375 (requiring "complete domination . . . so that corporate entity . . . had . . . no separate mind, will or existence of its own"). Under Delaware law, courts examine a variety of factors concerning the operation of the subsidiary corporation and its relationship to the parent, including: (1) whether the corporation was adequately capitalized for purposes of its business; (2) whether the corporation was solvent; (3) whether corporate formalities were followed, such as paying dividends, keeping records, and having properly functioning officers and directors; (4) whether there was any siphoning of funds by the dominant shareholder; and

(5) whether the corporation was a mere façade for the controlling shareholder. *Maloney-Refaie v. Bridge at School, Inc.*, 958 A.2d 871, 881 (Del. Ch. 2008).

In addition to satisfying the above multi-factor analysis, a plaintiff proceeding under an alter-ego theory must show that the subsidiary corporation is "a sham and exist[s] for no purpose other than as a vehicle for fraud." *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999); *see also Mitchell v. K.C. Stadium Concessions, Inc.*, 865 S.W.2d 779, 784 (Mo. Ct. App. 1993) (explaining that the plaintiff "must establish that the corporate cloak was used as a subterfuge to defeat public convenience, to justify a wrong, or to perpetrate a fraud"). The kind of "injustice" that is relevant to this analysis is not the underlying facts that give rise to the plaintiff's breach of contract or tort claims, but that the "fraud or injustice be found in the defendant's use of the corporate form itself." *Zweigenhaft v. PharMerica Corp.*, Civil Action No. 19-2201-RGA, 2020 WL 5258345, at *2 (D. Del. Sept. 3, 2020); *see also Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989) ("The underlying cause of action does not supply the necessary fraud or injustice."). For example, a defendant may use the corporate form to work an injustice where the defendant forms a corporation "'with specific intent to escape liability for a specific tort or class of torts,'" or where the defendant "strip[s] the corporation of its assets in anticipation of impending legal liability." *Mobil Oil Corp.*, 718 F. Supp. at 269 (quoting *Zubik v. Zubik*, 384 F.2d 267, 273 (3rd Cir. 1967) and discussing *Minn. Mining & Mfg. v. Eco Chem, Inc.*, 757 F.2d 1256, 1264 (Fed. Cir. 1985)); *Blanks*, 450 S.W.2d at 376

(explaining "there can be no piercing of the corporate veil without a showing of impropriety in the establishment or use of the corporate form sought to be disregarded").

In assessing the issues of alter-ego jurisdiction, the Court is mindful that disregarding the corporate form to "pierce the veil" is appropriate under Delaware law "only in exceptional circumstances." *Marnavi S.p.A. v. Keehan*, 900 F. Supp. 2d 377, 392 (D. Del. 2012). Simply put, it is not a step to be taken lightly. Based on a careful review of the facts alleged in the Amended Complaint, the evidentiary record, and the relevant caselaw, the Court finds that Plaintiffs have failed to demonstrate that Defendants "operate as a single economic unit, dominated by TLI, the Group Board, and Group Management, whose centralized control dictates the actions of the DeLaval Group through DLI, DeLaval Inc., and [West] Agro, including their distribution, sales, and marketing activities in the U.S. regarding the V300." [Dkt. 231 at 26.] The Court finds that the facts and circumstances highlighted by the Plaintiffs likely fall short of satisfying the showing required by the multi-factor test regarding corporate separateness to pierce the veil, and the Court will examine the various relevant factors in turn. But, even if some of the factors present a "close call" regarding whether the Defendant entities function as a single economic unit—particularly when viewed through the permissive lens of this procedural stage—the Court finds that Plaintiffs fail to show that the foreign Defendants have abused DeLaval Inc.'s corporate form to perpetuate a fraud or injustice.

### *Control and Disregard of Corporate Separateness*

As an initial matter, the Court notes that many of Plaintiffs' allegations lump the Foreign DeLaval Entities and Tetra Laval into a single unit for purposes of their alter-ego

theory, rather than distinguishing between them. But these distinctions matter. For instance, it is DHBV that owns all but a single share of DeLaval Inc.'s stock, while the only remaining share is owned by Tetra Laval. DHAB is a parent company of DHBV, but is not a direct corporate parent of DeLaval Inc. DLI is another subsidiary of DHBV, making it a sister company of DeLaval Inc., rather than a corporate parent of DeLaval Inc. This is notable because Eighth Circuit precedent permits the exercise of jurisdiction under an alter-ego theory when a parent corporation dominates and controls its subsidiary, but that authority is less supportive of piercing the corporate veil as to sibling-entities. *See Kruger*, 2020 WL 12991167, at *3 (citing *Epps*, 327 F.3d at 648–49, and observing that foreign companies that did not own U.S.-based affiliate were "unlikely" to have controlled and dominated the affiliate's affairs such that the affiliate was their alter ego). However, that is only the first of the weaknesses in Plaintiffs' attempt to exercise personal jurisdiction over these foreign Defendants under an alter-ego theory.

