# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Triple S Farms LLC, Green Acres Dairy, LLC, Charles Fry and Emily Snyder, Rocky Point Farms, Inc., and Northcrest Dairy, Inc., | Case No. 22-cv-1924 (KMM/SGE) |
| Plaintiffs, | |
| v. | **ORDER** |
| DeLaval Inc., West Agro, Inc., DeLaval Int'l AB, DeLaval Holding BV, DeLaval Holding AB, and Tetra Laval Int'l SA, | |
| Defendants. | |
| DeLaval, Inc., | |
| Counterclaim Plaintiff, | |
| v. | |
| Green Acres Dairy, LLC, | |
| Counterclaim Defendant. | |

## BACKGROUND

This is a putative class action against Defendants DeLaval Inc., and West Agro, Inc., ("DeLaval") relating to Plaintiffs' purchase and use of robotic cow-milking machines. Plaintiff Triple S Farms, LLC, is a dairy farm in Belgrade, Minnesota. Triple S purchased a robotic DeLaval voluntary milking system ("VMS") known as the DeLaval VMS V300 ("V300") in 2018 and made substantial changes to its barn to incorporate the new robotic

system. The Plaintiffs—all farms that purchased a V300 system—allege that DeLaval misrepresented the capabilities of the V300, that the robot is defective and fails to operate as promised, and that other issues have caused Plaintiffs and other similarly situated putative class members to incur substantial damages.

This matter is before the Court on two motions to compel: Plaintiffs' motion to compel critical discovery (Dkt. 373), and Defendants' Motion to Compel (Dkt. 382). For the reasons set forth below, the Court will grant in part and deny in part both motions.

## MOTIONS

The history of this case, both factual and procedural, is extensive. As such, only the information relevant to the instant motions is included in this Order.

### I. Plaintiff's Motion to Compel

Plaintiffs served their Third Request for Production of Documents on March 14, 2025. These requests included, as relevant to Plaintiffs' motion, requests for documentation of DeLaval's revenue for the V300 as well as its components and consumables, documents related to work on a new version of the V300, and documents related to various projects related to the V300 including Project Thunderbird. (See Wilders Decl. Ex. 16.) DeLaval responded with various objections on April 18, 2025, more than 30 days after the RFPs were served. (*Id.*)

On May 14, 2025, DeLaval produced a 55-page report addressing the experience that dairy farmers had using the V300 ("Project Green Report"). The Project Green Report comprised anonymized "comprehensive interviews of V300 owners" surveying their "overall experience" with using the V300. (Def. Mem. in Opp'n, Dkt. 393, at 3.) DeLaval

2

produced the Project Green Report to Plaintiffs one day before the deposition of its president, Fernando Cuccioli, and six days before the deposition of Krisy Campbell, who issued it. (*See* Wilders Decl. Ex. 2.) According to Campbell, the Project Green Report was part of a "litigation prevention" effort that began after this suit was filed. (*Id.* Ex. 3, Campbell Tr. 295-304.) After receiving the Project Green Report, Plaintiffs requested DeLaval produce documents from Campbell and three other employees she identified as being involved with Project Green, and two other witnesses "knowledgeable of the V300s defects." (Pl. Mem. in Supp., Dkt. 378, at 15.) DeLaval refused, asserting that the request was unduly burdensome and disproportionate in light of the discovery already produced and the cost that DeLaval would have to shoulder.

Relatedly, Plaintiffs seek production of communications between DeLaval's Chris Horton and the Federal Drug Agency regarding the V300 Teat Preparation Protocol. DeLaval does not oppose producing Horton's emails with the FDA since 2023, but it does oppose any other emails and files from Horton on grounds that it would be burdensome and disproportionate to the needs of the case.

