**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Triple S Farms, LLC; Green Acres Dairy, LLC; Charles Fry and Emily Snyder; Rocky Point Farms, Inc.; and Northcrest Dairy, Inc.,

Plaintiffs,

v.

DeLaval, Inc. and West Agro, Inc.,

Defendants.

No. 22-cv-1924 (KMM/SGE)

**ORDER**

---

Defendant DeLaval, Inc. is a Swedish company that created and marketed the VMS 300 ("V300"), a robotic milking system designed to automate the process of milking cows. Defendant West Agro, Inc. is a subsidiary of DeLaval that sells after-market parts related to the use of the V300. Plaintiffs Triple S Farms, LLC; Green Acres Dairy, LLC; Charles Fry and Emily Snyder; Rocky Point Farms, Inc.; and Northcrest Dairy, Inc. are dairy farms and farmers from various states who purchased or leased V300s.

In 2022, Plaintiffs brought this action alleging that the V300 has inherent defects that render it unreasonably dangerous and unfit such that no farmer would have purchased a V300 had they known of its defects, and that DeLaval misrepresented its capabilities to Plaintiffs. The matter is before the Court on Plaintiffs' Motion for Class Certification, in

which they seek to certify a class of 127 dairy farmers who collectively purchased or leased 633 V300s.[1] (Dkt. 442.) For the reasons discussed below, the Motion is denied.

## BACKGROUND

### I. Milking Process and Governing Standards

A dairy cow has multiple teats, each of which produces milk and must be milked with regularity to prevent harm to cow health, milk production, and milk quality. (Dkt. 449 ("Gordon Rpt.") at 6–7.[2]) Because milking can expose cows to bacteria and other contaminants that are pervasive on dairy farms, the process requires strict adherence to sanitation procedures. (*See* Dkt. 449-7 ("Campbell Dep.") at 103–04 ("[C]ontamination on a teat with little germicidal capability . . . [leads to] potential for it to move from teat to teat.").) Once contaminants enter a cow's teat canal, they can quickly multiply, causing discomfort and permanent harm to the infected cow, spreading to other cows through milking equipment, and damaging the milk supply. (Gordon Rpt. at 55, 58, 61.) Dairy cows are commonly susceptible to mastitis, or "[a]n inflammation caused by bacterial infection of the mammary gland" in their udders. (Dkt. 449-5 at 3.) Mastitis can be measured through the somatic cell count (SCC), or "the number of mastitis-causing bacteria on the teat end"

---

[1] In the United States, DeLaval has sold a total of 672 V300s to 146 dairy farmers. (Dkt. 465 at 6; *see also* Dkt. 448 at 12.) At the motion hearing, Plaintiffs' counsel explained that not every dairy farmer who bought or leased a V300 was included in the proposed class and subclasses because doing so may have created choice-of-law problems making class treatment less likely. (Dkt. 583 ("Hr'g Tr.") at 6–7.)

[2] The Court cites to the CM/ECF pagination where possible. For documents that do not have CM/ECF pagination, the Court cites to the pagination corresponding to the page number within the entire document. And for deposition transcripts, the Court cites to the transcript's page numbers.

and in the milk produced by a mastitis-infected cow. (*Id.*) A higher SCC corresponds with reduced milk production. (*Id.*) "Around 85% of the total cost of clinical mastitis" incurred by a dairy farm is attributable to decreased milk production and discarded milk. (*Id.*)

Many factors independent of the milking process can critically impact cow health, milk production, and milk quality. Some factors relate to farm management, such as proper maintenance of the barn and equipment, which must be cleaned with specified detergents and water temperatures, following careful protocols. (Dkt. 466-2 ("Reid Rpt.")[3] at 6–7 (detailing factors that affect mastitis rates, cow health, and maximization of milk quality and production); *see* Dkt. 466-4 at 28–29.) The use of clean milking equipment is crucial because, as noted earlier, equipment used across multiple teats and cows can cause cross-contamination by transferring bacteria from one teat or cow to another. (Campbell Dep. at 103–04.) Other factors include the layouts of the barn and stalls, the type of bedding used, and the quality of feed and water, both for drinking and for cleaning equipment. (Reid Rpt. at 6–7.) All these aspects of farm management play significant roles in a cow's health, hygiene, and comfort. (*Id.*) Moreover, there is some inherent variation in cow health and milk production across cow breeds given their differing udder and teat formations. (*Id.*) Udder maintenance—for example, whether udder hairs, which can trap dirt and manure, are regularly removed—also matters. (*Id.*) Again, because poor cow health can rapidly

[3] The Court relies in part on the reports of Defendants' expert witnesses Gordon Reid and Terry Smith, see the Court's Order denying Plaintiffs' Motions to exclude or partially exclude the expert reports. Generally, the propositions for which the Court cites the Smith and Reid reports are undisputed.

spread within a herd, and contribute to a widespread decrease in milk production, farms must account for these cow-specific factors to ensure that the milking environment is sanitary. (Gordon Rpt. at 54–55, 57–59.) Otherwise, they can have a "significant" impact on a farmer's earnings. (*Id.* at 60–61; *see also* Reid Rpt. at 7–10.)

Traditionally, cows have been manually milked using conventional milking systems, which is highly labor- and cost-intensive. Both the manual and automated milking process entail pre- and post-milking steps. First, to ensure that milking does not introduce or spread bacteria to the cow herd or to the milk, the equipment must be properly cleaned, and a cow's teats must be thoroughly sanitized with a disinfectant and dried before milking. (Gordon Rpt. at 55, 57–58.). This preparation, which serves "to achieve an acceptable level of decontamination of teat skin before milking," constitutes the "pre-milking steps." (*Id.* at 15.) The milking itself entails attaching an extraction unit (for the V300, a teat cup) and extracting the milk. (*Id.* at 24–25.) This step must also be performed carefully, with sanitization of equipment necessary throughout the process to ensure that it does not subject a cow or its milk to additional contamination. (*See id.* at 49–51.) Finally, after milking is complete, each teat must be promptly disinfected. This step is designed to "kill any potential microorganisms" from remaining milk residue, which helps to control contagious mastitis. (Campbell Dep. 53.) To be properly cleaned, all parts of the teat that come into contact with milking equipment must be sprayed with disinfectant. (*Id.* at 57.) A cow is particularly vulnerable to bacteria and contaminants immediately after milking, until its teat sphincter closes. (*See* Gordon Rpt. at 62.)

These steps are so consequential to cow health and milk quality that the United States Food and Drug Administration (FDA) has issued "national industry standard[s] for the production, processing and packaging of Grade A milk[.]" (Dkt. 449-8 ("Kolstad Dep.") at 27.) To retain "Grade A" status for their milk, dairy farmers must comply with those minimum standards, which are set forth in the Grade A Pasteurized Milk Ordinance (PMO). (*See* Dkts. 445-9 (2017 PMO), 445-10 (2019 PMO).) There is no dispute that a "successful" milking requires compliance with the standards outlined in the PMO, which reflect the three milking steps described above. (*See* Dkt. 449-6 ("Rodriguez Dep.") at 46, 51, 53 55–59; 2019 PMO at 75–86.). Therefore, dairy farmers expect that any given milking system will "meet or exceed industry standards, including those set forth in the . . . PMO." (Gordon Rpt. at 10 (stating that "[a] manufacturer's failure to design, manufacture, and deliver to dairy producers" milking systems that comply with the PMO "not only violates this nationwide industry standard . . . but also can cause dairy producers to suffer a loss of saleable milk" and "compromis[e] . . . cow health").)