Plaintiffs contend that because their Amended Complaint asserts the presence of several factors suggesting Group Board and Group Management control over DeLaval Inc.'s operations, this case presents an even stronger basis for finding personal jurisdiction under an alter ego theory than cases where courts have found similar allegations of a number of factors sufficient. [Dkt. 231 at 28 & n.23.] However, the Court finds Plaintiffs' reliance on the cases cited in their brief to be misplaced. For example, Plaintiffs suggest that their allegations create a stronger case for alter-ego jurisdiction than was found sufficient in *In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d 580 (M.D. Pa. 2009). However, despite Plaintiffs here having access to voluminous

28

discovery, including taking several depositions from the *Bishop* litigation already, neither their evidence nor their non-conclusory allegations demonstrate control by any of the foreign Defendants over DeLaval Inc.'s day-to-day operations that is comparable to what was found sufficient in that case. *Id.* at 614–15 (finding it appropriate to exercise personal jurisdiction over United Kingdom-based parent manufacturing companies where, among other things, the vertical management through product groups led the parent companies to "exercise[] centralized control over the day-to-day management of all . . . entities") (internal quotations omitted). Although Plaintiffs' Amended Complaint repeatedly *states* that the foreign Defendants "control" and "dominate" DeLaval Inc.'s operations, neither the facts they have alleged nor the evidence they produced make a prima facie *showing* of day-to-day operational control that would justify the exercise of personal jurisdiction under an alter-ego theory.

Plaintiffs have provided some evidence that indicates that there has been overlapping management or membership among the boards of directors of the various foreign Defendants and DeLaval Inc., but the Court does not find the record persuasive on this point. First, the fact that there are overlapping shareholders, directors, or officers between two companies is not necessarily indicative of an alter-ego relationship. *Case Fin., Inc. v. Alden*, No. Civ. A. 1184-VCP, 2009 WL 2581873, at *4–5 (Del. Ch. Aug. 21, 2009); *CNH Am. LLC v. Kinzenbaw*, No. C.A. 08-945 (GMS), 2009 WL 3737653, at *1 (D. Del. Nov. 9, 2009); *Dunne v. Res. Converting, LLC*, No. 4:16 CV 1351 DDN, 2017 WL 2264807, at *12 (E.D. Mo. May 24, 2017). And here the record actually indicates that what overlap exists is less significant than Plaintiffs imply. The chart

included in Plaintiffs' briefing identifies commonality between directors and officers of various DeLaval entities spanning a 15-year period, but does not identify when any of those individuals served in the identified roles. [Dkt. 154 at 10–11.] According to the declarations on file, none of DLI's employees or directors are officers or directors of DeLaval Inc. [Dkt. 164 ¶ 6.] None of DHAB's officers or directors are officers or directors of DeLaval Inc. [Dkt. 160 ¶ 6.] None of DHBV's officers or directors are officers or directors of DeLaval Inc. [Dkt. 123-1 ¶ 6.] And none of TLI's officers or directors are officers or directors of DeLaval Inc. [Dkt. 77 ¶ 7.] Further, the Group Management team includes no officers or directors of DHBV or DHAB. And there are no employees of any of the Foreign DeLaval Entities on the Group Board. The Plaintiffs put too much emphasis on the overlap among leadership teams.

The Plaintiffs also argue that DeLaval Inc. failed to observe corporate formalities. *See Marnavi S.p.A. v. Keehan*, 900 F. Supp. 2d 377, 392 (D. Del. 2012) (indicating that courts consider "whether dividends were paid, corporate records kept, officers and directors functions properly, and other corporate formalities were observed") (quoting *Maloney-Refaie*, 958 A.2d at 881). The Court agrees that the record on this point supports an inference that some of DeLaval Inc.'s business was conducted in an informal manner. For instance, Plaintiffs point to deposition testimony suggesting that DeLaval Inc. did not always hold regular board meetings. [Dkt. 156, Ex. 3.] And testifying in September of 2021, Mr. Cuccioli could not recall how many formal board meetings took place in 2015, 2016, 2017, 2018, and 2019. He testified that DeLaval Inc. has board members that meet "periodically, almost weekly." [Dkt. 168.] He indicated that "we don't have, you know, a

formal continuous, you know, structured board meetings. You know, we operate differently." [Dkt. 156, Ex. 3 at 62–63.] But the record before the Court also demonstrates that DeLaval Inc. did observe some corporate formalities, including paying dividends, keeping minutes of its board meetings when they occurred, and electing its own board members. [Dkt. 169.] And although the Court agrees that the Plaintiffs' showing is strongest on this point, as explored below, it is not enough to show the fraudulent or nefarious purpose that the law requires. This evidence simply does not lend support to the idea that DeLaval Inc. was a sham corporation created or used for the purpose of defrauding creditors or perpetrating an injustice.

Plaintiffs also highlight the corporate governance policies which require various DeLaval entities to operate for the good of the overall DeLaval team. But neither the law nor the facts support Plaintiffs' claim that these policies render DeLaval Inc. a sham corporation. General oversight by the parent corporation over its subsidiaries does not constitute evidence of improper control. *See Joiner v. Ryder Sys. Inc.*, 966 F. Supp. 1478, 1485–86 (C.D. Ill. 1996) (finding parent's implementation of several policies, a code of conduct, and code of ethics governing its subsidiaries, and its review of the subsidiaries' strategies and goals were consistent with sound business judgment rather than alter ego); *See In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d at 599–600 (finding allegations insufficient to demonstrate control by global parent over Canadian subsidiary for purposes of alter ego jurisdiction). In fact, here, the applicable governance documents also state that local management of DeLaval Inc. "has operational responsibility for their respective DeLaval Company/operating unit." [Dkt. 171 at 8.] In any event, the uniform

aspects of the DeLaval corporate governance on which Plaintiffs rely do not reflect the kind of "daily, operational control that is the *sine qua non* of an alter ego relationship." *In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d at 600.