In addition to the Project Green Report, DeLaval created and produced the "Persson Spreadsheet," a document that purports to identify 95 instances where the V300 achieved or exceeded a certain level of milk production. (See Wilders Decl. Ex. 8.) Plaintiffs have requested DeLaval produced the underlying data and discovery related to its creation. DeLaval argues that producing all underlying data would be disproportional to this case. DeLaval proposed that it would search for and produce the underlying data for the 95 instances in which farmers averaged more than 7,500 lbs. of milk production, but it refused

3

to produce the rest of the underlying data. It further states that its obligations to anonymize farm data would preclude it from producing the farm names absent a court order.

Plaintiffs then served DeLaval with a Fifth Set of Requests for Production of Documents on May 7, 2025. These included requests for documents sufficient to show the revenue, cost, and profits related to the V300 and its component parts and consumables. (*See* Wilders Decl. Ex. 17.) DeLaval's representative Persson testified at deposition that this information could be produced. (Wilders Decl. Ex. 10, Persson Day 1 Dep. Tr. 307:21-23.) DeLaval failed to object to these document requests within the time allotted by the Federal Rules.

Finally, Plaintiff seeks an order compelling DeLaval to apply the search term "Project Thunderbird" through the previously collected custodial documents it has preserved in connection with this litigation. It argues that DeLaval failed to identify "Project Thunderbird" as the name of its new robot development project until after the parties had agreed upon search terms, and that this Court has already found information about Project Thunderbird relevant to the issues and subject matter in this lawsuit. DeLaval argues that the search terms it already ran would have captured the material Plaintiffs seek, that the amount of attorney time the search would require be unduly burdensome, that DeLaval is already preparing to produce thousands of documents that relate to Project Thunderbird, and that the information must not be critical because Plaintiffs spent almost no time asking DeLaval's recent deponents about the development of Project Thunderbird.

**II.     DeLaval's Motion to Compel**

Separately, DeLaval moves this Court for an order requiring Plaintiffs to produce milk production and quality data, critical information relevant to their damages claims, including Quickbooks files and operating costs, and for leave to conduct additional fact depositions beyond what is allowed in the Pretrial Scheduling Order. At the motions hearing, the parties represented that the requests for Plaintiffs' labor and maintenance data and Quickbooks files were moot, leaving only the request for milk production and quality data and additional depositions.

## ANALYSIS

### I. Legal standard

Under the Federal Rules, parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the information, the parties' resources, the importance of the discovery in resolving the dispute, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Also, "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable." *Id.*

The party seeking discovery has the burden of showing relevance before the requested information is produced. *See Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992). Although discoverability is broader than admissibility, this standard "should not be misapplied so as to allow fishing expeditions in discovery. Some threshold showing of relevance must be made before parties are required to open wide the doors of discovery

5

and to produce a variety of information which does not reasonably bear upon the issues in the case." *Id.* The party resisting production "bears the burden of establishing lack of relevancy or undue burden." *Inline Packaging, LLC v. Graphing Packaging Int'l, Inc.*, Case no. 15-cv-3183 (ADM/LIB), 2016 WL 6997113, at *7 (D. Minn. Sep. 6, 2016) (quoting *Saint Paul Reinsurance Co. v. Com. Fin. Corp.*, 198 F.R.D. 508, 511 (N.D. Iowa Nov. 22, 2000)).

Courts have broad discretion in handling pretrial procedure and discovery. *See*, *e.g.*, *Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 353 (8th Cir. 2020) ("A district court has very wide discretion in handling pretrial discovery . . . ." (quotation omitted)); *Solutran, Inc. v. U.S. Bancorp*, Case no. 13-cv-2637 (SRN/BRT), 2016 WL 7377099, at *2 (D. Minn. Dec. 20, 2016) ("Further, magistrate judges are afforded wide discretion in handling discovery matters and are free to use and control pretrial procedure in furtherance of the orderly administration of justice." (cleaned up)).