## II. Marketing and Sale of the V300

In June 2018, DeLaval introduced the V300. It is a newer version of DeLaval's first automated milking system, the VMS Classic,[4] and is among several robotic systems on the market. Automated milking systems are designed to alleviate the burdens associated with

[4] The VMS Classic was the subject of prior litigation in the Western District of Missouri involving allegations that it was defective and that DeLaval had fraudulently induced farmers to purchase the machines. *Bishop v. DeLaval, Inc.*, No. 5:19-cv-6129-SRB, Dkt. 1-2 (Compl.) (W.D. Mo. Sept. 17, 2019). As this Court previously noted, the *Bishop* case ultimately ended in a $50M class-action settlement. (Dkt. 268 at 1.)

traditional milking by utilizing robots to automate all milking tasks. (*See* Dkt. 449-10 ("Horton Dep.") at 60–62 (agreeing that the "essential functions" of DeLaval's automated milking systems include all three sets of milking tasks); *see also* Rodriguez Dep. at 57–59 (discussing the three stages of a successful milking).) Nevertheless, the V300 requires some labor for equipment maintenance and upkeep. For example, barrels containing the chemicals needed to disinfect the teats and equipment must be replaced as soon as they are empty, and milk cup liners and filters must be changed frequently. (*See* Dkt. 466-21 ("Baker Dep.") at 46–47, 50–52, 62; Dkt. 466-11 ("Jason R. Dec. Dep.") at 119–20.) In addition, accommodating the V300 requires significant changes in farming practices. (Dkt. 466-4 at 24 (stating that "[a] change to robotic milking requires a total change in farm management" and that a farm "cannot keep [its] old management regime" in terms of "feeding, cow handling, [and] milking").)

### A. Triple S Farms

Located in Minnesota, Triple S Farms began the process of purchasing a V300 in 2017. (Dkt. 466-6 ("Godding Dep") at 16.) Triple S was owned by brothers Paul, Chuck, and Roger Stang. (*See* Dkt. 466-5 ("Stang Dep.") at 52.) Their sister, Ginny Scherping, assisted in the operation of the farm, and her sons—Dean, Daniel, Brian, and Robert Scherping—also worked for Triple S. (*Id.* at 52–53.) Robert served as the Chief Executive Officer of Triple S for a time.

In early 2017, Charles Godding, a representative of a local DeLaval dealer, initially met with the Scherping brothers to discuss DeLaval's robots because the Scherpings were seeking "another option to milk cows." (Godding Dep. at 23–24.) In or around March or

April 2018, after Triple S had been discussing a possible transition to automated milking with DeLaval for about a year, Mr. Godding met with the Stangs for the first time. (*Id.* at 23.) Triple S was considering purchasing V300s to make the milking process less labor-intensive. (*Id.* at 35–36.) A major concern for Triple S was whether, if they did not try something different and more automated, they could continue to operate a dairy because the manual labor associated with a traditional milking parlor was becoming unsustainable, especially as they aged. (*Id.* at 17–18, 23–24, 35–37.) However, at the time it was discussing the possibility of switching to DeLaval robots, Triple S was not yet having any issues with labor or milk production. (*Id.* at 24.)

In marketing the V300 to Triple S, DeLaval "would have provided some different brochures or maybe websites in which [Triple S] could go and visit to see things." (Godding Dep. at 42.) Brian Scherping and some of the Stangs met with Mr. Godding and Nick Kunkel from DeLaval to discuss the V300 in a meeting that included review of a brochure and videos. (Dkt. 445-56 ("Brian S. Dep.") at 50–52.) Mr. Scherping recalled seeing that the brochure contained representations that the V300 could produce more than 7,500 pounds of milk per day, had a 99.8% attachment rate and the ability to reach a 99% "hit rate" of post-milking teat spray, and could reduce labor costs, which was "a big deal for [Triple S]." (*Id.* at 50–51; *see also* Godding Dep. 32–33.) However, Chuck Stang, who also attended the meeting, did not remember any written materials or videos about the V300 that he might have seen, nor any specific representations about the V300's capabilities. (Dkt. 466-7 ("Chuck Stang Dep.") at 33–34.) Chuck Stang recalled that the "Scherping brothers . . . pretty much took the lead on everything," including "all the dealing," and were

"the ones who selected the V300s" in part because it would allow them to work with the people they preferred. (*Id.* at 30, 32.) But according to Mr. Godding, "[t]he ultimate decision . . . was . . . up to the Stangs," even though the Scherpings "were quite involved" and "pretty influential" in the decision-making. (Godding Dep. at 42.)

In July 2018, Triple S purchased four V300s for just over $866,000. (Dkt. 466-8 (Triple S Purchase Agreement).) A few months after the V300s were installed, however, two of the Scherping brothers "decided farming wasn't for them anymore" and left the operation, leaving Paul Stang as the primary individual responsible for managing the robots. (Dkt. 466-9 ("Brian S. Mar. 2025 Dep.") at 24.)

The record reflects that Triple S may not have always followed the best practices for operating and maintaining the robots. For example, Triple S often failed to singe or trim their cows' udder hairs before milking to ensure secure attachment of teat cups, did not change filters as often as DeLaval recommended, and may not have consistently used pre-spray disinfectant. (*See* Brian S. Mar. 2025 Dep. at 119–21; *see also* Stang Dep. at 35.) And Dr. Reid observed additional issues with the Triple S farming operation that could result in increased somatic cell counts and milk-production issues. These include his observation that Triple S's cows were dirtier than they should be, which Dr. Reid attributed to issues with maintaining their bedding, cows assuming suboptimal positions in the stalls, and issues with maintaining the stalls. (Reid Rpt. ¶¶ 100–02, 104.) At the same time, however, Dr. Reid found that Triple S "appeared to have a reasonable maintenance/cleaning plan for the robots" and "good feed quality management." (*Id.* ¶¶ 103, 105.)

In 2022, Paul Stang passed away, and the responsibilities of managing the farm gradually fell on other family members. (*See* Chuck Stang Dep. at 32, 38; *see* Brian S. Mar. 2025 Dep. at 119–20.) Although Triple S sold Grade B milk for a time, it has consistently sold Grade A milk since about 2016, including the entire time it has been operating the V300s. (Chuck Stang Dep. at 31.)

**B. Green Acres Dairy**

Operated by Jason and Kerrie Roetcisoender, Green Acres Dairy in Washington State was the first farm in the United States to operate a V300. In or around 2016, the Roetcisoenders became interested in switching to robotic milking. (Jason R. Dec. Dep. at 85–88.) They had been experiencing "labor issues with milkers" and high rates of "milker turnover," which led to "[i]mproper milking procedures" and contributed to Green Acres's issues with elevated SCC at the time. (*Id.* at 85, 156–57.)

In considering the V300, Mr. Roetcisoender reviewed marketing materials from a DeLaval employee, including brochures claiming that the V300 had a "99.8 percent attachment rate [and] 10 percent higher yields," and videos that "talk[ed] about . . . the better lifestyle, more time with the family" that farmers could enjoy with the V300. (Dkt. 466-12 ("Jason R. Feb. Dep.") at 260–61, 263, 265.) Ms. Roetcisoender was told that the "maintenance and supply costs of the [V300]" would be about $4,000 to $4,500 per month, which was more than it cost the Roetcisoenders to maintain their traditional milking parlor. (Dkt. 445-60 ("Kerrie R. Dep.") at 28.) At the suggestion of the same DeLaval employee, Mr. Roetcisoender attended a V300 event in Wisconsin, at which the employee made "[t]he same types of guarantees that [were] in the marketing materials" about a "99.8 percent

attachment [rate], every teat getting cleaned, increased milk production, [and] better quality of life." (Jason R. Feb. Dep. 266.) At the event, Mr. Roetcisoender saw multiple videos, DeLaval's "feed pusher . . . on display," and "a robot set up with . . . an udder in it[.]" (Jason R. Dec. Dep. 91–92.) "[S]eeing all that stuff . . . affirmed [to Mr. Roetcisoender] that [he] was making the right decision" about purchasing the V300. (*Id.* at 92; *see also id.* at 93–94.)