Similarly, the Court finds Plaintiffs' cash-pooling allegations fail to establish domination and control of DeLaval Inc. by the foreign Defendants. First, other courts have found that centralized management of funds by a parent corporation is not necessarily indicative of an alter ego relationship. *Tyco Laboratories, Inc. v. DASI Indus., Inc.*, No. 92 C 5712, 1993 WL 356929, at *10 (N.D. Ill. Sept. 9, 1993) (finding that a corporate parent was not the alter ego of subsidiaries even though all of the subsidiaries' funds flowed to it and it paid for their financial obligations); *United States v. Bliss*, 108 F.R.D. 127, 132 (E.D. Mo. 1985) (rejecting the government's attempts to pierce the corporate veil despite the parent's management of the subsidiary's cash because the companies maintained corporate formalities and the parent did not "delve into the day-to-day operations" of the subsidiary). Moreover, the evidentiary record here suggests that DeLaval Inc. is not, in fact, involved in a cash pool with the Foreign DeLaval Entities or TLI. When Mr. Poggensee was deposed in the *Bishop* litigation, he explained that, in fact, "DeLaval, Inc., is not part of the Tetra Laval cash pool." Instead, DeLaval Inc. primarily obtains loans from Tetra Pak, Inc., and DeLaval Inc. manages the cash pool for U.S.-based DeLaval entities. [Pogensee Dep. 144–46.] In sum, while some of the facts in the record might weigh in the Plaintiffs' favor, the relevant factors as a whole do not demonstrate a lack of corporate separateness or total control by the Foreign DeLaval Entities or TLI over DeLaval Inc.

### *Perpetuating a Fraud Or Injustice*

Even if the multi-factor analysis above more strongly supported Plaintiffs' position, they would still fail to establish the critical second part of the required showing: whether the Foreign DeLaval Entities or Tetra Laval have used DeLaval Inc.'s corporate form to perpetrate a fraud or injustice. The kind of fraud or injustice that is required is not that worked by a tort or breach-of-contract claim underlying the plaintiff's complaint; rather, it must "be found in the defendant's use of the corporate form itself." *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 619 (D. Del. 2018). A general concern that one may be unable to collect on a judgment in an action against a subsidiary "does not constitute fraud or injustice to support piercing the corporate veil." *In re Western States Wholesale Natural Gas Antitrust Litig.*, MDL No. 1566, 2009 WL 455663, at *12 (D. Nev. Feb. 23, 2009).

In an effort to demonstrate fraud, Plaintiffs primarily contend that the Defendants siphoned funds from DeLaval Inc. and saddled it with debt both during the *Bishop* litigation and shortly before this lawsuit was filed. However, the Court finds the Plaintiffs' allegations and evidence on this point insufficient. For one thing, although Plaintiffs state that funds were removed from DeLaval Inc.'s books to avoid potential liability for punitive damages in this proceeding, the Amended Complaint contains no well-pled factual allegations even hinting that any of the Foreign DeLaval Entities or TLI was aware at the time the alleged siphoning occurred that this lawsuit was forthcoming. Nor does the record support an inference that the foreign Defendants stripped DeLaval Inc. of its resources in such a way that either the *Bishop* plaintiffs or any other claimant

was unable to collect. Indeed, there is nothing in the record or the Amended Complaint to suggest that the very large settlement from *Bishop* was reduced due to the alleged lack of cash in DeLaval Inc.'s coffers. In fact, there is no evidence before the Court demonstrating that any of the Foreign DeLaval Entities or Tetra Laval has ever caused DeLaval Inc. to defraud a creditor or otherwise fail to satisfy DeLaval Inc.'s own debts. *See Nestle Purina Petcare Co. v. The Blue Buffalo Co., Ltd.*, No. 4:14-cv-859-RWS, 2016 WL 5390945, at *6 (E.D. Mo. Sept. 27, 2016) (finding allegations that owners and operators of a company that had "kept [it] on the brink of insolvency to protect [its] assets from the reach of potential creditors" insufficient to state a veil-piercing claim under Missouri law where there was "no allegation that [the company] has defrauded or failed to satisfy any debts"); *see also id.* (finding no basis to pierce the corporate veil where individual owners and operators of a company allegedly "retained the company's earnings that were in excess of what the company needed to maintain its operations budget" and then "loan[ed] capital back to [the company] as needed and at interest").

Plaintiffs focus on balance sheets that they argue show DeLaval Inc. had assets of *negative $1* in early 2020. First, it is somewhat difficult to see how a reasonable inference from this fact is that DeLaval Inc. is insolvent or undercapitalized *today* when it continues to do business. Moreover, such an inference seems particularly unreasonable given that DeLaval Inc. participated in the payment of a $55 million settlement in the *Bishop* litigation even after funds had allegedly been siphoned from its books for the purpose of evading its creditors. And the record belies that DeLaval Inc. actually had a negative asset balance in 2020. The question of DeLaval Inc.'s solvency came up during

the *Bishop* litigation, and Mr. Poggensee provided a declaration there explaining that an accounting software error had led Mr. Cucciolli to submit mistaken information regarding the negative $1 figure. [Dkt. 173.] Mr. Poggensee explained that in 2020, DeLaval Inc. was not, in fact, insolvent. It had over $175 million in assets, around $168 million in liabilities, and just under $8 million in equity. [*Id.* ¶ 10.] This evidence does not support a finding that DeLaval Inc. is undercapitalized or insolvent, nor that the foreign Defendants have used DeLaval Inc.'s corporate form to perpetrate an injustice.