## II. Plaintiffs' Motion

### A. Project Green Report

The Court first addresses Plaintiffs' request for documents related to the Project Green Report. DeLaval argues that Plaintiffs' request is unduly burdensome, stating that ordering it to compile a new document collection from six employees and running all of the parties' agreed-upon search terms through those documents is disproportionate. As a compromise, rather than run all the parties' search terms over two years of documents and email from six custodians, DeLaval offered to collect only Campbell's emails and documents since 2023 and produce documents that hit on very limited search terms. In the

Court's view, this would be unnecessarily restrictive, particularly considering the inarguable relevance of a study of the overall experience of V300 users to the issues in this case.

The Court determines that the creation and existence of the Project Green Report is relevant, and discovery of documents related to the same is proportional to this dispute. DeLaval's representative Kristy Campbell identified herself, Derek Zepp, Chris Horton, and Fernando Cuccioli as being involved in Project Green. Accordingly, the Court will grant Plaintiffs' motion as it relates to documents in the possession of Campbell, Zepp, Horton, and Cuccioli that are relevant to the creation of the Project Green Report, including documents collected and created up until March 14, 2025—the date of the Report's publication. The Court also determines, however, that Plaintiffs have not established that Mats Nilsson and Alix Edouard are likely to have discoverable information related to the Project Green Report, and the Court will not order DeLaval to include Nilsson's and Edouard's documents in this collection.

The Court agrees, however, that requiring DeLaval to undertake a full collection and review of more than two years of documents from these four custodians would be overly burdensome considering the limited issue into which the Court is granting discovery. It is difficult for this Court to assess the reasonableness of any search terms that the parties might use to locate these documents—particularly as they have not been put before this Court. As such, the parties must meet and confer regarding the search terms necessary to satisfy the terms of this order no later than 5 days after this Court's order. If the parties cannot come to an agreeable resolution, the parties must coordinate a telephone

call with the Court pursuant to the Pretrial Scheduling Order to arrange a conference to resolve the issue.

Separately from documents related to the Project Green Report, Plaintiffs seek production of a different subset Horton's communications, specifically communications between Horton and the Federal Drug Agency regarding the V300 Teat Preparation Protocol. DeLaval earlier agreed to produce Horton's emails with the FDA since 2023 as part of the parties' meet-and-confer before the instant motions. The Court also determines that these communications are relevant and discoverable, and their production would be neither unduly burdensome or disproportionate. Accordingly, Plaintiffs' motion will be granted as it relates to Horton's emails with the FDA since 2023.

### B. Milk Production Spreadsheet

In addition to the Project Green Report, DeLaval created and produced the "Persson Spreadsheet," a document that purports to identify 95 instances where the V300 achieved or exceeded a certain level of milk production. (See Wilders Decl. Ex. 8, Persson Dep. Ex. 189.) DeLaval produced the Persson Report to Plaintiffs on May 1, 2025, and Plaintiffs have requested DeLaval produced the underlying data and discovery related to its creation.

DeLaval argues that producing all underlying data would be disproportional to this case. The Persson Report, however, was created after this litigation began and contradicts some of Plaintiffs' critical allegations. It seems almost certain that Defendants will attempt to use the Persson Report at trial, making it highly relevant to this case. DeLaval proposed that it would search for and produce the underlying data for the 95 instances in which

8

farmers averaged more than 7,500 lbs. of milk production, but it refused to produce the rest of the underlying data.

The Court finds all of the Persson Report underlying data is relevant and must be produced. At the motions hearing, DeLaval's counsel represented that they had recently found a way to pull the responsive data but had concerns regarding the format of the data they might ultimately produce. DeLaval asserts that it has obligations to anonymize farm data that preclude it from producing the farm names absent a court order. The Court determines that this data is relevant and discoverable, and DeLaval will be ordered to produce all of the underlying MyFarm data.[1]. Furthermore, the Court notes that the parties can avail themselves of the controlling protective order in this matter to ensure that confidential information remains protected.