In July 2018, the Roetcisoenders decided to implement the V300 on Green Acres. (*Id.* at 11–12.) However, unlike the other Plaintiffs, who purchased their milking machines, the Roetcisoenders leased their five V300s, which were installed in April 2019, for approximately $1.2 million. (*Id.* at 11–13; Dkt. 467-3.) In a promotional video five months later, Mr. Roetcisoender explained that he chose the V300 in part because it addressed the labor issues he had faced, he liked "how clean [the V300s] stay," "[he] thought that the indexing system on the[] [V300] was much better" than other robots for addressing the variety and types of cows in his herd, and he "like[d] working with [the local DeLaval dealership]." (Green Acres Video 0:59–1:01, 1:08–1:15, 1:23–1:28.[5]) By then, he had noticed that "the incidence of treated mastitis . . . [was] way less than before" and that it had led to "a dramatic decrease in the amount of mastitis drugs" used at Green Acres. (*Id.* at 2:15–2:25.)

[5] The video is available at https://www.facebook.com/DeLavalCA/videos/green-acres-dairy-5-delaval-vms-v300/1089315488565300/ (last visited July 26, 2026).

At the same time, some evidence suggests Green Acres was grappling with other issues on its farm and did not always adhere to DeLaval's best practices. Contrary to DeLaval's recommendation that the V300's milk filters be changed three times per day, Green Acres only changed them twice daily at most. (*See* Jason R. Dec. Dep. at 120.) Green Acres was also addressing an increase in mastitis in its herd with veterinarians, including one hired by DeLaval who advised that Green Acres "rak[e] manure and level[] beds" more frequently. (*Id.* at 114–16.) Despite these issues and noncompliance with DeLaval's best practices, Green Acres has never failed an FDA or state inspection and has maintained Grade A status for its milk. (Jason R. Feb. Dep. at 299–303.)

### C. Rocky Point Farms, Charles Fry, and Emily Snyder

Located in Maryland, Rocky Point Farms is operated by Plaintiffs Charles Fry and Emily Snyder.[6] In 2018 or 2019, Mr. Fry became interested in purchasing the V300 after receiving a 45-page DeLaval brochure. (Dkt. 363 ¶ 255; Dkt. 466-17 ("2025 Fry Dep.") at 204; *see* Dkt. 445-61 at 26; Dkt. 466-18 (Brochure).) The brochure makes the following claims about the V300: "Up to 50% faster attachment time," "10% higher capacity," "99.8% attachment rate," and "More than 7500 lbs milk per day." (Brochure at 8.) It also contains a disclaimer that data was collected on test and pilot farms and that "[r]esults may vary and are not guaranteed." (*Id.*) Mr. Fry saw the representations but does not recall seeing the disclaimer. (*See* 2025 Fry Dep. at 204–05.) He also viewed three videos about

[6] Charles Fry and Emily Snyder are the only plaintiffs bringing suit personally, as opposed to the other plaintiffs, which are dairy farms. (Dkt. 363 ¶¶ 17, 252–73, 432–39.)

the V300 that he received from DeLaval employees. (Dkt. 466-19 ("Rocky Point Dep.") at 26–27.) Although he could not remember specific information from the videos, they were generally "very attractive." (*Id.* at 27.)

In February 2020, Mr. Fry went on a trip organized by DeLaval to Fair Oaks Farm, which used V300s for milking. (*Id.* at 28–29.) According to Mr. Fry, Fair Oaks Farm had a "very impressive . . . greenhouse barn" with "perfect" cows that were younger and "different" from those he had at Rocky Point. (2025 Fry Dep. at 103–04.) During the visit, while watching the operating V300s, Mr. Fry "noticed that even with milking younger cows, the machines sometimes still missed teats." (*Id.* at 104.) Although he found this observation "troubling," Mr. Fry was told by a DeLaval representative that the V300 "just didn't see the teat and . . . would catch it the next time" and did not ask about it further at the time. (*Id.* at 104, 106.) In addition to personally witnessing the V300's issues with attaching to teats, Mr. Fry was also told by a DeLaval representative "that sometimes the [V300] missed teats[.]" (*Id.* at 107.) Eventually, after the purchase agreement had been prepared, Mr. Fry asked about "[p]lacement, milking, [the V300's] ability to milk cows, the ability to do all the things that we saw [at Fair Oaks Farms]," including how the V300s "didn't put the milker on the cow[] and . . . struggled." (*Id.* at 105.) In response, the DeLaval representative repeated, "If it doesn't get it today, it will get it tomorrow." (*Id.* at 106.) In March 2020, Mr. Fry purchased two V300s for $411,657 from a DeLaval dealer. (Dkt. 467-4 (Fry Purchase Agreement) at 3.) Ms. Snyder testified that they ultimately chose the V300 because "service [would] . . . be closer," given that the nearest DeLaval-certified dealer was "40, 45 minutes away," as opposed to a competitor whose nearest location was

two hours away. (Dkt. 445-62 ("Snyder Dep.") at 74.) Additionally, Mr. Fry had previously worked with DeLaval. (*Id.*) Ms. Snyder is not a party to the purchase agreement, which does not contain a choice-of-law provision. (*See* Fry Purchase Agreement.)

Rocky Point Farms began using the V300s in January 2021. (Rocky Point Dep. 23.) Beginning in May 2021 and through September 2022, over eighteen months after the V300s were installed, Mr. Fry and Ms. Snyder made multiple public statements praising the V300 and their decision to purchase it for their farm. Mr. Fry explained that "the main driver in this is . . . cost," and that although it was "expensive, . . . so is labor, so is housing, so is all the things that are associated with employees. The biggest thing is animal care and quality."[7] Just four months after Rocky Point began using the V300, Mr. Fry claimed that the farm's "herd had completely changed," and that the machines "had saved [him] so much time and energy" and "help[ed] [Rocky Point] better provide for the community."[8] Ms. Snyder's later statements—including that "[c]ows are happier," "milk quality is up," the farm "picked up a lot of efficiency," and that the V300 had assisted with "a laundry list of things beyond labor"—are consistent with Mr. Fry's claims that the V300 improved Rocky Point's operations in various ways.[9] As late as September 2022, Mr. Fry made statements about how the V300s had "resulted in happier, healthier cows," including by "help[ing] detect mastitis . . . days before the human eye would be able to catch clinical

[7] Farm Credit Horizon, Newsroom, *Moo-ving into the Future with Rocky Point Creamery*, https://www.horizonfc.com/about/newsroom/moo-ving-future-rocky-point-creamery (July 5, 2021) (last visited July 26, 2026).

[8] *Id.*

[9] *Id.*

signs," which ultimately reduced the amount of discarded contaminated milk.[10] According to Mr. Fry, the cows were at their "peak[]" productivity after things "evened out" over the first three months.[11] Like Green Acres Dairy, Rocky Point's "ability to sell its milk as Grade A milk" was never affected, nor did the farm fail any inspections by its customers, the state, or the county. (2025 Fry Dep. at 154, 159–60, 162.)