Plaintiffs similarly point to a $100 million loan that was allegedly placed on DeLaval Inc.'s books by one or more of the European-based Defendants, but again the record undermines Plaintiffs' argument. The loan, rather than being a sham, was for the acquisition of a company called Milkrite | Interpuls, Inc. Although Plaintiffs allege on information and belief that the acquisition of that company was not for the benefit of DeLaval Inc., the evidence in the record establishes that DeLaval Inc. is the sole owner of Milkrite's outstanding shares. [Dkt. 244-6.] To state the obvious, while the record indicates DeLaval Inc. took on a loan to acquire Milkrite, it also shows that DeLaval Inc. itself, not the Foreign DeLaval Entities or Tetra Laval, obtained Milkrite as an asset. And Plaintiffs do not contest that Milkrite was a valuable asset.

Plaintiffs also argue that DeLaval Inc. is undercapitalized because it is not named on the insurance policies that could provide coverage for the claims at issue in this case. In response, Defendants submitted several insurance policies for the Court's review, which, on their face, undermine Plaintiffs' assertions. The polices do, indeed, list Tetra

Pak Inc., as the insured, but each policy contains an amendment which plainly refers to DeLaval Inc. as a named insured. [Dkt. 244, Exs. B–F.]

Finally, Plaintiffs assert that the Defendants' misuse of the corporate form has caused an injustice because it is allegedly an attempt to frustrate Plaintiffs' ability to obtain discovery relevant to any litigation. However, Plaintiffs offer only conclusory allegations to support this claim and fail to point to any authority from Delaware (or any other jurisdiction) to support the proposition that an alleged effort to frustrate discovery in potential litigation is the kind of injustice that allows a court to disregard corporate separateness. Moreover, Plaintiffs' theory is belied by the record. Plaintiffs have admitted in this case that they engaged in significant jurisdictional and merits discovery during the *Bishop* litigation, including relating to the issues of corporate governance and alter ego.[10] [Dkt. 39 at 6 (discussing the discovery conducted in the *Bishop* case).] And no showing has been made that DeLaval Inc. has resisted or will resist discovery requests, or that third-party subpoenas will not be available or workable to acquire needed information. Easing the path to discovery is not a factor that supports piercing the corporate veil.

For these reasons the Court finds Plaintiffs have failed to meet their burden to show that exercise of personal jurisdiction over the Foreign DeLaval Entities or Tetra Laval is appropriate under an alter-ego theory.

---

[10] In another case against DeLaval Inc. and other DeLaval related entities, the same counsel that are representing the Plaintiffs here explained that in *Bishop* they received over 1 million documents during the discovery. *Hardy's Holsteins, LLC v. DeLaval Inc. et al*., No. 21-cv-6151, Doc. No. 19 (W.D. Mo. Mar. 25, 2022). Defendants represent that DLI produced nearly 3.5 million pages of material in *Bishop*. [Dkt. 241 at 15.]

### *Jurisdictional Discovery*

In their briefing, Plaintiffs request that if the Court finds their showing insufficient to meet their burden at this stage, they be permitted to engage in jurisdictional discovery. [*E.g.*, Dkt. 231 at 40–41 n.35.] "A district court has the discretion to allow limited jurisdictional discovery on a motion to dismiss for lack of personal jurisdiction if ascertaining additional facts will help resolve the jurisdictional issue." *WinRed, Inc v. Ellison*, 581 F. Supp. 3d 1152, 1165 n.6 (D. Minn. 2022), *aff'd sub nom.*, 59 F.4th 934 (8th Cir. 2023). That request is denied.

Questions of alter-ego often present an information imbalance, especially in the context of private companies where the information necessary for a plaintiff to meet its burden is in the exclusive control of its opponents. Here, however, the circumstances are far different. The Plaintiffs have already obtained significant discovery through the *Bishop* litigation, much of which concerned the interrelationship between the various DeLaval entities, including taking several depositions and obtaining extensive document discovery. The Court finds that ordering additional jurisdictional discovery concerning Plaintiffs' alter-ego theory will not further illuminate the issue. Plaintiffs do not explain why additional discovery would be likely to reveal domination and control of DeLaval Inc. by the Foreign DeLaval Entities or Tetra Laval or show that these Defendants have used DeLaval Inc.'s corporate form to perpetrate a fraud or injustice when previous efforts did not.