### C. Additional Requests for DeLaval's Financial Information

The Court now turns to Plaintiffs' requests for certain financial documents, which include requests for documents sufficient to show the revenue, cost, and profits related to the V300 and its component parts and consumables. (Wilders Decl. Ex. 17.) DeLaval's representative Persson testified at deposition that this information exists and could be produced. Plaintiffs then served the Fifth RFPs. DeLaval failed to formally object to these document requests within the time allotted by the Federal Rules. Plaintiffs argue that all of these documents are relevant to their recovery claims for unjust enrichment, disgorgement,

---

[1] The MyFarm data that is ordered to be produced here is the same discovery that this Court ordered DeLaval produce immediately following the June 24, 2025 hearing. (See Dkt. 398.)

and punitive damages. DeLaval argues that these requests seek information that is burdensome and disproportionate to the needs of the case.

The Court determines that the documents Plaintiffs request are discoverable and overrules most of DeLaval's objections for several reasons. First, as to Plaintiffs' requests regarding financial data for the V300 and its component parts and consumables, the Court notes that these requests are limited to documents "sufficient to show" the specific information that they seek. (See Wilders Decl. Ex. 16, Request Nos. 52-77; *id.* Ex. 17, Request Nos. 92-96.) These necessarily do not seek every single document that shows some piece of the information, but rather only sufficient documentation to demonstrate how much DeLaval charged for and profit from the sale of the V300, its attendant parts, consumables, and necessary maintenance.

DeLaval represents to this Court that it produced documents that show DeLaval's gross annual profit margin from 2020-2025 for VMS sales through each dealer in the United States, including "the annual net invoicing for the units themselves, the gross margin (in dollars and as a percentage), and the number of units sold," as well as a similar spreadsheet for certain consumables and parts. (Def. Mem. in Opp'n, Dkt. 391, at 15.) Thus, the parties agree that this information is relevant and discoverable. Therefore, DeLaval shall produce documents in response to Plaintiffs' RFPs sufficient to determine the number of V300s operating each year, which after-market products were used only with V300s, which after-market products are used with V300s and other products, and how much of the after-market products were used by the V300s.

Some of Plaintiffs' requests, however, seek documents outside the reach of discovery. To the extent Plaintiffs seek documents related to DeLaval's "expected" profits as opposed to actual profits, the Court determines that the requests are not relevant to Plaintiffs' damages claims. *See SEC v. Markusen*, 143 F. Supp. 3d 877, 893 (D. Minn. 2015) (defining disgorgement as "the return of wrongfully obtained profits"). Similarly, the profit margin on devices other than the V300 are not relevant to the claims and defenses in this action, and Plaintiffs' motion will be denied as it relates to documents showing DeLaval's expected profits and profits from devices other than the V300.

### D. Project Thunderbird

Finally, Plaintiff seeks an order compelling DeLaval to apply the search term "Project Thunderbird" through the previously collected custodial documents it has preserved in connection with this litigation. It argues that DeLaval failed to identify "Project Thunderbird" as the name of its new robot development project until after the parties had agreed upon search terms, and that this Court has already found information about Project Thunderbird relevant to the issues and subject matter in this lawsuit.

DeLaval argues that the search terms it already ran would have captured the material Plaintiffs seek, that the amount of attorney time the search would require be unduly burdensome, that DeLaval is already preparing to produce thousands of documents that relate to Thunderbird, and that Plaintiffs' failure to ask any substantive questions on Project Thunderbird during depositions shows that the information is not critical to the dispute.

Based on the representations and arguments of the parties, the Court determines that Plaintiffs' request should be granted. It is undisputed that "Project Thunderbird" is highly

11

relevant to a crucial issue in this case, namely, whether there was a feasible alternative design that DeLaval could have employed. *See Wagner v. Hesston Corp.*, 450 F.3d 756, 760 (8th Cir. 2006) (quoting *Kallio v. Ford Motor Co.*, 407 N.W.2d 92, 96 (Minn. 1987)) (products-liability "'plaintiff ordinarily has the burden of showing the existence of an alternative design that was safer.'"). DeLaval's allegations of undue burden lose force when placed up against its obligation to update discovery responses; in other words, DeLaval knew that it was using "Project Thunderbird" for the next generation of machines and neither informed Plaintiffs of its use nor updated the search terms to include the term in its searches until very late in discovery. Any additional time that this review will require is a result of DeLaval's decision not to include the term in its earlier searches, and the Court is confident that DeLaval's counsel will work diligently and efficiently to satisfy its obligations under the Rules and this Order.