Evidence in the record suggests that Rocky Point did not adhere to DeLaval's best practices either. Despite DeLaval "specifically informing [Mr. Fry] that he needed quality compressed air for the robot to work correctly," and its recommendation that the V300 be used with a specific air compressor, Rocky Point opted for a cheaper version that caused issues with the V300's air valves, which are critical to its functionality. (Dkt. 466-21 ("Baker Dep.") at 21–23, 25.) Moreover, within the first year, Mr. Fry did not properly maintain the V300s. To remedy Mr. Fry's failure to change the milk cup liners and short tubes as directed, David Baker, Rocky Point Farms' dealer representative, spent "[a]lmost two years" visiting Rocky Point "every three weeks just to change" them. (*Id.* at46–48.) During that period, Mr. Baker also performed daily checks of Rocky Point's filter changes. (*Id.* at 51–52.) Rocky Point Farms agrees that these maintenance failures could result in higher incidents of SCCs and cow disease. (Rocky Point Dep. 254.) In addition, chemical barrels containing detergent and other materials necessary for the V300s to function

---

[10] Faces of Maryland Farming, *Robotic Milking Leads to Happy Cows* (Sept. 1, 2022), https://mymdfarmers.com/robotic-milking-leads-to-happy-cows/ (last visited July 26, 2026).

[11] Country Folks, *Selling country and sunshine* (Sept. 20, 2022) https://www.countryfolks.com/selling-country-and-sunshine/ (last visited July 26, 2026).

properly were not promptly replaced. (Baker Dep. at 52, 62.) Mr. Baker set up the V300s to stop milking when there were insufficient chemicals, but after two months, Mr. Fry "wanted [him] to turn [the feature] off, because he was tired of getting stop alarms for empty chemical barrels." (*Id.* at 67.) Chemical leaks that could be detected by performing daily visual inspections would routinely be left unfixed for "a week or so," causing damage to other parts. (*Id.* at 117–18.) In one instance, a leak left for about a week "ate through the wires on ten sensors." (*Id.* at 119–20.)

The farm itself also had numerous issues. Mr. Baker observed that the barn had no working fans, manure was left unscraped, and water troughs were not cleaned, which could negatively impact a cow's comfort and cause increased stress while milking. (*See id.* at 62.) According to Mr. Baker, the fact that Rocky Point experienced higher than usual rates of mechanical issues related to cows kicking equipment could be attributable to higher levels of stress and discomfort among the cows at Rocky Point. (*Id.* at 112–13.) The dealer described the cleanliness of Rocky Point as "the worst" and "[w]ell below average" among the farms that he serviced. (*Id.* at 93.) Consistent with these observations, Dr. Reid, one of DeLaval's experts who inspected Rocky Point, noticed that "[t]he arms and areas around the robots were not as clean as they should be and the foam lens cleaning pads were very discolored and in need of replacement." (Reid Rpt. ¶ 69.) He also observed that the cow feed "was not pushed up" and "show[ed] spoilage" in "significant areas," unlike what he would expect to see on farms with "high production herds." (*Id.* ¶¶ 70–71.) The stalls also had inadequate head bob clearance and insufficient amounts of bedding, which was "very hard and packed" and had a "bad odor." (*Id.* ¶¶ 60–61.) These factors could contribute to

cow lameness, or their inability to walk properly, and affect the flow of cows in and out of the stalls. (*Id.* ¶¶ 60, 62.) There is no dispute that "[g]ood stalls" and "good bedding" affect cow comfort and, in turn, milk production. (Rocky Point Dep. 253–54.)

### D. Northcrest Dairy, Inc.

Northcrest Dairy is a farm in Wisconsin co-owned by Jeffrey and Jenny Spoke. "[S]ometime between 2015 and 2018," the Spokes began to consider replacing their milking system (Dkt. 466-23 ("Jenny Dep.")[12] at 41; *see* Dkt. 466-24 ("Jeff Aug. 22 Dep.") at 61) because they "had an old parlor that needed updating, but . . . didn't want to build a new one" (Dkt. 466-26 at 2). As part of their decision-making process, they attended a DeLaval sales conference in Denver, Colorado, where they toured a farm with V300s and observed the robots milking cows for about "20 minutes." (Dkt. 466-25 ("Jeff Aug. 7 Dep.")[13] at 58.) The Spokes also viewed a brochure about the V300 that they received from DeLaval or one of its independent dealers, and Mr. Spoke "Googled everything [he] could about [the V300]." (*Id.* at 72, 82; Jenny Dep. 45.) Mr. Spoke was also told that the cost to maintain the V300 on Northcrest Dairy would be $8,000 to $10,000 annually. (Jeff Aug. 7 Dep. at 71.) After considering a few options, they selected the V300 because it had "updates that . . . improved [the VMS Classic]" and was cheaper than a competitor's robot. (Jeff Aug. 22 Dep. 61; Jenny Dep. 41.) In August 2018, Northcrest Farms LLC[14] purchased eight

[12] Additional excerpts of Ms. Spoke's deposition can be found at Dkt. 445-65.

[13] Additional excerpts of Mr. Spoke's August 7, 2025 deposition can be found at Dkt. 445-64.

[14] Mr. Spoke explained that Northcrest Dairy, Inc. and Northcrest Farms LLC are separate entities. The corporation, Northcrest Dairy, "owns the cows and everything related

V300s for $1,434,400 from an independent DeLaval dealer. (Jeff Aug. 7 Dep. 92–93; Dkt. 467-13 (Northcrest Purchase Agreement); *see also* Dkt. 465 at 50.)

According to an article from September 2020, the Spokes were "more than satisfied with the [V300]," which resulted in their cows' foot "injuries . . . pretty much disappear[ing]," eliminated the "need[] to train teat positions," provided "a tremendous amount of data" about each milking, and introduced "a lot of potential in the herd for increased production," especially with their older cows. (Dkt. 466-26 at 2, 8.) The Spokes saw a "several pound[] per cow" increase in milk production and were able to "reduce[] labor by almost 300 paid hours per week," which alleviated their need to "always find[] and train[] new people." (*Id.* at 8.) The V300 provided Northcrest "flexibility and room to grow" while providing "the flexibility . . . 'to go to [their] kids' sporting events or even help coach because [they] don't have to milk at 5 p.m.'" (*Id.*) In short, "[t]he [V300s] . . . made life better for [the Spokes] and the[ir] cows." (*Id.* (quotation omitted).)

Like the other Plaintiffs, evidence before the Court indicates that Northcrest faces issues with farm management. During his inspection of Northcrest, Dr. Reid observed that its cows "were not as clean as they should be for a robot milking barn, as the cows had visible clumps of manure on their tails and on their legs[.]" (Reid Rpt. ¶ 75.) There was "a significant amount of perching in stalls," which "can contribute to a compressive load on [a cow's] feet, contributing to lameness and potentially leading to a higher incidence of

---

to the cows." The LLC, Northcrest Farms, owns "the equipment." (Jeff Aug. 7 Dep. 92–93; Jenny Dep. 9–10 (stating that the "LLC owns the land and therefore the buildings on the land. And the corporation runs the farm.").)

mastitis." (*Id.* ¶¶ 76–77.) And some of the stalls contained waterbeds, which "c[ould] cause significant cow comfort issues by "not sufficiently encourage[ing] a cow to lay down to relax and stimulate milk production." (*Id.* ¶ 76.) In addition, "bedding in the stalls was inadequate, resulting in a dug out or sunken area that reduces lying time[,] . . . makes it difficult for the cows to enter and exit the stalls," and increases moisture and bacteria growth. (*Id.* ¶ 78.) The stalls also lacked adequate "head bob space," which allows cows to move in a natural way that minimizes excess pressure on their joints and is therefore "is significant [for] cow comfort." (*Id.* ¶ 79.) Among other things, Dr. Reid also observed that "[t]he water supply and troughs were . . . in need of maintenance and cleaning." (*Id.* ¶ 81.) However, Dr. Reid's "inspection of the Northcrest feeding operation appeared to be good." (*Id.* ¶ 84.)