## B. Agency Theory

Plaintiffs also advance an "agency theory" as an alternative basis on which the Court can exercise specific personal jurisdiction over the Foreign DeLaval Entities and Tetra Laval.[11] "Under the agency theory, the court may attribute the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf or at the parent's direction." *C.R. Bard, Inc. v. Guidant Corp.*, 997 F. Supp. 556, 560 (D. Del. 1998); *see also Travel Leaders Leisure Gr., LLC v. Cruise & Travel Experts, Inc.*, 2020 WL 46045534, at *13 (D. Minn. Aug. 11, 2020) (citing, *inter alia*, *Daimler*, 571 U.S. at 135 n.13 and assessing "agency-based" issues of jurisdiction in the context of an employer-employee relationship). Unlike the alter-ego theory, this approach "attributes specific acts to the parent because of the parent's authorization of those acts, but does not treat the parent and the subsidiary as one entity." *C.R. Bard*, 997 F. Supp. at 560 (citing *Stinnes Interoil, Inc. v. Petrokey Corp.,* No. 82C–JN–109, 1983 WL 21115 (Del. Super. Aug. 24, 1983)). "Thus, under the agency theory 'only the precise conduct shown to be instigated by the parent is attributed to the parent.'" *Id.* (quoting *Applied Biosystems, Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1464 (D. Del. 1991)). For the reasons that follow,

---

[11] The Supreme Court has held that it is improper for district courts to exercise general jurisdiction over a foreign parent corporation under an agency theory based on a finding that its in-state subsidiary "performs services that are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the [parent] corporation's own officials would undertake to perform substantially similar services." *Daimler AG v. Bauman*, 571 U.S. 117, 134–35 (2014) (internal quotations omitted). In *Daimler*, the Court noted that "[a]gency relationships . . . may be relevant to the existence of *specific* jurisdiction. . . . As such, a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there." *Id.* at 135 n.13.

the Court finds that the Plaintiffs have failed to make an adequate prima facie showing to establish that the Court has personal jurisdiction over the Foreign DeLaval Entities and Tetra Laval under an agency theory.

Plaintiffs first argue that the Amended Complaint states that the Foreign Defendants and TLI "control and direct DeLaval Inc. in the sale, marketing, and distribution of the V300 in each of the United States," and control and direct the sales and marketing conduct through the Group Management Team and the Group Board vis-à-vis the "dictates of the Corporate Policy." [Am. Compl. ¶¶ 105–06; Dkt. 231 at 38.] Plaintiffs point to their allegations that the foreign Defendants dominated and controlled the day-to-day corporate affairs of DeLaval Inc. as support for the proposition that DLI, DHAB, DHBV, and TLI directed the specific sales and marketing of the V300s to Triple S, Green Acres, Fry, and Rocky Point. [Dkt. 231 at 38 (referring to argument in Section II.A of response brief).]

Rather than detailing the specific acts that each of the foreign Defendants allegedly authorized or directed DeLaval Inc. to perform in Minnesota, the Amended Complaint continues to lump them all together. [Am. Compl. ¶¶ 104–07 (alleging that there is specific personal jurisdiction because DeLaval Inc. "acted as the agent of DLI, DHAB, DHBV, and TLI in the United States").] Such diffuse pleading fails to identify the precise conduct of DeLaval Inc. that Plaintiffs intend to attribute to each of the other Defendants for purposes of exercising personal jurisdiction under an agency theory, and such specificity is required. As a result, Plaintiffs' agency theory is essentially premised on the same alleged control and domination of DeLaval Inc.'s day-to-day operations as

their alter-ego theory. However, the Court has found that Plaintiffs fail to establish a prima facie showing of control and domination. They cannot bring the foreign Defendants within the Court's personal jurisdiction simply by giving their broad alter-ego theory an "agency" label.

To the extent Plaintiffs focus on any one of the Foreign DeLaval Entities at all, it is DLI. Plaintiffs assert that DLI (1) exercised control over DeLaval Inc.'s "drafting, design, and distribution of marketing materials" for use in the V300 marketing campaign in the United Staes [Am. Compl. ¶ 100; Dkt. 231 at 38.]; and (2) dictated DeLaval Inc.'s sales, marketing, and distribution of the V300s through a distribution agreement the two companies entered,[12] [Am. Compl. ¶¶ 105–06; Dkt. 231 at 38–40].

The Court finds these allegations are not enough to establish an agency-based personal jurisdiction over DLI. The allegations in the Amended Complaint regarding DLI's purported control over DeLaval Inc.'s marketing are generally conclusory and therefore do not reasonably support an inference that DeLaval Inc. was simply acting as DLI's its agent. As explored above, this is not a case where the allegations and evidence suggest that DeLaval Inc.'s day-to-day activities were, in fact, controlled or directed by DLI or the other foreign Defendants. Moreover, the Amended Complaint alleges in detail

---

[12] There is, indeed, evidence that DLI has a distribution agreement with DeLaval Inc. through which it sells equipment to DeLaval Inc. "for the further sales to the United States market by DeLaval Inc., through independent distributors or other channels as DeLaval Inc. may assign." [Dkt. 164 ¶ 4.] However, Plaintiffs cite no authority for the proposition that the mere existence of a distribution agreement between two companies within a corporate family sufficiently demonstrates that one acted as the other's agent for purposes of exercising specific personal jurisdiction.

how DeLaval Inc.'s own employees or agents were involved in the sale of the V300 robots to the Plaintiffs, but there are no facts alleged indicating how DLI (or any of the other Defendants) directed or instigated their conduct. [Am. Compl. ¶¶ 195–256; *see also* Dkt. 164 ¶ 9 (explaining that the individual with whom Triple S transacted was never a DLI employee or agent).] Moreover, Defendants have provided unrebutted evidence indicating that marketing materials developed outside of the United States were modified and adapted for U.S. markets by DeLaval Inc. [Dkt. 215-3 at 3–5.] For example, during a 30(b)(6) deposition of DeLaval Inc. from the *Bishop* litigation, the company's designated witness, Francisco Rodriguez, testified that after receiving marketing materials from a location outside the United States, when the "tool" "arrived into each country, the solution manager would be responsible for updating it and making it relevant and revised for the local market, as every local market has its own regulations and so on." [Dkt. 217-1 at 6.] Although this reality demonstrates corporate coordination, these facts do not show that DeLaval Inc. was simply acting at the direction or on behalf of DLI when it marketed V300 robots in the United States and in Minnesota.