### III.   DeLaval's Motion to Compel

The Court now turns to DeLaval's Motion to Compel. DeLaval seeks an order (1) compelling Plaintiffs to produce documents related to their milk production and quality and financial documentation, and (2) allowing depositions in excess of what is allowed under the governing pretrial scheduling order.

At the outset, the Court notes that the Local Rules of the District of Minnesota set forth the contents that a motion to compel discovery under Rule 37 must include. D. Minn. LR 37.1. As relevant here, a motion to compel must include "the text (which may appear in an exhibit to which the motion or memorandum refers) of any interrogatory, request, question, or notice in dispute, together with each answer, response, or objection to any such

12

interrogatory, request, question, or notice . . . ." LR 37.1(e). DeLaval has not specified, identified, or referenced any particular discovery request that remains in dispute. Instead, DeLaval relies on the argument that the identified information is so plainly relevant to the dispute that Plaintiff' obligation to produce it is self-evident. But this Court will not take the opportunity to guess at the form and substance of DeLaval's discovery requests to Plaintiffs, how Plaintiffs responded to those requests, and whether those responses were "insufficient, evasive, incomplete, or otherwise improper." *See* D. Minn. LR 37.1(d). This would enough on its own for the Court to deny DeLaval's motion.

### A. Individual Farm Remote Access Codes

As for the substance of the motion, DeLaval asks this Court to order Plaintiffs to provide the remote access codes so that it can access Plaintiffs' Dairy Herd Information ("DHI").[2] Using this information, DeLaval states that it would be able to have complete access to key data relevant to Plaintiffs' claims in a low-cost, low-burden manner. (Def. Mem. in Supp., Dkt. 382, at 6-7.) Plaintiffs oppose this request, arguing that they have already produced all responsive information that DeLaval would be able to access with the access code.

The Court will deny DeLaval's request for Plaintiff's remote access codes. It is probably true that having Plaintiffs' remote access codes would give DeLaval information about Plaintiffs' milk production and quality that it argues Plaintiffs have thus far refused to produce. But DeLaval does not argue that Plaintiffs have failed to produce responsive

---

[2] DeLaval's motion also sought an order requiring Plaintiffs to supplement their milk check production discovery. At the hearing, counsel for the parties confirmed that the parties had resolved this issue. (Tr. 58:16-17.)

13

documents and data—just that Plaintiffs have not provided DeLaval unfettered access to their DHI information. That is not enough. Additionally, DeLaval has identified no case that supports its request for unfettered access to Plaintiffs' DHI by compelling the disclosure of their remote access codes. In analogous requests, Courts in this district and elsewhere have denied parties full access to opposing parties' social media accounts in discovery. *See, e.g.*, *Holter v. Wells Fargo & Co.*, 281 F.R.D. 340, 342-44 (D. Minn. 2011) ("Just as the Court would not give defendant the ability to come into plaintiff's home or peruse her computer to search for possible relevant information, the Court will not allow defendant to review social media content to determine what is relevant."); *Brown v. City of Ferguson*, 2017 WL 386544, at *2 (E.D. Mo. Jan. 27, 2017) (determining "unfettered access" to social media accounts was "not permitted under the Federal Rules of Civil Procedure"). Similarly here, requiring Plaintiffs to give DeLaval their remote access codes would allow DeLaval to conduct its own search and review of Plaintiffs' data and thereby subvert the traditional, self-regulated discovery process. If DeLaval questions Plaintiffs' document productions, it can inquire into what has and has not been produced and challenge the productions if it believes that it is incomplete or fails to satisfy the obligations imposed by the Federal Rules or orders of this Court. The request for Plaintiffs' remote access credentials, however, will be denied.