Despite the fluctuations in SCC, the Spokes have never lost Grade A status for the milk they produce on Northcrest Dairy or had their milk rejected by customers. (Jeff Aug. 7 Dep. at 41.)

## III. Present Lawsuit and Procedural Background

In May 2022, Plaintiffs brought this action against Defendants, alleging that DeLaval "knew and concealed that the V300 was incapable of performing its essential functions and was uniformly defective," and that it had done so by perpetuating "uniform misrepresentations in its global marketing campaign[.]" (Dkt. 448 at 15; *see generally* Dkts. 1, 363.) According to Plaintiffs, "[t]he uniform design failures of the V300 impact[] all purchasers," who have suffered "hundreds of millions of dollars in damages." (Dkt. 448 at 15, 32.) Plaintiffs raise claims of fraud, negligent misrepresentation, breach of contract,

breach of express and implied warranties, strict products liability, negligence, and violations of consumer-protection statutes, and sought to litigate those claims on behalf of a nationwide class and a "direct purchaser subclass." (Dkt. 1 at 40, 42–45, 47–54; *see* Dkt. 363 ¶¶ 319–21.)[15]

On September 8, 2025, Plaintiffs filed the Motion for Class Certification that is now before the Court. (Dkt. 442.) The Court held a hearing on the Motion on May 14, 2026. (Dkt. 578; *see also* Hr'g Tr.)

## ANALYSIS

Plaintiffs seek certification of four subclasses totaling 127 dairy farmers who collectively purchased or leased about 633 V300s. First is the Missouri subclass, which consists of 29 farmers who purchased 107 machines directly from DeLaval through purchase agreements containing a Missouri choice-of-law provision. Second is the Minnesota subclass, which consists of 17 Minnesota farmers who purchased 48 machines from third-party dealers and whose purchase agreements do not contain a choice-of-law provision. Third, the Wisconsin subclass includes 31 farmers from Wisconsin who purchased 107 machines from third-party dealers through purchase agreements without a choice-of-law provision. Fourth is the multi-state subclass, which consists of 51 farmers from twelve states who purchased 331 machines from either "a DeLaval-owned dealership

[15] Plaintiffs define the "nationwide class" as "[a]ll Persons who purchased, financed, leased, and/or rented a V300," and the "direct purchaser subclass" as "[a]ll Persons who purchased, financed, leased, and/or rented a V300 pursuant to a DeLaval Purchase Agreement[.]" (Dkt. 363 ¶¶ 319–21.)

with an Illinois choice-of-law provision or from a third-party dealer." (Dkt. 448 at 44 (cleaned up).)

Plaintiffs seek to bring the following claims on behalf of each of the four subclasses: (1) fraud by concealment, omission, or nondisclosure; (2) fraud by inducement or misrepresentation; (3) negligent misrepresentation; and (4) unjust enrichment. (Dkt. 448 at 42–43.) The multi-state subclass raises no additional claims. Plaintiffs seek to bring the following additional claims for the remaining subclasses. For the Missouri subclass, under Missouri law, they raise: (1) breach of express or implied warranty; (2) negligence; and (3) strict liability. The Minnesota subclass would bring the same additional claims under Minnesota law. Finally, for the Wisconsin subclass, they propose the following claims under Wisconsin law: (1) negligence; (2) strict liability; and (3) violation of the Wisconsin Deceptive Trade Practices Act (WDTPA).[16]

The Court concludes that class certification is inappropriate because common issues of law and fact will not predominate over individualized fact questions. In particular, the elements of reliance and causation, which are relevant to many claims and for all subclasses, will require individualized inquiries based on evidence specific to each class member. Taken together, those considerations render a class action unsuitable for adjudicating the remaining claims before the Court.

[16] Wis. Stat. § 100.18 et seq.

## I. Legal Standard

A "class action serves to conserve the resources of the court and the parties by permitting an issue that may affect every class member to be litigated in an economical fashion." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 267 F.R.D. 549, 557 (D. Minn. 2010) (citing *Gen Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982)). When deciding whether to certify a class, a court must engage in "the 'rigorous analysis' that is required under Rule 23" of the Federal Rules of Civil Procedure. *Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1036 (8th Cir. 2018) (quoting *Falcon*, 457 U.S. at 161). A plaintiff seeking class certification "must satisfy both the four requirements of Rule 23(a)—'numerosity, commonality, typicality, and adequate representation'—and 'one of the three requirements listed in Rule 23(b).'" *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 834 (9th Cir. 2022) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345, 349 (2011)); *see also Postawko*, 910 F.3d at 1036. Plaintiffs carry the burden of "affirmatively demonstrat[ing]" that they meet the Rule 23 requirements. *Hudock v. LG Elecs. U.S.A., Inc.*, 12 F.4th 773, 775 (8th Cir. 2021) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)); *see also Postawko*, 910 F.3d at 1036 ("To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b)." (quotation omitted)).

Here, Plaintiffs seek certification under Rule 23(b)(3), which requires them to show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

23(b)(3). Because Defendants' primary argument is that Plaintiffs cannot satisfy the predominance and superiority requirements of Rule 23(b)(3) (*see* Dkt. 465 at 18), the Court addresses those requirements first. *See Moua v. Jani-King of Minn., Inc.*, No. 08-cv-4942 (ADM/JSM), 2010 WL 935758, at *2 (D. Minn. Mar. 12, 2010) (beginning with analysis of predominance under Rule 23(b)(3) and declining to address "the threshold requirements of Rule 23(a) or the Rule 23(b)(3) requirement of superiority" because plaintiffs' failure to establish predominance was "fatal" to class certification).

## II. Predominating Common Questions of Law or Fact

The predominance requirement of Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). The "core" of this requirement is "whether the defendant's liability to all plaintiffs may be established with common evidence." *Id.* "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question." *Id.*

Stated otherwise, the "predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotation omitted). Predominance can be found even if some issues, like damages, might need to be tried individually. *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 833 (8th Cir. 2016). Nonetheless, it is a "demanding" requirement that requires courts to "take a 'close look at whether common questions predominate over

individual ones.'" *Hudock*, 12 F.4th at 776 (quoting *Comcast Corp.*, 569 U.S. at 34)). Because this inquiry requires an examination of the underlying elements of each claim, predominance is analyzed on a claim-by-claim basis. *See In re Zurn*, 267 F.R.D. at 560 (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)). The predominance standard is satisfied only if those elements "can be proven on a systematic, class-wide basis." *Id.* (quoting *Blades*, 400 F.3d at 569).

### A. Fraud and Negligent Misrepresentation

Plaintiffs seek to bring two fraud claims on behalf of all subclasses: (1) fraud by concealment, nondisclosure, or omission; and (2) fraud by inducement or misrepresentation. Plaintiffs claim that "no farmer would have purchased the V300 if DeLaval had disclosed [or accurately represented] what it knew because the V300 is incapable of producing Grade 'A' milk." (Dkt. 448 at 59.)

Because there is no dispute[17] that reliance is an element of both fraud claims in all relevant jurisdictions, the Court will consider Missouri law in this context.[18] Here, the

[17] (*See* Dkt. 458 at 55–62; Dkt. 465 at 59–60.)