### C. Conspiracy Theory

Plaintiffs allege that the Foreign DeLaval Entities and Tetra Laval are subject to personal jurisdiction in Minnesota under the conspiracy theory of jurisdiction. In their Amended Complaint, Plaintiffs allege that, through the DeLaval Group, Group Management, Group Board, and the corporate polices, all Defendants "were involved in the creation, review, and/or approval of the content of the sales and marketing materials for V300—including the alleged fraudulent statements or omissions—particularly those

41

published on their shared website and Internet presences and through the use of their shared marketing materials." [Am. Compl. ¶ 97.] They assert that "in the alternative, to the extent any Defendant is not an alter ego, each agreed to take part or participate in and did participate in a conspiracy to commit the causes of action alleged herein." [Am. Compl. ¶ 97.] In addition, Plaintiffs allege that "all Defendants should be held liable as alter egos, agents, or co-conspirators of DeLaval Inc." [Am. Compl. ¶¶ 318, 325, 332, 341, 353, 359, 375, 382, 390, 397, 405, 413.]

In Minnesota, courts may assert personal jurisdiction over conspirators who might not otherwise be subject to it. *Yellow Brick Rd., LLC v. Childs*, 36 F. Supp. 3d 855, 864 (D. Minn. 2014). "Conspiracy-based personal jurisdiction requires a showing that (1) a conspiracy existed, (2) the non-resident defendant participated in or joined the conspiracy, and (3) an overt act was taken in furtherance of the conspiracy within the forum's borders." *Id.*

The Court finds that Plaintiffs have failed to sufficiently allege the existence of a conspiracy or that any of the non-resident defendants participated in or joined such a conspiracy. The paragraphs in the Amended Complaint that specifically mention a conspiracy are entirely conclusory, and they rely solely on the same allegations Plaintiffs insist establish that DeLaval Inc. is the alter-ego of all other DeLaval entities. However, the Plaintiffs do not explain how allegations that purportedly show the various Defendants are mere façades for one another also demonstrate the existence of a conspiracy between them. They do not allege facts showing any meeting of the minds between the various Defendants. Instead, they simply attribute all alleged

42

misrepresentations in the marketing and promotion of the V300s to each and every DeLaval entity through the theory that their corporate separateness is a sham to avoid liability. Nevertheless, Plaintiffs argue that they have met the requisite threshold for pleading a conspiracy theory of jurisdiction because "each Defendant was aware of and participated in the alleged fraudulent sale of the V300 to Plaintiffs, which were for their collective benefit." [Dkt. 231 at 49 (citing Am. Compl. ¶¶ 83, 68, 63, 112).] The allegations in these paragraphs reinforce the Court's conclusion that Plaintiffs are simply repackaging their alter-ego theory with a "conspiracy" label. And they point to no authority that has found conspiracy-jurisdiction proper in a case even remotely similar to this.

### D. Minimum Contacts of DLI

Even aside from the above theories for establishing jurisdiction over the foreign Defendants, Plaintiffs assert that they have made the requisite prima facie showing of personal jurisdiction over DLI (DeLaval International AB) specifically under a traditional minimum-contacts analysis. First, Plaintiffs and DLI appear to disagree over whether the Court should evaluate DLI's alleged minimum contacts with Minnesota or Missouri. In its original motion to dismiss, DLI argued that Plaintiffs failed to allege any contacts between DLI and Minnesota so that this Court could not exercise either general or specific jurisdiction. [Dkt. 163 at 4–5.] However, DLI later argued that any of the alleged contacts with Minnesota are irrelevant because this case was originally filed in the Western District of Missouri and transferred to the District of Minnesota, so that "the question is whether DLI had sufficient personal contacts with the state of Missouri."

[Dkt. 213 at 11 & n.6.] DLI cites no authority for that proposition, and the Foreign DeLaval Entities do not address this issue at all in their reply brief. [Dkt. 241.]

On the other hand, Plaintiffs argue that the Court should evaluate whether DLI has sufficient minimum contacts with Minnesota. However, Plaintiffs cite no post-transfer cases addressing which forum the transferee court must consider when assessing personal jurisdiction over defendants who had not yet been served with or who had not yet filed a responsive pleading at the time of a transfer pursuant to 28 U.S.C. § 1404(a). [Dkt. 231 at 41–42.][13]

DLI is correct that where, as here, a diversity case is filed in a federal district court in one state and transferred to a district court in another state for the convenience of the parties and witnesses under 28 U.S.C. § 1404(a), "the transferee court applies the choice-of-law rules of the state in which the transferor court sits." *Club Vista Fin. Servs., LLC v. Maslon, Edelman, Borman & Brand, LLC*, No. 10-cv-3174 (SRN/JJG), 2011 WL 4947629, at *4 (D. Minn. Oct. 18, 2011). However, DLI points to no authority that suggests this rule affects the analysis of a transferee court's assessment of personal jurisdiction over a defendant. Accordingly, the Court will consider whether the Plaintiffs