### B. Individual Farm Back-up Files

As to DeLaval's request for Plaintiffs' DelPro BAK files, Plaintiffs do not contest relevance. Rather, Plaintiffs argue that this requiring this production would be unduly burdensome. Plaintiffs maintain that retrieving the files would require travel to and from

14

each individual computer, as well as painstaking restoration of the files themselves—all for files that are less complete than the "MyFarm" and "Dairy Data Warehouse" data that DeLaval has in its possession and has produced in discovery. Considering the scope and breadth of this litigation, the Court determines that the cost of obtaining and restoring the DelPro BAK files would not impose an undue burden on Plaintiffs. This is especially true as, based on the information before the Court, the number of files that Plaintiffs have not produced is quite small. Plaintiffs have produced DelPro BAK files up through November 2024 for Plaintiffs Triple S, Rocky Point, and Green Acres, and through June 2025 for Northcrest. Producing the files for Triple S, Rocky Point, and Green Acres from December 2024 through June 2025 is neither unduly burdensome nor disproportionate. Because these files relevance of the information contained in the files and the relatively modest cost of obtaining the files, and in order to help secure the just, speedy, and inexpensive resolution of this matter, the Court will grant DeLaval's motion for Plaintiffs' DelPro BAK files.

### C. Three Additional Depositions

Finally, DeLaval seeks an order allowing three more depositions. The scheduling order in this case limits the parties to 10 fact depositions. (*See* Dkt. 201 and Dkt. 271 (limiting parties to "[n]o more than 10 factual depositions"), and Dkt. 333 (leaving all unaddressed deadlines, limitations, and instructions in Dkt. 271 "in full effect.") Under Rule 16(b)(4), "[a] schedule may be modified only for good cause and with the judge's consent." "The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements." *Morrison Enterp., LLC v. Dravo Corp.*, 638 F.3d 594, 610 (8th Cir. 2011) (quotation marks omitted). Given the absence of a clear test to establish

whether a party has been diligent enough to establish good cause, courts may also look to other factors that consider the circumstances of a particular case. *Shank v. Carleton College*, 329 F.R.D. 610, 614 (D. Minn. 2019). Ultimately, issues of pretrial discovery are committed to the discretion of the court. *E.g.*, *SDI Operating P'Ship v. Neuwirth*, 973 F.2d 652, 655 (8th Cir. 1992). "In practical terms, a party seeking leave to take more depositions . . . than are contemplated by . . . the Court's Scheduling Order, must make a particularized showing of why the discovery is necessary." *Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minn.*, 187 F.R.D. 578, 586 (D. Minn. 1999).

The Court determines that good cause exists to justify increasing the number of fact depositions that DeLaval can take by two. Several facts support this conclusion. First, this Court granted Plaintiffs leave to amend the complaint and add a new named plaintiff, Rocky Farm, over DeLaval's objection. (*See* Dkt. 362.) The addition of an entirely new named plaintiff sufficiently increases the underlying facts of this case that good cause exists to amend the scheduling order to increase the number of depositions available to DeLaval. Second, the individuals that DeLaval identifies are likely to have relevant, discoverable information regarding facts that are critical to this dispute. Based on the procedural history of this case and the addition of a new named plaintiff, this Court determines that good cause exists that DeLaval be allowed to depose the current manager of Triple S's farm, Triple S's accountant, and Rocky Point's dealer representative.

## ORDER

Accordingly, based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' Motion to Compel (Dkt. 373) is **GRANTED IN PART** and **DENIED IN PART** as set forth above;

2. Defendants' Motion to Compel (Dkt. 382) is **GRANTED IN PART** and **DENIED IN PART** as set forth above;

3. A Fourth Amended Pretrial Scheduling Order will issue in due course;

4. Each party shall bear its own costs and fees; and

5. All prior, consistent orders remain in full force and effect.

Dated: August 20, 2025

                                      *s/Shannon G. Elkins*
                                      SHANNON G. ELKINS
                                      United States Magistrate Judge