[18] With respect to the Missouri subclass, Defendants argue that Missouri law does not necessarily extend beyond the contract-based claims to apply to the tort claims. (Dkt. 465 at 55 ("Missouri law should not apply to the remaining claims for fraud, negligence, unjust enrichment, and strict liability, because the choice-of-law provision in DeLaval's purchase agreement is not broad enough to encompass any and all disputes related to the parties' relationship."); *see also id.* at 47.) The Court acknowledges that, as a general rule, "an individualized choice-of-law analysis must be applied to each plaintiff's claim in a class action." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1120 (8th Cir. 2005) (citing *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 822–23 (1985)). But, because reliance and causation are elements of Plaintiffs' fraud and unjust-enrichment claims in all potentially relevant jurisdictions, the Court concludes that there is "no actual conflict between state laws," and a choice-of-law analysis is not required at this point. *Gen. Star Indem. Co. v. Toy Quest*

reliance element requires that a purchaser relied on the concealment of the V300's inability to milk in compliance with the steps and standards set forth in the PMO or on the misrepresentation that it could. *See Borgschulte v. Bonnot*, 285 S.W.3d 345, 348 (Mo. Ct. App. 2009); *see White v. Bowman*, 304 S.W.3d 141, 149–50 (Mo. Ct. App. 2009) (noting that "[c]oncealment of a material fact can serve as a substitute for the elements of a false representation if there exists a duty to disclose"). But Plaintiffs do not show they can prove this element as to all proposed class members through common evidence. As the Eighth Circuit has explained, "fraud cases often are unsuitable for class treatment, because proof often varies among individuals concerning what representations were received, and the degree to which particular persons relied on the representations." *Hudock*, 12 F.4th at 776 (quoting *In re St. Jude Med., Inc.*, 522 F.3d 836, 838 (8th Cir. 2008)). That is the case here, where the record reflects that there are material differences in the information and representations that the named Plaintiffs were exposed to, as well as the sources of that information, which form the basis for their fraud claims.

For example, Mr. Roetcisoender of Green Acres Dairy attended a V300 event, at which he watched multiple unspecified videos of the V300 and spoke with a DeLaval employee, in addition to reviewing various "marketing materials and brochures." (Jason R. Feb. Dep. at 260, 265–68.) In contrast, Mr. Fry of Rocky Point Farms visited Fair Oaks

*Ltd.*, 170 F.4th 664, 669 (8th Cir. 2026); *see also Bacon v. Liberty Mut. Ins. Co.*, 688 F.3d 362, 366 (8th Cir. 2012) (concluding that no choice-of-law analysis was required where "no true conflict exist[ed]" in state laws). While the Court considers Missouri law in this context, the Court later notes where choice-of-law issues arise as to some other claims.

Farm, at which he witnessed the V300 "sometimes . . . miss[ing] teats" and had conversations with a DeLaval representative about his observations of the V300's abilities. (2025 Fry Dep. at 107.) And the Spokes of Northcrest Dairy attended yet another DeLaval sales conference and toured a different farm to watch the V300 in action. (Jeff Aug. 7 Dep. at 58.) Even among the named Plaintiffs alone, the record reflects wide farm-to-farm variability in the information and representations that were received prior to purchasing the V300. Such variability would become significantly more pronounced when all 127 putative class members' experiences are considered. Therefore, any trial would require farm-by-farm inquiries into each Plaintiff's sources of information about the V300's milking capabilities and the credibility of any farmer's denial that they relied on DeLaval's statements. *See St. Jude Med.*, 522 F.3d at 839; *cf. Parkhill v. Minn. Mut. Life Ins. Co.*, 188 F.R.D. 332, 343 (D. Minn. 1999) ("[I]f certification were granted the court would have to conduct thousands of individual inquiries into the content of each sales presentation, the expectations and questions asked by each policyholder, and the reliance placed by the policyholder on the representations made by defendant's agents.").

That is why *Custom Hair Designs by Sandy v. Central Payment Co., LLC*, which Plaintiffs rely on, is distinguishable. 984 F.3d 595 (8th Cir. 2020). In *Custom Hair*, unlike here, "all claims deal[t] with either a common scheme of fraud or a term common to all [relevant] contracts" based on a universal "failure to get bank preauthorization" and a "uniform" contract term. *Id.* at 601; *see also id.* (noting that "statements communicating changes to billing were nearly identical"). Here, by contrast, each plaintiff had different conversations with different DeLaval employees or independent dealers, and each was

exposed to different information about the V300 before signing different purchase agreements.

Moreover, the farm-to-farm variability evident in the experiences of the named Plaintiffs, who comprise a very small proportion of proposed class members, supports the conclusion that the details of the V300's milking capabilities were less important than other factors to some farmers. *See Hudock*, 12 F.4th at 777. For example, for Mr. Fry, "the main driver . . . [was] cost," as well as "animal care and quality." Farm Credit Horizon, *supra* n.9. Despite personally observing the V300 fail to perform consistently with some of DeLaval's representations about its capabilities, he purchased it anyway and later stated that the switch had increased efficiency, "resulted in happier, healthier cows," and otherwise improved his farm's operations. Faces of Maryland Farming, *supra* n.12; Country Folks, *supra* n.13. It is possible that Mr. Fry did not rely on the alleged omissions or misrepresentations in his purchasing decision at all. The same is true of Mr. Roetcisoender, who testified that "labor issues with milkers" are what prompted him to consider switching to robotic milking; in a video five months after Green Acres Dairy had begun using the V300, he reiterated that he chose the V300 because it addressed those labor issues. (Jason R. Dec. Dep. 85, 156–57; Green Acres Video 0:58–1:05.) He also highlighted the compatibility of the V300's indexing system with the types of cows in his herd and the ability to continue working with a local DeLaval dealership that he had a prior relationship with. (Green Acres Video at 1:08–1:30.) These parts of the record indicate that "[q]uestions of which . . . features [and benefits] . . . motivated individual consumers to purchase [the V300]" will be "the kind of 'plaintiff-by-plaintiff determinations' that [make]

certification inappropriate" under Eighth Circuit precedent. *See Hudock*, 12 F.4th at 777; *see also St. Jude*, 522 F.3d at 840. Where, as here, "[t]he named plaintiffs . . . admitted to divergent degrees of reliance upon the numerous promotional materials disseminated by the defendants which purportedly were the common element to most purchasers' claims," common questions do not predominate for purposes of Rule 23(b)(3). *Darms v. McCulloch Oil Corp.*, 720 F.2d 490, 493 (8th Cir. 1983). The Court agrees that DeLaval should have a full opportunity to present evidence that the alleged misrepresentations or omissions "w[ere] immaterial in some purchases, or to some consumers."[19] *Hudock*, 12 F.4th at 777. Contrary to Plaintiffs' claim, there is no commonsense inference of reliance that can be made on behalf of the entire class. (*See* Dkt. 448 at 59.) In sum, Plaintiffs have failed to meet their burden to establish the predominance of common issues with respect to their fraud claims.

This reasoning applies with equal force to Plaintiffs' claim for negligent misrepresentation, which also undisputedly requires reliance in all relevant jurisdictions.[20] *See, e.g.*, *Sanders v. Ins. Co. of North America*, 42 S.W.3d 1, 9 (Mo. Ct. App. 2000) (indicating that one element of negligent misrepresentation under Missouri law is that "the listener justifiably relied on the information" supplied by the speaker). Therefore, the same problems the Court identified with classwide treatment of reliance also pervade the

[19] Dkt. 465 at 63 ("DeLaval is entitled to present evidence rebutting the presumption of reliance for each putative class member[.]").