---

[13] Plaintiffs correctly note that DeLaval Inc. and West Agro represented to the transferor court in Missouri that they did not intend to contest personal jurisdiction, and indeed they have not done so here. However, to the extent Plaintiffs imply that when DeLaval Inc. and West Agro made such a representation, the other Defendants were precluded or judicially estopped from contesting personal jurisdiction in this District, the Court disagrees. Courts generally apply such estoppel only when a party requests a transfer in one court under § 1404(a), and then after obtaining that transfer, the same party argues that the transferee court lacks personal jurisdiction over it. *E.g.*, *Kreshner v. Komatsu Ltd.*, 2019 WL 1359247, at *1–2 (W.D. Pa. Mar. 26, 2019) (finding that parent corporation that joined in request for transfer pursuant to § 1404(a) without suggesting there was any challenge to personal jurisdiction in transferee forum was judicially estopped from arguing that transferee court lacked personal jurisdiction).

have adequately alleged sufficient minimum contacts between DLI and Minnesota and whether Plaintiffs' causes of action arise out of or relate to DLI's activities within Minnesota.

Plaintiffs allege that DLI designed the V300 for the United States market and sought FDA approval for a protocol for preparing dairy cows to be milked by a voluntary milking system known as the "Teat Preparation Protocol." They note that DLI admitted the existence of a distribution agreement between itself and DeLaval Inc. through which DeLaval Inc. sells DLI-manufactured equipment to every state in the United States. Further, Plaintiffs allege that DLI targeted Minnesota, and every other state where V300s were sold, with marketing materials, including those seen and considered by the Plaintiffs in this case. DLI allegedly incorporated false representations into marketing materials distributed throughout the United States, which each of the Plaintiffs relied on to their detriment in purchasing a V300. These marketing materials included an FDA approval memorandum provided to each V300 purchaser, meaning it was distributed into Minnesota and each state in which the V300 was sold. DLI allegedly specifically contacted V300 purchasers across the United States to service V300 robots and performed ongoing maintenance and service through remote access and direct consultations with service providers throughout the United States. DLI has seven authorized dealers in Minnesota. Finally, Plaintiffs allege that DLI acted through DeLaval Inc. as its sales agent in providing in-person marketing and sales pitches on farms in Minnesota.

Having reviewed the Amended Complaint and considered DLI's arguments, which were admittedly directed at the sufficiency of contacts with Missouri [Dkt. 213 at 11–14], the Court finds that it cannot resolve the issue of whether there is personal jurisdiction over DLI based on its own contacts with Minnesota on a motion to dismiss.[14] The record before the Court raises questions about, but does not clearly resolve, whether DLI itself has sufficient contacts with Minnesota, so limited jurisdictional discovery addressed to this question will be permitted. The parties are encouraged to meet and confer regarding appropriate limits to such discovery and to attempt to resolve any disagreements without the need for further court involvement.[15] And in the meantime, the Court denies DLI's motion to dismiss for lack of personal jurisdiction, in part, without prejudice, though it can be renewed at an appropriate time.

### E. Conclusion

Based on the foregoing, the Court finds that it lacks personal jurisdiction over Defendants DeLaval Holding BV; DeLaval Holding AB; and Tetra Laval International SA. Accordingly, the Court will grant their motions to dismiss for lack of personal

---

[14] The task of resolving the motion to dismiss is made more difficult by the fact that DLI did not address the issue of its alleged contacts with Minnesota in the Foreign DeLaval Entities' reply memorandum. [Dkt. 241.] And neither party has cited apposite authority indicating after a diversity case is transferred pursuant to 28 U.S.C. § 1404(a), the transferee court addressing a newly served defendant considers whether there would be specific personal jurisdiction over that defendant in the transferor forum. The choice-of-law cases cited by DLI do not clearly stand for such a proposition, but should the parties find authority to that effect, if the personal jurisdiction issue is raised again, the Court expects the parties to adequately brief this underlying issue.

[15] Any disputes regarding such limited jurisdictional discovery that cannot be resolved through the parties' own efforts at compromise should be presented to United States Magistrate Judge David T. Schultz.

jurisdiction and dismiss them from this suit. Because the dismissal is on jurisdictional grounds, it shall be without prejudice.

With respect to Defendant DeLaval International AB, the Court finds that Plaintiffs have not met their burden to show that the Court has personal jurisdiction over it under either an alter-ego theory, agency-theory, or conspiracy-theory. However, the Foreign DeLaval Entities' motion to dismiss is denied in part to the extent that a dispute exists with respect to whether Defendant DeLaval International AB maintains minimum contacts with the State of Minnesota sufficient to exercise personal jurisdiction directly. The Court will therefore allow for jurisdictional discovery on this issue.