[20] *See* Dkt. 448 at 62 (agreeing that a negligent-misrepresentation claim includes an element of reliance); *see also* Dkt. 444.

predominance inquiry for Plaintiffs' negligent-misrepresentation claims. Accordingly, the Court concludes that common issues of fact do not predominate as to Plaintiffs' claims for negligent misrepresentation.

### B. Unjust Enrichment

The last claim that Plaintiffs seek to bring on behalf of all proposed subclasses is unjust enrichment. For this claim, they must show as to each purported class member that they conferred a benefit on DeLaval, DeLaval appreciated the benefit, and DeLaval accepted and retained the benefit under inequitable or unjust circumstances. *See Hargis v. JLB Corp.*, 357 S.W.3d 574, 586 (Mo. banc 2011).[21] The governing law sets a high bar for class treatment of unjust-enrichment claims, and the Court finds that Plaintiffs have not made the showing necessary to clear it.

Generally, "unjust-enrichment claims are . . . inappropriate for class treatment" because "[w]hether a particular transaction might be considered inequitable or unjust turns on the specific circumstances of each transaction, which . . . places individual inquiries front and center." *In re Folgers Coffee Mktg.*, 159 F.4th 1151,1158 (8th Cir. 2025). As noted in the Court's discussion of reliance, there remain significant and overwhelmingly individualized questions of whether purchasers reasonably relied on or were influenced by the alleged misrepresentations and omissions made by DeLaval. Therefore, litigation of the unjust-enrichment claim will also require individualized inquiries into whether a purchaser

---

[21] Plaintiffs identify similar elements of unjust enrichment in other jurisdictions. (*See* Dkt. 444.)

heard or saw the alleged fraudulent statements and whether they relied on them. Plaintiffs do not identify, nor can the Court discern, any reason why that general rule does not apply to the circumstances here. The Court concludes that none of the claims that are common to all subclasses are appropriate for class treatment. And because the multi-state subclass has no other claims, certification of that subclass is denied.

### C. Express and Implied Warranty Claims

Plaintiffs seek to bring claims for breach of express or implied warranty for the Missouri and Minnesota subclasses. In doing so, Plaintiffs argue, and Defendants do not dispute, that there is no meaningful difference between the laws of the two states, which have both adopted the Uniform Commercial Code and require a plaintiff to establish the following elements: "(1) the existence of a warranty, (2) breach, and (3) a causal link between the breach and the alleged harm." (Dkt. 448 at 56–57 (quoting *Cleveland v. Whirlpool Corp.*, 550 F. Supp. 3d 660, 668 (D. Minn. 2021), and citing *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 12 (Mo. banc 2010)).).

Like the other claims the Court has addressed, the warranty claims require resolution of numerous fact questions that turn on evidence individualized to each plaintiff, specifically as to causation. To establish DeLaval's liability, Plaintiffs will need to show that issues with milk production, milk quality, and cow health "exist[] on each [farm] as a result of" DeLaval's actions, and if so, whether those issues are "wholly, or actually, attributable to" DeLaval in each instance. *See Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 479 (8th Cir. 2016). But this will be a hotly contested issue, given that many farm-specific factors can impact milk production and quality and cow health. One such factor is

pre-existing issues with cow health that a farm had before purchasing the V300. For example, in the years leading up to its switch to the V300, Green Acres experienced increased SCCs that it attributed in part to labor issues. (Jason R. Dec. Dep. at 85, 156–57.) Other relevant factors include the characteristics of a herd (e.g., types of cows and their anatomy), the extent to which a farm complied with DeLaval's best practices, and farm management practices, ranging from stall layouts, types of bedding and feed, and adherence to sanitation procedures that, among other things, can affect water quality. (Reid Rpt. at 6–7.)

The detailed factual discussion above demonstrates that farm management practices and compliance with the best practices for use and maintenance of the V300 varied widely among each plaintiff farm, and presumably across all class members. As a result, there would need to be farm-by-farm assessments of "whether unique conditions and features" of each farm or the V300's alleged defects caused any claimed damages. *Ebert*, 823 F.3d at 479. The need to make such assessments for all 127 putative class members indicates that DeLaval's liability as to plaintiffs cannot be established with common evidence and will instead turn on "evidence that varies from member to member." *Avritt*, 615 F.3d at 1029. Because common questions do not predominate Plaintiffs' claims for breach of express and implied warranty, class treatment of those claims is denied.

### D. Strict Liability and Negligence

All that remains are Plaintiffs' claims for strict liability and negligence, which they seek to bring on behalf of the Missouri, Wisconsin, and Minnesota subclasses. There are at least three barriers to class treatment of these claims.

Once again there are choice-of-law issues that Plaintiffs downplay. For example, with respect to the strict-liability claim, Plaintiffs do not address Minnesota law at all. (*See* Dkt. 448 at 54–55 (discussing strict liability under Wisconsin and Missouri law).) The Court cannot resolve all of these state-law variations on the record before it but observes that they would require careful management for any subclass.

More critically, the issues with causation discussed above pervade Plaintiffs' strict liability and negligence claims as well. In each of the relevant states, causation is an element of both claims. *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 712 (Mo. Ct. App. 2020) ("Under both strict liability and negligence theories, the plaintiff is required to show a causal connection between the defendant's conduct and the plaintiff's injury." (quotation omitted)); *Mahner ex rel. Wendorff v. Rew Motors, Inc.*, 726 N.W.2d 356 (Table), at *5 n.9 (Wis. Ct. App. 2006) ("Causation is an element of both [strict] products liability and negligence."); *see Zimprich v. Stratford Homes, Inc.*, 453 N.W.2d 557, 560 ("This causal connection is sufficient to allow [plaintiffs'] claims of negligence and strict liability to proceed."). For the reasons discussed above, the element of causation would require extensive factfinding individualized to each class member about whether there exists a causal relationship between DeLaval's defective or negligent design of the V300 and a plaintiff's injury.

Moreover, the problem of individualized issues is exacerbated by the fact that the Missouri plaintiffs' claims for negligence based on product design cannot be decided without consideration of additional individual issues because, at least in Missouri, "the issue of [a] Defendant's negligence cannot be decided without reference to the class

members' comparative fault." *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 96 (W.D. Mo. 1997). In Missouri, "a jury decides the issues of relative fault and assesses appropriate percentages and since the apportionment of fault and damages is factual by nature, a jury should be as fully informed as possible in order to determine the relative fault of the parties." *Id.* (quoting *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 107 (Mo. banc 1996)) (brackets omitted). If the variation in the experiences of the named Plaintiffs is any indication, this will require presentation of significant evidence specific to each class member. Plaintiffs have not dispelled the Court's concern that proposed class members "will need to present evidence that varies from member to member" to make a prima facie case for their negligence claims. *Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 984–85 (8th Cir. 2021) (quoting *Tyson Foods*, 577 U.S. at 453).

**E. WDTPA**

For the Wisconsin subclass, Plaintiffs also seek to bring a claim for violation of the Wisconsin Deceptive Trade Practices Act, which makes it "unlawful . . . for any person seeking to sell merchandise to the public to make '*in this state* any assertion, representation or statement of fact which is untrue, deceptive or misleading.'" *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 790 (D. Minn. 2020) (emphasis added) (quoting Wis. Stat. § 100.18(1)) (cleaned up). To successfully to bring a WDTPA claim, a plaintiff must establish "three elements: (1) the defendant made a representation to one or more members of the public with the intent to induce an obligation; (2) the representation was untrue, deceptive or misleading; and (3) the representation materially induced a pecuniary loss to the plaintiff." *Hinrichs v. DOW Chem. Co.*, 937 N.W.2d 37, 56 (Wis. 2020).