## IV.    Failure to State a Claim

Defendants also filed motions to dismiss for failure to state a claim. Because the Court has found that it lacks personal jurisdiction over DHBV, DHAB, and TLI, it need not address whether the Amended Complaint states a claim as to any of those Defendants. However, the Court has not found that DLI should be dismissed for lack of personal jurisdiction at this time. In their motion, the Foreign DeLaval Entities argue simply that dismissal of Plaintiffs' claims against them "under Rule 12(b)(6) is appropriate because those claims can survive only if their jurisdictional allegations are sufficient, and they are not for the reasons already stated." [Dkt. 213.] Based on the Court's review of the Amended Complaint, Plaintiffs have alleged more with respect to DLI than its involvement as part of an amorphous alter-ego theory. Plaintiffs specifically allege DLI's involvement in the marketing of the V300 and alleged responsibility for several misrepresentations on which Plaintiffs detrimentally relied in purchasing the

robots. Given that reality, the Court will not dismiss the claims against DLI for failure to state a claim.

West Agro has also renewed its previously filed motion to dismiss,[16] and raises the following three arguments. First, West Agro argues that the Amended Complaint continues to suffer from the same flaw as the original pleading, lumping West Agro together with all Defendants and failing to state what conduct, specifically, West Agro engaged in that should subject it to liability. Second, West Agro contends that as a wholly owned subsidiary of DeLaval Inc., it cannot be subjected to liability for DeLaval Inc.'s actions under an alter-ego theory. And third, West Agro argues that Plaintiffs fraudulent inducement and fraudulent concealment claims fail because they fail to meet the heightened pleading requirements of Fed. R. Civ. P. 9(b).

Based on the Court's review of the Amended Complaint, West Agro's motion, and the Plaintiffs' response, the Court will not dismiss the claims against West Agro for failure to state a claim. The Court finds that the Amended Complaint does not suffer from the same problems of lumping with respect to West Agro that were present in the original complaint, and it will not dismiss Plaintiffs' claim against West Agro on that basis. Further, the Court is skeptical of whether West Agro may ultimately be subject to any liability based on any assertion that that it is the alter-ego of DeLaval Inc. However, West

---

[16] The Court previously found that like DeLaval Inc., West Agro was not a party to the contract through which Triple S purchased its V300, and therefore, Plaintiffs failed to state a claim for breach of contract against both DeLaval Inc. and West Agro. [Dkt. 189 at 27.] The Court understands that in filing their Amended Complaint, Plaintiffs have alleged those breach-of-contract claims not for the purpose of seeking reconsideration of the Court's prior Order, but to preserve the issue.

Agro did not cite legal authority to support its argument that it cannot be subject to liability on a veil-piercing theory solely because it is DeLaval Inc.'s subsidiary, and Plaintiffs have pointed to some authority to suggest that such "reverse veil piercing" can be appropriate in certain cases. [Dkt. 39 at 7–8 (citing 18 C.J.S. Corporations § 28; *Hibbs v. Berger*, 430 S.W.3d 296, 309 (Mo. Ct. App. 2014); *In re Patters Co., Inc.*, 561 B.R. 738 751 (Bankr. D. Minn. 2016)).] Therefore, Court declines to consider this undeveloped argument.[17]

Finally, with respect to West Agro's argument that Plaintiffs fail to adequately plead their fraud-based claims, the Court finds otherwise for the same reasons articulated in *Kruger v. Lely North America, Inc.*, 518 F. Supp. 3d 1281, 1293 (D. Minn. 2021) ("When multiple defendants are members of the same corporate family, are wholly owned subsidiaries, and share counsel, the defendants should be able to sort out amongst themselves who is responsible for the allegedly fraudulent behavior."). Specifically, as in *Kruger*, the Plaintiffs here provide adequately specific facts to establish the "'who, what, when, where, and how' of the alleged fraud." *Id.* at 1292 (quoting *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012)). The Plaintiffs here raise specific allegations about the fraudulent actions taken by the various Defendants, including West Agro, to put them "on notice of the allegations" against them. *Id.* at 1293. Of note, West Agro allegedly knew about significant defects in the V300 system, had superior access to

---

[17] The Court notes that in the context of a Rule 12(b)(6) motion, it is not permitted to consider materials outside of the pleadings like those that the Court has taken into consideration in the context of the personal jurisdiction motions under Rule 12(b)(2).

information about those defects than any of the Plaintiffs, knew that information about those defects would be material to purchasers of the V300, and failed to disclose that information. [*See* Am. Compl. ¶¶ 143–65, 166–94, 361–75, 384–90.] Accordingly, the motion to dismiss for failure to state a claim is denied.

## V.    Order

Based on the discussion above, **IT IS HEREBY ORDERED THAT:**

1. DeLaval International AB, DeLaval Holding BV, DeLaval Holding AB, and West Agro, Inc.'s Motion to Dismiss First Amended Complaint [Dkt. 210] is **GRANTED IN PART** and **DENIED IN PART** as stated in this Order.

    a.   DeLaval Holding BV and DeLaval Holding AB are dismissed from this suit without prejudice for lack of personal jurisdiction.

    b.  The motion to dismiss for lack of personal jurisdiction is denied without prejudice with respect to DeLaval International AB. Limited jurisdictional discovery is permitted as stated in this Order.

    c.  The motion is denied to the extent it seeks dismissal on grounds of failure to state a claim for relief pursuant to Fed. R. Civ. P. 12(b)(6).

2. Defendant Tetra Laval International SA's Motion to Dismiss for Lack of Jurisdiction [Dkt. 218] is **GRANTED**. Defendant Tetra Laval International SA is dismissed from this suit without prejudice for lack of personal jurisdiction.

Date: March 27, 2024

                                           *s/Katherine Menendez*
                                           Katherine Menendez
                                           United States District Judge