Plaintiffs' WDTPA claim suffers from the same issue of requiring individualized fact inquiries related to reliance explored above. Plaintiffs claim that the nature of DeLaval's representations "is necessarily common to all Wisconsin subclass members" because "DeLaval launched the V300 . . . at a public event in Wisconsin." (Dkt. 448 at 71.) However, they have not alleged that every putative class member in the Wisconsin subclass attended the event or even that DeLaval made the challenged representations to each member in Wisconsin, as required by statute. At the least, as a preliminary matter, there would need to be individualized factfinding as to whether each plaintiff in the subclass was exposed to an assertion, representation, or statement of fact which is untrue, deceptive or misleading by DeLaval in the state. Because making "a prima facie showing [requires] the members of [the Wisconsin subclass] . . . to present evidence that varies from member to member," *Avritt*, 615 F.3d at 1029, individualized inquiries will predominate in assessing DeLaval's liability on Plaintiffs' WDTPA claims, making class certification inappropriate.

## III. Superiority (Practical Difficulties of Managing a Class Action and Interest in Individually Controlling the Prosecution of Separate Actions)

In addition to predominance, Rule 23(b)(3) provides that class certification is appropriate if "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The Court finds that a class action here is not the superior method. Although at first blush, it might appear to offer efficiency, that illusion breaks down on closer examination.

First and foremost, the Court's conclusion that all of Plaintiffs' claims, for one reason or another, are not suitable for class certification "ultimately unravels and undoes

any efficiencies gained by the class proceeding because many individual issues will require trial." *Ebert*, 823 F.3d at 479. Even if one or two claims could be managed on a classwide basis for one or two subclasses, no efficiency would be gained because every single plaintiff's case would also require an individual trial.

Second, "[t]he most compelling rationale for finding superiority in a class action," namely "whether the action is a negative value suit," is not applicable here. *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 210 (D. Minn. 2003) (citing *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996)). According to Plaintiffs, a single V300 costs about $175,514, and it can cost a farm up to $1.3 million to retrofit a barn to accommodate the robot. (Dkt. 448 at 42.) The potential value of each individual plaintiff's product-defect case is substantial. Nor is the Court persuaded by Plaintiffs' assertion that farms would be deterred from bringing their claims on an individual basis because they "still depend on the V300 (and DeLaval) to operate their farms[.]" (*Id.* at 50.) The fact that DeLaval has already settled claims with some farms who continue to operate their V300 robots undermines this argument. (Dkt. 465 at 84.)

* * *

In sum, class certification is not appropriate under the circumstances, and Plaintiff's Motion is denied.

## IV. Issue Certification Under Rule 23(c)(4)

Plaintiffs dedicate the final page of their Motion to request issue certification as an alternative to class certification. (Dkt. 448 at 14, 82.) Rule 23(c)(4) of the Federal Rules of Civil Procedure provides that "[w]hen appropriate, an action may be brought or maintained

as a class action with respect to particular issues." With hardly any analysis, Plaintiffs ask the Court to certify the following issues to "be tried [by] a single jury":

> is the V300 defective; did DeLaval know that it was defective (and when); did DeLaval conceal material facts about the V300 from purchasers; were DeLaval's representations false; did the V300 actually automate the task of milking a cow; did DeLaval breach its duty of care; was the V300 unreasonably dangerous; did DeLaval breach its warranties; was DeLaval's conduct intentional, reckless, or negligent[.]

(Dkt. 448 at 82.) But these issues are essentially the entire case, and many suffer from the same farm-specific challenges discussed above. To the extent that any of these issues have not been addressed by the Court's above discussion, it is not clear to the Court how issue certification would "substantially facilitate[] the resolution of the . . . dispute, preserve[] the parties' procedural and substantive rights and responsibilities, and respect[] the constitutional and statutory rights of all class members and defendants." (*Id.* (quoting *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 270–71 (3d Cir. 2021)) (cleaned up).) This is particularly true where some of these issues would resolve claims brought only by some of the proposed subclasses. Therefore, Court concludes that Plaintiffs have not identified any issues that should be certified under Rule 23(c)(4) and declines to certify any particular issues.

## V. Defendants' Objection to Recommended Sanction

One final matter requires a brief discussion. In their opposition to the motion for class certification, Defendants argued that a class action is not the superior method of adjudication because 74 of the 127 farms that are potential class members are subject to arbitration clauses and class-action waivers that Defendants would seek to enforce if a class

were certified. Defendants assert that those farms are presumptively excluded from any class and, if Plaintiffs challenge the enforceability of these agreements, the Court will have to examine individualized issues under the applicable body of contract law for each such farm. (Dkt. 465 at 86–89.)

The parties engaged in protracted litigation around Plaintiffs' efforts to obtain information relating to these agreements and how Defendants or their dealers presented the terms to the farmers. This required Plaintiffs to move to compel discovery of requested information, resulted in several hearings before United States Magistrate Judge Shannon G. Elkins, and led Plaintiffs to seek sanctions for Defendants' delays in providing the requested information. On July 31, 2026, Judge Elkins granted Plaintiffs' motion for sanctions, finding that Defendants had disobeyed prior discovery orders. (Dkt. 605.) In relevant part, Judge Elkins recommended that this Court "issue an Order, pursuant to Fed. R. Civ. P. 37(b)(2)(A)(ii) and its inherent powers," precluding Defendants "from relying on arbitration clauses and class action waivers to oppose class certification."[22] (*Id.* at 20.)

Defendants objected to Judge Elkins's recommendation, arguing that the delays in production of the requested information were due to "honest mistakes that were ultimately rectified" and "this sanction was neither warranted nor appropriate, particularly where it

[22] Given the context in which the dispute arose and the specific wording of Judge Elkins's recommended sanction, the Court understands the recommendation to be that Defendants may not offer evidence of these agreements in opposition to class certification, but not that they be prevented from relying upon them for other purposes.

was recommended in addition to a significant order of fees and expenses."[23] *See* Fed. R. Civ. P. 72(b)(2). In denying Plaintiffs' motion for class certification, this Court has neither agreed with, nor rejected Defendants' argument that the existence of the arbitration agreements and class-action waivers makes certification improper. The Court neither reiles nor considers these agreements in any way. As a result, the Court finds it unnecessary to resolve whether the recommended sanction under Rule 37(b)(2)(A)(ii) was appropriate. Accordingly, the Court declines to consider Defendants' objection to the recommended sanction of exclusion as moot and overrules Defendants' objections.

**ORDER**

For the foregoing reasons, **IT IS HEREBY ORDERED THAT**:

1. Plaintiffs' Motion for Class Certification (Dkt. 442) is **DENIED**.
2. The Court declines to accept the recommendation that Defendants be sanctioned pursuant to Fed. R. Civ. P. 37(b)(2)(A)(ii) (Dkt. 605 at 20), and DeLaval's Objection to Magistrate Judge's Recommendation on Plaintiffs' Motion for Sanctions (Dkt. 614) is **OVERRULED**.

Date: August 18, 2026

*s/Katherine M. Menendez*
Katherine M. Menendez
United States District Judge

[23] The Court notes that "DeLaval accepts that an award of reasonable fees and expenses is appropriate, but objects to the amount Plaintiffs are seeking. DeLaval's position on the amount that should be awarded is set forth in its Opposition to Plaintiff's Fee Petition[.]" (Dkt. 614 at 1 n.1.) The reasonableness of Plaintiffs' fee petition is a question for another day.